UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ALPHEAUS DAILEY, JR.,

                                    Plaintiff,
            v.
                                                        9:15-cv-01051
                                                        (BKS/TWD)

JOSHUA FULLER, MS. IRIVING,

                                    Defendants.
_____

APPEARANCES:                                OF COUNSEL:

ALPHEAUS DAILEY, JR.
*also known as* Alphaeus Daily, Jr.
13-B-1253
Plaintiff, *pro se*
Franklin Correctional Facility
P.O. Box 10
Malone, NY 12953

ROBERT A. DURR, ESQ.                        CAROL L. RHINEHART, ESQ.
ONONDAGA COUNTY ATTORNEY                     Deputy County Attorney
Counsel for Defendants
Onondaga County Department of Law
John H. Mulroy Civic Center
421 Montgomery St., 12th Floor
Syracuse, NY 13202

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**ORDER AND REPORT AND RECOMMENDATION**

I.      **INTRODUCTION**

        Presently before the Court is Defendants' motion for summary judgment pursuant to Rule

56 of the Federal Rules of Civil Procedure.  (Dkt. No. 16.)  The motion has been referred to me

for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Northern District of New

York Local Rule ("L.R.") 72.3(c) by the Honorable Brenda K. Sannes, United States District Judge.

*Pro se* Plaintiff Alpheaus Dailey, Jr., is an inmate in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), and is currently housed at the Franklin Correctional Facility ("Franklin"). (*See* Text Entry 11/04/2016.[1]) Plaintiff commenced this civil rights action pursuant to pursuant to 42 U.S.C. § 1983 on September 27, 2015. (Dkt. No. 1.) The allegations in Plaintiff's complaint relate to Plaintiff's previous confinement at the Onondaga County Justice Center in 2012. *Id.* at 4-5.[2]

Plaintiff's claim for medical indifference against Deputy Joshua Fuller ("Fuller") and Deputy Ms. Iriving[3] ("Irving") survived initial review pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). (Dkt. No. 4 at 8.[4]) Defendants have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that: (1) Plaintiff has failed to exhaust his administrative remedies; and (2) Defendants are entitled to judgment as a matter of law. (Dkt. No. 16-11 at 4-11.) Plaintiff has not opposed the motion or sought

---

[1] It appears DOCCS has inadvertently transposed two letters of Plaintiff's first name. (*See* Dkt. No. 1.)

[2] Page references to documents identified by docket number are to the page number assigned by the Court's CM/ECF electronic docketing system.

[3] Although Plaintiff names Deputy Ms. Iriving as a Defendant, her surname is correctly spelled "Irving." (*See* Dkt. Nos. 7 and 8.) The Court will use the correct spelling of Defendant's surname name throughout the Report and Recommendation.

[4] The Court *sua sponte* dismissed Plaintiff's "failure to protect" claim and all claims against Sheriff Kevin Walsh and Chief Administrative Officer Esteben for failure to state a claim upon which relief could be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). (Dkt. No. 4 at 5-8.)

additional time within which to do so. For the reasons explained below, the Court recommends granting Defendants' motion for summary judgment and dismissing the complaint in its entirety.

## II.    FACTUAL BACKGROUND

In his verified complaint, Plaintiff claims that on or about September 12, 2012, a seven-inch bolt fell from the gymnasium ceiling at the Onondaga County Justice Center, striking him on the head. (Dkt. No. 1 at 4.[5]) Plaintiff was knocked unconscious. *Id.* While Plaintiff was unconscious "for a few seconds," witnesses explained to Fuller and Irving, the supervising deputies, what had happened to Plaintiff. *Id.* Thereafter, Fuller and Irving questioned Plaintiff about the incident and Plaintiff explained what had happened to the best of his abilities. *Id.*

Fuller and Irving then "inform[ed]" Plaintiff to return to his cell. *Id.* at 4-5. Plaintiff "was place[d] on bed rest, the next day to await medical attention, which left [Plaintiff] without medical attention for a whole 24 hours while [he] sat in pain." *Id.* at 5. After the incident, Plaintiff had a continuous headache, blurred vison, weakness, and was vomiting in his cell. *Id.* Because Plaintiff kept complaining, Plaintiff was finally seen by a nurse at one o'clock in the morning, and was told he had a concussion. *Id.*[6]

Plaintiff alleges Defendants were deliberately indifferent to his serious medical needs. *Id.* at 4-6. More specifically, Plaintiff claims that Fuller did not "pull or push [the] emergency button when [the] injury took place" and Irving "did not call emergency medical attention which lead [sic] to [Plaintiff] having continuous pain and vomiting all nite [sic]." *Id.* at 4-5.

---

[5]  Plaintiff's complaint is properly verified under 28 U.S.C. § 1746. (*See* Dkt. No. 1 at 8.) *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

[6]  Although not entirely clear from the complaint, it appears Plaintiff alleges the incident occurred around 6:00 p.m. (*See* Dkt. No. 1 at 4).

According to Defendants, on September 15, 2012, at approximately 5:25 p.m., while Fuller was supervising Unit 3A, Plaintiff approached the Deputy's Station holding a bolt and washer in one hand, while rubbing his head with his other hand. (Dkt. No. 16-7 at ¶ 9.)

Plaintiff informed Fuller that while he was in the recreation yard playing basketball, the bolt fell from the basketball hoop, striking him on the head. *Id.* at ¶¶ 7-10. Plaintiff told Fuller his head hurt and asked to see the nurse. *Id.* at ¶ 12. Fuller did not observe an open would or any blood coming from Plaintiff's head. *Id.* Fuller contacted the medical unit, speaking to Julianne Seaton ("Nurse Seaton"). *Id.* at ¶ 13. Nurse Seaton advised she would come to the pod to assess Plaintiff. *Id.*

Seven minutes later, at 5:32 p.m., Nurse Seaton arrived to evaluate Plaintiff. *Id.* at ¶ 15. Nurse Seaton provided Plaintiff with an ice pack and determined no further medical attention was required. *Id.* According to Fuller, Plaintiff appeared satisfied after receiving the ice pack from Nurse Seaton. *Id.* Pursuant to customary practice, Fuller documented Nurse Seaton's presence on the unit in the facility's log book, and generated an Incident Report documenting Plaintiff's incident. *Id.*[7]

When Irving returned from her evening meal break to resume supervising Unit 3A, Fuller briefed Irving on the incident involving Plaintiff. (Dkt. No. 16-10 at ¶ 11.) Specifically, Fuller told Irving that Plaintiff stated a bolt fell from a piece of wood that was holding the basketball hoop to the wall in the large recreation yard and that Plaintiff said the bolt struck him on the

---

[7] In addition, Fuller went to the recreation yard and observed that a bolt was missing from the piece of wood that holds the basketball hoop to the wall. (Dkt. No. 16-7 at ¶ 14.) Fuller gave the bolt and washer, along with the Incident Report to his supervisor, Lieutenant Raus. *Id.* at ¶ 17. Fuller also forwarded a maintenance request through the computer system for repair of the basketball hoop. *Id.*

head.  *Id*.  Fuller informed Irving that a nurse evaluated Plaintiff, and that Plaintiff was given an ice pack and did not require further medical attention.  *Id*. at ¶ 12.

Thereafter, sometime around 6:00 p.m., while Irving was touring the pod, Plaintiff told Irving that his head hurt.  *Id*. at ¶ 13.  Irving called the medical unit and spoke to Nurse Seaton.  *Id*.  Irving informed Nurse Seaton that Plaintiff was complaining his head hurt.  *Id*.  Nurse Seaton told Irving she would notify a doctor.  *Id*.  Irving documented this information in the facility's log book.  *Id*.  Approximately ten minutes later, Nurse Seaton called Irving and stated that she had contacted the doctor and Plaintiff would be reevaluated by medical staff and given pain medication later that evening during the routine medicine pass.  *Id*. at ¶ 14.[8]  Irving relayed this information to Plaintiff.  *Id*. at ¶ 15.  According to Irving, Plaintiff seemed irritated.  *Id*.

Around 7:00 p.m., Irving observed Plaintiff lying on his bunk rocking his foot up and down.  *Id*. at ¶ 16.  Irving documented this information in the facility's log book.  *Id*.  Approximately ten minutes later, Plaintiff approached Irving at the Deputy's Station, stating his head and face hurt and that his face felt numb.  *Id*. at ¶ 17.  Irving called the medical unit and spoke to Nurse Seaton again.  *Id*.  Nurse Seaton stated she would examine Plaintiff.  *Id*.

At approximately 7:19 p.m., Plaintiff was reexamined by Nurse Seaton.  *Id*. at ¶ 18.  Nurse Seaton provided Plaintiff with two more ice packs and indicated that no further medical attention was necessary.  *Id*.  Irving documented Nurse Seaton's presence in the facility's log book.  *Id*.  At 8:25 p.m., nursing staff entered Unit 3A to distribute medication.  *Id*. at ¶ 19.

---

[8]  Typically nursing staff arrives on the unit sometime between 8:00 p.m. and 9:00 p.m. to distribute medication to those inmates who had doctor's orders to receive medication.  (Dkt. No. 16-10 at ¶ 14.)

Irving declares the nurse was present on the unit for approximately twenty-five minutes, and Plaintiff received pain medication from the nurse during the medication pass. *Id.*

At 9:20 p.m., Fuller returned to supervise Unit 3A, relieving Irving for a ten minute break. (Dkt. No. 16-7 at ¶ 20.) Fuller does not recall having a conversation with Plaintiff during this time, nor does Fuller recall Plaintiff issuing any complaints during this time. *Id.* At 9:30 p.m., Irving returned from her break. *Id.* at ¶ 21. Fuller declares he did not return to Unit 3A the remainder of his shift, which ended at 11:00 p.m., and does not recall having any further interaction with Plaintiff in the days that followed. *Id.* Fuller also declares he has no knowledge of Plaintiff losing consciousness after the incident or vomiting in his cell. (Dkt. No. 16-7 at ¶ 22.) Neither Plaintiff, nor any other inmate, informed Fuller that Plaintiff had lost consciousness. *Id.* at 23. Fuller states Plaintiff never told him that his vision was blurry, he was weak, or had vomited. *Id.*

At approximately 10:32 p.m., Nurse Seaton returned to Unit 3A to examine Plaintiff. *Id.* (Dkt. No. 16-10 at ¶ 21.) At 10:55 p.m., Deputy Peck arrived at Unit 3A to assume responsibility of supervising the inmates for the next shift. *Id.* at ¶ 23. Irving briefed Deputy Peck on the activities and the status of the inmates, including Plaintiff's incident. *Id.* at ¶ 23. At 11:00 p.m., Irving completed her shift, and she had no further contact or involvement with Plaintiff. *Id.* at ¶ 24.

Irving declares that during her shift, she conducted tours of the unit every thirty minutes, and did not observe Plaintiff vomiting at any time in his cell, nor did Plaintiff report that he had vomited. *Id.* at ¶ 22. Irving further states that had she been aware that Plaintiff had vomited, she would have reported this information to the medical unit and would have documented the incident in the facility's log book. *Id.*

## III.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to be treated as an affidavit.  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). Indeed, "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *see also Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[9] "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Woods*, 2006 WL 1133247, at *3 & n.11.

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is

---

[9] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

proceeding *pro se*, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When a party fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are undisputed in the record; and (2) assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the moving party. *See id.*; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001); L.R. 7.1(b)(3).

## IV.     PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Here, Plaintiff has failed to respond to Defendants' Statement of Material Facts (Dkt. No. 16-5) as required under L.R.(a)(3).[10] Where a party has failed to respond to the movant's

---

[10]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[11] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[12]  *See Artuz*, 76 F.3d at 486.  As set forth above, "[a] verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist[.]"  *Colon*, 58 F.3d at 872 (2d Cir. 1995) (internal citations omitted); *see also Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (same).  Accordingly, the facts set forth in Defendants' Rule 7.1 Statement of Material Facts (Dkt. No. 16-15) are accepted as true as to those facts that are not disputed in Plaintiff's verified complaint.  *See Rosario v. Anson*, No. 9:12-cv-1506 (BKS/CFH), 2015 WL 5692550, at *4 (N.D.N.Y. Sept. 28, 2015).

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).  However, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements

---

[11]  L.R. 7.1(a)(3) provides that "<u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.</u>" *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[12]  The Court notified Plaintiff of the response deadline.  (Dkt. No. 18.)  Defendants provided Plaintiff with notice of the consequences of failing to response.  (Dkt. No. 16 at 3.)

regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record in this case.

## V.      ANALYSIS

### A.      Exhaustion of Administrative Remedies

#### 1.      Legal Standard for Exhaustion

Under the Prison Litigation Reform Act of 1996 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).

According to Mark Casselmon ("Casselmon"), a Sergeant employed with the Onondaga County Sheriff's Office, the Onondaga County Justice Center has a written policy for handling inmate complaints and grievances, which is set forth in Directive CUS-007 entitled "Inmate

Grievances." (Dkt. No. 16-11 at ¶¶1, 4.[13]) Every inmate entering the Onondaga County Justice Center receives an inmate handbook which sets forth the procedure for filing an inmate grievance. *Id*. at ¶ 5.[14]

First, prior to filing a written grievance, an inmate must attempt to resolve his compliant with the housing pod deputy. *Id*. In the event that the housing pod deputy cannot resolve the complaint, the inmate may fill out a grievance form. *Id*. The deputy with whom the inmate addressed is required to fill out a portion of the grievance form. *Id*. The deputy will then notify a sergeant of the inmate's grievance. *Id*.

The sergeant will then attempt to resolve the inmate's complaint. *Id*. In the event that the sergeant is unable to resolve the complaint, the sergeant must fill out a portion of the grievance form, and then submit the grievance to a lieutenant for review. *Id*. If the lieutenant cannot resolve the complaint, the grievance form will be forwarded to the Grievance Coordinator. *Id*.

The Grievance Coordinator must either meet with the inmate or respond in writing within five business days of receipt of an inmate's grievance. *Id*. An inmate who is not satisfied with the Grievance Coordinator's response may appeal to the Chief Custody Deputy in writing. *Id*. That appeal must be made within two business days of receiving the Grievance Coordinator's response. *Id*. The Chief Custody Deputy must respond to the inmate's appeal within five business days of receiving the appeal. *Id*. Finally, if the inmate is not satisfied with the Chief

---

[13]  Directive CUS-007 complies with the minimum standards established by the New York State Commission of Correction. (Dkt. No. 16-11 at ¶ 4.) A copy is attached to Casselmon's affidavit as Exhibit A. (Dkt. No. 16-12.)

[14]  A copy of the Onondaga County Justice Center Handbook is attached to Casselmon's Affidavit as Exhibit B. (Dkt. No. 16-13.)

Custody Deputy's decision, within three days of receipt of the unsatisfactory decision, the inmate may appeal to the New York State Commission of Correction. *Id.*

If a prisoner has failed to properly follow each of the applicable steps, he has failed to exhaust his administrative remedies and is barred from commencing a federal lawsuit. *See Woodford*, 548 *U.S.* at 93 (holding the PLRA requires "proper exhaustion" – "using all steps that the agency holds out, and doing so properly that the agency addressed the issues on the merits").

Because failure to exhaust is an affirmative defense, the defendant bears the burden of showing by a preponderance of the evidence that the plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4 (N.D.N.Y. Mar. 31, 2010); *Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

A prisoner's failure to exhaust may nonetheless be excused if administrative remedies were unavailable to him. As the Supreme Court recently clarified, "[a]n inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1858 (2016). To guide courts in this analysis, the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of relief." *Id.* at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through

13

machination, misrepresentation, or intimidation." *Id.* at 1860. Whether a plaintiff has exhausted his administrative remedies is a question of law to be decided by the court as a matter of law. *See Snider v. Melindez*, 199 F.3d 108, 113-14 (2d Cir. 1999).

2. Exhaustion Analysis

Plaintiff alleges that on or about September 15, 2012, while confined at the Onondaga County Justice Center, he was struck on the head by a large bolt that fell from the basketball hoop in the recreation yard of Pod 3A. (Dkt. No. 1 at 4-5.) Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs in violation of his constitutional rights. *Id.* More specifically, Plaintiff alleges Fuller failed to "pull or push [the] emergency button when [the] injury took place" and Irving "did not call emergency medical attention," which resulted in Plaintiff having continuous pain and vomiting throughout the night. *Id.* at 5. Plaintiff claims he was denied medical attention for "a whole 24 hours while [he] sat in pain." *Id.* According to Plaintiff, he was not seen by a nurse until one o'clock in the morning. *Id.* At that time, he was informed he had a concussion. *Id.*

Defendants argue Plaintiff failed to exhaust his administrative remedies regarding his medical indifference claim. (Dkt. No 16-15 at ¶ 28; Dkt. No. 16-16 at 6-7.) The Court agrees.

In support of their motion for summary judgment, Defendants submit the affidavit of Casselmon, who served as the Compliance Supervisor at the Onondaga County Justice Center from 2012 to 2014. (Dkt. No. 16-11 at ¶ 2.) In that capacity, Casselmon also served as the Grievance Coordinator and was responsible for ensuring that all written complaints filed by inmates were properly investigated and that all policies and procedures were followed at the Onondaga County Justice Center. *Id.* at ¶ 3. As the Grievance Coordinator, Casselmon maintained a Grievance Log for all submitted inmate grievances. *Id.* at ¶ 13.

According to Casselmon, Plaintiff was an inmate at the Onondaga County Justice Center on eight separate occasions between 2006 and 2013, including the period from August 17, 2012, through April 29, 2013. *Id.* at ¶ 14. Casselmon reviewed the Grievance Log for the relevant time period, which indicated Plaintiff filed one grievance (Number 12-349) dated September 18, 2012. *Id.* at ¶¶ 15-16. Plaintiff's grievance states in full:

> **Brief Description of the Grievance**: "This grievance for lack of
> maintance of this Onondaga County Sheriff Building. Recently a
> big screw (drop off) come from ceiling and hit my head. Now I
> have problems."
> **Action Requested**: "Check gym make sure nothing else is broken
> so, no one else gets hurt. Thank you."

(Dkt. No. 16-14 at 2.)

Plaintiff's grievance was submitted to a deputy, sergeant, and watch commander. (*See* Dkt. No. 16-14 at 2.) Eventually it was received by the Grievance Coordinator. *Id.* at 3. On September 26, 2012, Casselmon accepted Plaintiff's grievance. *Id.* In so doing, Casselmon verified with the deputy about the missing screw (bolt), and confirmed that the recreational yard was checked before each shift. *Id.* Casselmon also placed a work order request to have maintenance check the basketball backboard in pod 3A. *Id.* Casselmon avers Plaintiff was satisfied with his response. (Dkt. No. 16-11 at ¶ 17.)

In this case, there is no record of Plaintiff filing an Inmate Grievance Form regarding a denial of medical care at the Onondaga County Justice Center. (Dkt. No. 16-11 at ¶ 18.) Although it is appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally. *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006). Consistent with this purpose, a prisoner must allege facts sufficient to alert corrections officials

"to the nature of the claim," and "provide enough information about the conduct" at issue "to allow prison officials to take appropriate responsive measures." *Singh v. Lynch*, 460 F. App'x 45, 47 (2d Cir. 2012) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)).

As set forth above, Plaintiff's sole grievance makes no mention of delayed or inadequate medical care. (*See* Dkt. No. 16-14 at 2-3.) Plaintiff's failure to describe *any* problem in his grievance concerning the lack of medical treatment after the incident did not give the facility enough information to investigate the allegations against Fuller and Irving. Because Plaintiff's grievance contains no mention of inadequate or delayed medical care after the incident, the Court finds Plaintiff's claim for medical indifference has not been exhausted.

Even if Plaintiff's Inmate Grievance could be liberally construed as filing a grievance for medical indifference against Fuller and Irving, Casselmon avers Plaintiff was satisfied with his response. (Dkt. No. 16-11 at ¶ 17.) Had Plaintiff been unsatisfied with the Grievance Coordinator's response, in order to fully exhaust his administrative remedies, Plaintiff was required to submit an appeal to the Chief Custody Deputy in writing within two days of receipt of Casselmon's Response. *See id.* at ¶ 11. Moreover, had Plaintiff had been unsatisfied with the Chief Custody Deputy's response, Plaintiff was required to appeal to the New York State Commission of Correction. *Id.* Here, Plaintiff did not appeal to the Chief Custody Deputy. (*See* Dkt. No. 16-14 at 3.) Thus, in the alternative, Plaintiff's grievance for medical indifference was not properly exhausted before commencing this action. *See Woodford*, 548 U.S. at 90 (holding the PLRA requires "proper exhaustion" – "using all steps that the agency holds out, and doing so properly that the agency addressed the issues on the merits").

In light of the above, the Court finds Defendants have "adequately supported the affirmative defense of failure to exhaust." *See, e.g.*, *Bennett v. Onua*, No. 09-cv-7227 (SAS),

16

2010 WL 2159199, at *3 (S.D.N.Y. May 26, 2010) (finding that defendants discharged their initial burden on summary judgment by producing affidavits that a search of prison records indicated that no grievances were ever filed). Furthermore, there is no evidence that administrative remedies were unavailable to Plaintiff. It is undisputed there was a grievance program in place at the Onondaga County Justice Center, which was set forth in the inmate handbook. (Dkt. No. 16-15 at ¶ 25.) There is no evidence that the grievance procedure operated as a "simple dead end" or that it was "so opaque" it was incapable of use. To the contrary, Plaintiff utilized the administrative procedure to file a grievance concerning the lack of maintenance at the facility, which was addressed to Plaintiff's apparent satisfaction. (Dkt. No. 16-14 at 2-3.) Lastly, the record is devoid of evidence that Defendants "thwarted" Plaintiff "from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *See Ross*, 136 S. Ct. at 1860. Thus, Plaintiff's medical indifference claim against Fuller and Irving has not been exhausted.

Based upon the foregoing, the Court recommends granting Defendants' motion for summary judgment for failure to exhaust available administrative remedies.

### B.      Deliberate Indifference to Medical Needs

Even if Plaintiff had properly exhausted his medical indifference claim, the Court would still recommend summary judgment for Defendants on the merits. Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).[15] Prison officials must ensure, among other

---

[15] Upon initial review, the Court explained that it is unclear whether Plaintiff was a pretrial detainee or was serving a sentence at the time of the events alleged in the complaint. (Dkt. No. 4

things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 526- 27 (1984)). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition, and (2) deliberate indifference. *Farmer*, 511 U.S. at 834-35; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

Although medical deliberate indifference claims are most often asserted against medical personnel, non-medical personnel may also be held liable for deliberate indifference to medical needs where a plaintiff proves that "prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel." *Hodge v. Coughlin*, No. 92 Civ. 0622(LAP), 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994) (citations and internal quotation marks omitted), *aff'd*, 52 F.3d 310 (2d Cir. 1995) (table); *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) (same); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (noting that deliberate indifference may be manifested when prison guards intentionally deny or delay access to medical care).

Here, Defendants contend Plaintiff cannot demonstrate they were deliberately indifferent to Plaintiff's serious medical condition. (Dkt. No. 16-16 at 7-11.) The Court agrees.

Plaintiff claims Defendants showed deliberate indifference to his serious medical needs by failing to "pull or push" the emergency button when the injury took place, and failing to "call

---

at 8 n.6) ("If Plaintiff was confined a the Onondaga County Justice Center as a pretrial detainee, he "received[d] protection against mistreatment at the hands of prison officials under . . . the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment.") (quoting *Caiozzo v. Koreman*, 581 F.3d 63, (2d Cir. 2009)). Neither the Supreme Court nor the Second Circuit has yet addressed the possible implications of *Kingsley v. Hendrickson*, __ U.S. __, 135 S. Ct. 2466, 2470 (2015) for deliberate indifference medical claims brought by pretrial detainees. District Courts in this Circuit which have addressed this issue have concluded that the Eighth Amendment standards apply. (Dkt. No. 4 at 8 n.6 (collecting cases)). As a result, the Court will follow existing Second Circuit precedent and analyze Plaintiff's deliberate indifference medical claim under both a subjective and objective standard.

emergency medical attention," causing Plaintiff to have "continuous pain and vomiting" all night. (Dkt. No. 1 at 4-5.) However, the record belies Plaintiff's claims.

The record evidence demonstrates that on September 15, 2012, at approximately 5:25 p.m., Plaintiff approached the Deputy's Station in Unit 3A informing Fuller that a large bolt fell out of the basketball hoop in the recreation yard striking him on the head. (Dkt. No. 16-15 at ¶¶ 9-10; Dkt. No. 16-9 at 2.) Plaintiff was holding a bolt and washer in one hand and rubbing his head with the other hand. (Dkt. No. 16-15 at 9.) Plaintiff asked to see a nurse; Fuller called the medical unit. (Dkt. No. 16-9 at 2; Dkt. No. 16-15 at ¶ 11.)

Nurse Seaton arrived at Plaintiff's housing unit at 5:32 p.m., approximately seven minutes after Fuller placed the call to the medical unit to assess Plaintiff's injury. (Dkt. No. 16-15 at ¶ 12.) Upon examination, Nurse Seaton found that Plaintiff had no change in mood/affect, he was alert and orientated, his pupils were equal and reactive to light, and his grips and gait were normal. *Id*. at ¶ 13. Nurse Seaton provided Plaintiff with an ice pack and informed Fuller that no further medical attention was necessary. *Id*. at ¶¶ 13-14. Fuller had no further interaction with Plaintiff concerning his medical needs. (Dkt. No. 16-6 at ¶¶ 19-21.)

The record establishes that Irving contacted the medical unit on two occasions after Plaintiff reported head pain and discomfort, which resulted in the issuance of two more ice packs, pain medication, and neurological checks of Plaintiff every four hours. (*See* Dkt. No. 16-15 at ¶¶ 16-23; Dkt. No. 17 at 37, 101-102; Dkt. No. 16-8 at 4-6.[16]) Specifically, around 6:00

---

[16] In fact, the record evidence demonstrates every time Plaintiff had a documented health issue, he received medical care while at Onondaga County Justice Center. (*See generally* Dkt. No. 17.) Plaintiff's medical records from September 16, 2012, through April 2013, show Plaintiff used sick call effectively, and received care when requested. (*See* Dkt. No. 17 at 17-23-51). Further, a CT scan of Plaintiff's head on November 6, 2012, revealed no fracture or intracranial hemorrhage. *Id*. at 66. Plaintiff also received eye glasses. *Id*. at 56-57.

p.m., Plaintiff complained to Irving that his head hurt and Irving called the medical unit. (Dkt. No. 16-15 at ¶ 16.) Nurse Seaton indicated that she would contact the doctor. *Id*. Nurse Seaton informed Irving that she contacted Dr. Carlisle and received orders for Motrin and instruction to conduct neurological checks of Plaintiff every four hours. *Id*. at ¶ 18. At approximately, 6:25 p.m., Nurse Seaton told Irving that Plaintiff would be reassessed and provided with pain medication a little later in the evening. *Id*. Irving relayed this information to Plaintiff. *Id*.

About thirty minutes later, around 7:00 p.m., Plaintiff approached Irving at the Deputy's Station stating that his head and face hurt and that his face was numb. *Id*. at ¶ 19. Irving again contacted the medical unit and Nurse Seaton arrived at approximately 7:19 p.m., to reevaluate Plaintiff. *Id*. at ¶ 20. Nurse Seaton provided Plaintiff with two more ice packs and indicated that no further medical attention was needed. *Id*. at ¶ 21. Plaintiff received pain medication sometime between 8:25 p.m. and 9:00 p.m. *Id*. at ¶ 22. At approximately 10:30 p.m., nursing staff conducted a neurological check of Plaintiff. *Id*. at ¶ 23. At 11:00 p.m., both Fuller and Irving ended their shifts and had no further contact with Plaintiff. *Id*. at 24.

Based on the foregoing, Defendants did not withhold medical care from Plaintiff or delay treatment of his serious medical condition. Every time Plaintiff complained of pain, Defendants appropriately responded to Plaintiff's complaints, and Plaintiff received treatment from medical personnel. As custody deputies, Fuller and Irving were entitled to rely on the opinions of the medical staff. *See Rosario*, 2015 WL 5692550, at *12 (supervisory official entitled to rely on the opinions of medical staff concerning the proper course of treatment) (citing *Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 183 (N.D.N.Y. 1996) (collecting cases)).

Thus, Plaintiff's claim that despite informing Fuller and Irving of his serious medical condition, Plaintiff was "left . . . without medical attention for a whole 24 hours while [he] sat in

pain," and that he did not see a nurse until one o'clock in the morning, is wholly contradicted by

the record, and is insufficient to create a material issue of fact. *See, e.g.*, *Warren v. Corcoran*,

No. 9:09-CV-1146 (DHN/ATB), 2011 WL 5599587, at *6 n.12 (N.D.N.Y. Oct. 20, 2011)

("Plaintiff's conclusory claims to the contrary, which are flatly contradicted by medical records

documenting the care he received, are insufficient to create a material issue of fact with respect

to his claims of deliberate indifference."); *Brown v. White*, 9:08-CV-200 (GLS/ATB), 2010 WL

985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse

completely refused to provide any medical attention on a particular date is insufficient to create a

dispute of fact in the face of the sworn declaration and supporting documentary evidence in the

record); *Benitez v. Pecenco*, 92 Civ. 7670 (DC), 1995 WL 444352, at *3 n.5, (S.D.N.Y. July 27,

1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by

medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v.*

*Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are

insufficient to withstand a motion for summary judgment once the moving party has set forth a

documentary case")).

In light of the above, no issue of fact exists as to whether Defendants were deliberately

indifferent to Plaintiff's serious medical needs. *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435,

451 (2d Cir. 1999) (affidavits based on conclusory allegations insufficient at summary

judgment). Accordingly, the Court also recommends granting summary judgment for

Defendants on the merits.

## VI.  FAILURE TO PROSECUTE

Lastly, the Court notes that this action could also be dismissed pursuant to Rule 41(b) of

the Federal Rules of Civil Procedure. Rule 41(b) of the Federal Rules of Civil Procedure

provides that a court may, in its discretion, dismiss an action based upon the failure of a plaintiff to prosecute the case, or to comply with the procedural rules or orders of the court. Fed. R. Civ. P. 41(b); *see also Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962). This power to dismiss may be exercised when necessary to achieve orderly and expeditious disposition of cases. *See Freeman v. Lundrigan*, No. 95-CV-1190 (RSP/RWS), 1996 WL 481534, at *1 (N.D.N.Y. Aug. 22, 19961). It is also well-settled that the term "these rules" in Rule 41(b) refers not only to the Federal Rules of Civil Procedure, but also to the local rules of practice for a district court. *See Tylicki v. Ryan*, 244 F.R.D. 146, 147 (N.D.N.Y. 2006).

Courts consider a Rule 41(b) dismissal in light of five factors: (1) the duration of the plaintiff's failure to comply with the court order (or the court's procedural rules); (2) whether the plaintiff was on notice that failure to comply would result in dismissal; (3) whether the defendant is likely to be prejudiced by further delay in the proceedings; (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard; and (5) whether the judge has adequately considered a sanction less drastic than dismissal. *Lucas v. Miller*, 84 F.3d 532, 535 (2d Cir. 1996); *Davis v. Citibank, N.A.*, 607 F. App'x 93, 94 (2d Cir. 2015).

As to the first factor, the Court notes that Local Rule 41.2(a) states that "the plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution." N.D.N.Y.L.R. 41.2(a). In this case, a review of the docket reveals that Plaintiff has failed to take any action in this case for more than ten months. Plaintiff's motion for appointment of counsel dated January 8, 2016, which was denied without prejudice, was Plaintiff's last communication with the Court. (*See* Dkt. Nos. 14 and 15.) In further support of Plaintiff's lack of interest in

pursuing this case, Plaintiff failed to respond to Defendants' motion for summary judgment. Thus, the Court finds that the first factor weighs in favor of dismissal.

"The Second Circuit requires that the plaintiff receive adequate notice that the case could be dismissed due to inaction." *Folk v. Rademacher*, No. 00-CV-199S, 2005 WL 2205816, at *4, (W.D.N.Y. Sept. 9, 2005) (citing *Martens v. Thomann*, 273 F.3d 159, 180-81 (2d Cir. 2001)). In this case, the Court learned through publicly available records maintained by DOCCS that Plaintiff is currently housed at Franklin. (*See* Text Entry 11/04/2016.) The Clerk confirmed with inmate records at Franklin that Plaintiff arrived at their facility from Gowanda Correctional Facility ("Gowanda") on September 2, 2016. *Id.* Accordingly, this Court reminded Plaintiff that pursuant to the Local Rules, he was required to promptly notify the Court of any change of address. (*See* Text Order 11/04/2016.) Plaintiff was directed to file a change of address by November 30, 2016. *Id.* Plaintiff was notified that his failure to do so may result in sanctions including, but not limited to, a recommendation that this action be dismissed for failure to follow Court rules and directives. *Id.* The Court's November 4, 2016, Text Order was mailed to Plaintiff at both Franklin and Gowanda, neither of which were returned as undelivered to the Court. *See id.* Thus, the second factor also weighs in favor of dismissal. *See e.g.*, *Nolan v. Primagency, Inc.*, No. 07 Civ. 134, 2008 WL 1758644, at *3 (S.D.N.Y. Apr. 16, 2008) ("The Second Circuit has held that where a court puts a plaintiff on notice that the court is considering dismissal, and a plaintiff fails to file a document explaining the failures and outlining why the action should not be dismissed, this element has been met.") (citing *Shannon v. General Elec. Co.*, 186 F.3d 186, 194-95 (2d Cir. 1999)); *Europacific Asset Mgmt. Corp. v. Tradescape, Corp.*, 233 F.R.D. 344, 353 (S.D.N.Y. 2005) ("A court's prior warning of dismissal, and subsequent inaction by a plaintiff, weighs in favor of dismissal.").

The third factor is also satisfied as further delay is likely to prejudice Defendants. The events giving rise to Plaintiff's medical indifference claim occurred in September 2012. (*See* Dkt. No. 1 at 4-5.) This action was commenced in August 2015, and Defendants filed their answer more than one year ago. (Dkt. Nos. 1 and 8.) *See, e.g.*, *Georgiadis v. First Boston Corp.*, 167 F.R.D. 24, 25 (S.D.N.Y. 1996) (noting that passage of time would cause memories to fade). Moreover, Defendants filed their motion for summary judgment on July 25, 2016. (Dkt. No. 16.)

Under the circumstances, the Court finds that the need to alleviate congestion on the Court's docket would outweigh Plaintiff's right to receive a further chance to be heard in this case. It is the need to monitor and manage cases such as this that delay the resolution of other cases and contribute to the Second Circuit's relatively long median time to disposition for such civil rights cases. Finally, the Court has also carefully considered sanctions less drastic than dismissal and would find them to be inadequate under the circumstances.

In light of the above, the Court finds that Plaintiff has exhibited an apparent unwillingness to participate in this litigation. Accordingly, based upon Plaintiff's failure to comply with directives from the Court, and after considering the factors relevant to dismissal under Rule 41(b) of the Federal Rules of Civil Procedure, the Court also recommends dismissal for failure to prosecute.

**WHEREFORE**, based on the findings above, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 16) be **GRANTED** and the complaint (Dkt. No. 1) be **DISMISSED IN ITS ENTIRETY**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report and Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: December 5, 2016
          Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of
New York, Kelly L. Munkwitz, Esq., Asst. Attorney
General, of Counsel, Department of Law, Albany, NY,
for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

 **\*1** Plaintiff, Jeff Smith, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Report-
Recommendation dated March 17, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted, and that plaintiff's motion for
partial summary judgment be denied. (Docket No.
51). The plaintiff has filed objections to the Report-
Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of
the report and recommendations to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly,
it is ORDERED that
1. Defendants' motion for summary judgment is
GRANTED;

Plaintiff's motion for partial summary judgment is
DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Rules of Practice
for this Court. In this *pro se* civil rights action brought
under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges
that five employees of Upstate Correctional Facility-
Deputy Superintendent Robert K. Woods, Captain
Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service
Administrator Richard Antonelli, and Correction Officer
Wayne Holt ("Defendants")-violated his rights under the
First, Fourth, Eighth, and Fourteenth Amendments by
(1) retaliating against him for having previously filed a
complaint, (2) subjecting him to an unreasonable search
and seizure, (3) subjecting him to a damaged bunk bed
while he was housed in the Upstate Correctional Facility
Special Housing Unit, and (4) taking away his "good
time" credits without affording him due process. (Dkt.
No. 5 [Plf.'s Am. Compl.].) [1]

[1]    Given my duty to liberally construe a *pro se*
plaintiff's civil rights complaint, I construe Plaintiff's
Amended Complaint as including a claim that
various Defendants violated Plaintiff's rights under
the Fourth Amendment to be free from unreasonable
searches and seizures. *See Phillips v. Girdich,* 408
F.3d 124, 130 (2d Cir.2005) ("We leave it for the
district court to determine what other claims, if any,
[the plaintiff] has raised. In so doing, the court's
imagination should be limited only by [the plaintiff's]
factual allegations, not by the legal claims set out
in his pleadings.") [citations omitted]. *(See also*
Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that
Defendants Woods and Holt "violat[ed]" plaintiff's
4th ... Amendment[ ] rights"], ¶ 15 [alleging that

Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2] A fact is "material" only if it would have some effect on the outcome of the suit. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 477 U.S. 574, 585-86 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Ross v. McGinnis, 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a pro se plaintiff's pleadings. "[I]n actions in which one of the parties appears pro se, this Court is faced with the ... responsibility of granting significant liberality in

how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]     *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]     *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]     Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a) (3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at \*4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at \*2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit

or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

6    *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; *Fed.R.Civ.P. 56(c)* ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

7    *Fed.R.Civ.P. 56(e)* ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

8    *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made

on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory. [9] Of course, an affidavit may be conclusory because its assertions are too general. [10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

9    *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

10   *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985);

*Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No.

42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a][2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12]  However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

12    (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13    (*See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff *"stuck with them* as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate

was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"]*; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to *hold a copy of the complaint"* in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents *being in my possession ...* you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

[14]   (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]   (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube".].)

[16]   (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

[17]   (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

 **\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

[18]   (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

[19]   (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

[20]   (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer

were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

[21]    (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer. [22]

[22]    (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action. [23] In pertinent part, the letter stated,

[23]    (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already took both of you that I am helping him with the filing of his motions, etc....
Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. [24]

[24]    (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. [25]

[25]    (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. [26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." [27] In addition, the last page of the letter states:

[26]    (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

**27**

(Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original.*

It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession.[28]

**28**

(Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters.[29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

**29**

(Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

*Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")*

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods.[30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request."[31]

**30**

(Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

**31**

(Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods.[32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention."[33]

**32**

(Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

**33**

(Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic."[34]

**34**

(Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods.[35] The note stated, in pertinent part:

**35**

(Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration

cannot take any action against the inmate's family nor myself. [36]

[36]    (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

[37]    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

[38]    (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

[39]    (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

[40]    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41]    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

[42]    (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

[43]    (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

[44]    (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who

found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods.[45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F.[46]

[45] (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

[46] (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

Plaintiff's Misbehavior Report,
Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002.[47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20.[48]

[47] (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

[48] (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee;[49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization;[50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate

family member without the consent or approval of the Superintendent or his designee. [51]

[49]    (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt.].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

[50]    (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14] [v].

[51]    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

[52]    (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

[53]    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

[54]    (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11

[Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

[55]    (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

[56]    (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

[57]    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any

denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

58    (Id.)

59    (Id.)

Meetings Between Defendants
Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

60    (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

61    (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

62    (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible

evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63    (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

64    (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

65    (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the

record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU. [68]

[66]  (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67]  (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68]  (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

### III. ANALYSIS

A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9**  In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. See *Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. See *Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); see also *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of

the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]    *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at \*7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks

before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

[70]    (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

[71]    (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

[72]    (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without

providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73    (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74    (See, supra, Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

### B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. 75

75    (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense

counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) See *Clissuras v. CUNY*, 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. 76 Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. 77 In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." 78

76    (See Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

77    (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites

the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am".]

78      (Dkt. No. 5, ¶ 14 [Am. Compl.].)

 **\*11** The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80] Indeed, Plaintiff appears to recognize this point of law. [81]

79      *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

80      *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at \*5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

81      (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and

seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

82      (Dkt. No. 5, ¶ 12 [Am. Compl.].)

83      I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

84      *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

### C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU

as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis"[85] in September of 2002 as a result of sleeping on a defective bed.[86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a

prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

85    "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at \*35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

86    (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

87    *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at \*4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at \*11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at \*13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at \*4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

88    (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].)

89    (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he

suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective. [90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question. [91]

[90]     (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91]     (*See, supra,* Statement of Fact No. 29.)

 **\*13**  More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed, [92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002. [93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002. [94]

[92]     (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

[93]     (*Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02,** after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02,** and that the date of diagnosis was **9/20/02**] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02**] *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02,** or three days after his admission to SHU].)

[94]     (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds. [95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

[95]     *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at \*3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at \*5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. [96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. [97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antonelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96]     (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97]     (*See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints. [98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

[98]     (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely

moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99]     (*Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

[100]     (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

[101]     (*See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed was not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose

decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

### 1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions,

testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question.[103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

[102]  (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[103]  (*See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question.[104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable.[105]

[104]  (*See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105]  (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

### 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

### 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school.[106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F.[107] Indeed, he had filed grievances immediately before and during this very time period.[108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]    (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]    (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]    (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

### E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17**  In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S. 477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997)

].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue.[109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated.[110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated.[111]

[109]    *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110]    *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at \*7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at \*7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

[111]    (See, e.g., Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect Plaintiff's loss of good-time credits]; Dkt. No. 38,

Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'....".].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

### F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, see, e.g., Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. See Webb v. Goord, 340 F.3d 105, 110 (2d Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." Webb, 340 F.3d at 110 [internal quotation

marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. Id. (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); Boddie v. Schneider, 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. (See, supra, Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no evidence to the contrary. Plaintiff merely argues that DOCS' policies and procedures would never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

G. Whether Defendants Are
Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992).[112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness"[113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[112] *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

[113] *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819; *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter" regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in

SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment Based on the above reasons, I find that Plaintiff's motion for partial summary judgment–which (at best) contains arguments regarding the issues discussed above–is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED*.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

### B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

---

[1] In light of this finding, there is no need to consider the defendant's qualified immunity argument.

### *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5692550
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Wilfredo ROSARIO, Plaintiff,

v.

Captain ANSON, Summit Shock Incarceration
Facility, John Doe # 1, Facility Nurse, Summit
Shock Incarceration Facility, Defendants.

No. 9:12–cv–1506 (BKS/CFH).
|
Signed Sept. 28, 2015.

**Attorneys and Law Firms**

Wilfredo Rosario, Orlando, FL, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Colleen D. Galligan, Esq., Assistant
Attorney General, Albany, NY.

**MEMORANDUM–DECISION AND ORDER**

Hon. BRENDA K. SANNES, District Judge.

**I. INTRODUCTION**

*\*1* Plaintiff pro se Wilfredo Rosario brought this
action under 42 U.S.C. § 1983 alleging that defendant
Captain Anson was deliberately indifferent to his serious
medical needs, in violation of the Eighth Amendment,
by refusing to discharge plaintiff from the program
he was participating in at Summit Shock Incarceration
Correctional Facility [1] and transfer him to another facility
so that he could receive medical treatment for his knee
condition and asthma. Dkt. No. 2. Defendants filed a
motion for summary judgment on December 10, 2014,
seeking to dismiss the complaint. Dkt. No. 63. Plaintiff
did not file a response to the motion. Defendants' motion
was referred to United States Magistrate Judge Christian
F. Hummel for a report and recommendation under 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

---

[1] According to defendants, the "Shock Program
is a voluntary boot camp style drug treatment
program available to inmates with non-violent drug

convictions; inmates who successfully complete the
program can shorten their sentence." Dkt. No. 65, ¶ 2.

On July 31, 2015, Magistrate Judge Hummel issued a
Report–Recommendation and Order recommending that
defendants' motion for summary judgment be granted
and that plaintiff's claims against John Doe # 1 be
dismissed without prejudice for failure to serve that
defendant. Dkt. No. 69, p. 20. Magistrate Judge Hummel's
recommendation is based on his conclusion that no
reasonable fact finder could conclude that Captain Anson
was aware of a substantial risk of harm when he
recommended that plaintiff continue in the program for
the weekend or that Captain Anson intentionally delayed
or denied medical care. Dkt. No. 69, pp. 16–17.

Plaintiff objects to Magistrate Judge Hummel's conclusion
and asserts that he was denied adequate medical care
for his knee condition and asthma at Summit and that
Captain Anson ignored" his "constant pleas" to be
discharged from Summit "in order to receive immediate
medical attention." Dkt. No. 73, p. 4. Defendant has not
responded to this objection. For the reasons set forth
below, the Report–Recommendation is adopted in its
entirety.

**II. DISCUSSION**

**A. Standard**
The Court adopts Magistrate Judge Hummel's summary
of the facts and applicable law and does not repeat
them here. This Court reviews de novo those portions
of the Magistrate Judge's findings and recommendations
that have been properly preserved with a specific
objection. *Petersen v. Astrue,* 2 F.Supp.3d 223, 228–29
(N.D.N.Y.2012); 28 U.S.C. § 636(b)(1)(C). Findings and
recommendations as to which there was no properly
preserved objection are reviewed for clear error. *Id.*

**B. Sufficiently Serious Medical Conditions–Objective**
In his objections, plaintiff argues that the evidence shows
that he had no "knee problems prior to entering the shock
program," that he suffered knee swelling after entering the
shock program, and that he was asthmatic. Dkt. No. 73,
p. 2. Plaintiff's objection with respect to his knee condition
is irrelevant, however, because Magistrate Judge Hummel
found "there exists a question of fact whether plaintiff's
knee pain was sufficiently serious," (Dkt. No. 69, p.
14), in satisfaction of the objective element of an Eighth

Amendment deliberate indifference to serious medical needs claim. *See Spavone v. New York State Dep't of Corr. Svcs.,* 719 F.3d 127, 138 (2d Cir.2013) ("The objective component requires that the deprivation be 'sufficiently serious,' creating a risk of 'death, degeneration, or extreme pain.' ") (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006)).

**\*2** Further, although Magistrate Judge Hummel found the evidence insufficient to allow a reasonable factfinder to conclude that plaintiff's asthma was sufficiently serious, Dkt. No. 69, p. 16, even crediting plaintiff's assertion in his objections that the deprivation of an inhaler was sufficient to meet the first, objective element of a deliberate indifference claim, Dkt. No. 73, p. 3, plaintiff fails to raise a genuine issue of fact as to the second, subjective element of the claim. *Spavone,* 719 F.3d at 138 ("The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care.").

### C. Deliberate Indifference—Subjective

In his objections, plaintiff asserts that when he spoke with Captain Anson on November 12, 2010,[2] Captain Anson "acknowledged the swelling on the knee when the plaintiff rolled up his pants and revealed ... the injury on his left knee." Dkt. No. 73, p. 4. Plaintiff contends that he asked Captain Anson to discharge him "from the shock program in order to receive immediate medical attention." *Id.* Plaintiff asserts that the he has suffered "long term complications ... which ... still affects his left leg and prevents [him] from performing everyday physical labor duties." *Id.*

[2]    In his objections, plaintiff states that he made "constant pleas to Anson to be discharged" from Summit. Dkt. No. 73, p. 4. Plaintiff's objections, however, are unsworn, and there is no evidence in the record indicating that his pleas were "constant." The record indicates that plaintiff requested to speak to Captain Anson once prior to their Friday, November 12, 2012 meeting and spoke with officers about seeing Captain Anson the following Monday. Dkt. No. 63–5, p. 45.

The subjective element of a deliberate indifference claim requires evidence that "that the charged official [must] act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result." *Spavone,* 719 F.3d at 138. "Officials need only be aware of the risk of harm,

not intend harm ." *Id., see also Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (holding that to establish deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Plaintiff does not present any evidence from which a reasonable fact finder could conclude that Captain Anson acted with a "sufficiently culpable mental state." *Salahuddin v. Goord,* 467 F.3d 263, 282 (2d Cir.2006). Even viewed in the light most favorable to plaintiff, the evidence shows that Captain Anson's delay in allowing plaintiff to sign out of the program was the result of his efforts to persuade plaintiff to remain in the program. Dkt. No. 63–1, p. 3. Captain Anson explained that his "direction to plaintiff to think over his decision was purely meant to help plaintiff, since continued participation in the shock treatment program would be to his benefit and would have shortened his time of incarceration." *Id.,* s*ee, e.g., Victor v. Milicevic,* 361 F. App'x 212, 215 (2d Cir.2010) (finding summary judgment appropriate where the plaintiff "failed to demonstrate that Laux was deliberately indifferent to his serious medical needs because the ten-month delay in receiving a liver biopsy was the result of [the defendant's] belief that [the plaintiff] did not meet the Department of Correctional Services'... criteria for such a procedure."). Though plaintiff stated in his deposition that he expected Captain Anson to "call [him] back up" on Monday, November 15, Dkt. No. 63–5, p. 42, there is no evidence from which a factfinder could conclude that the reason Captain Anson failed to contact plaintiff that day was deliberate indifference to plaintiff's serious medical needs.[3]

[3]    Plaintiff's transport on November 16, 2010, to another facility for a court appearance was an additional source of delay. Dkt. No. 65, ¶ 37. There is no evidence that this transfer was attributable to Captain Anson.

**\*3** Nor is there evidence that Captain Anson had reason to believe that requiring plaintiff to remain for the weekend posed a substantial risk of harm. Although plaintiff had reported that his knee was "building up a lot of inflammation" and "getting wors[e]," and showed Captain Anson his swollen knee, Captain Anson explained that he nevertheless "directed plaintiff to assess his situation over the coming weekend before making a decision to quit the program," because "plaintiff was

medically cleared and had actively participated in physical training" the day of their meeting and the day before, Dkt. No. 63–1, p. 2. There is therefore no evidence from which a reasonable fact finder could conclude that Captain Anson had reason to believe that requiring plaintiff to remain at Summit for the weekend would be "seriously harmful." *Salahuddin,* 467 F.3d at 282–83 (finding that although the defendant's conclusion that that cancelling a biopsy may have been "unsound," in the absence of evidence that "any physician ever informed [him] that it would be harmful to cancel the scheduled ... biopsy, "the record evidence does not raise a genuine factual question concerning whether [the defendant] acted with a sufficiently culpable mental state."). Thus, plaintiff has failed to raise a genuine issue of material fact as to whether Captain Anson was deliberately indifferent to his serious medical needs.

The Court has reviewed for clear error the portions of the Report–Recommendation to which plaintiff has not objected and finds none.

### III. CONCLUSION

For these reasons, it is

**ORDERED** that the Report–Recommendation (Dkt. No. 69) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that defendant's motion for summary judgment (Dkt. No. 63) is **GRANTED;** and it is further

**ORDERED** that plaintiff's claims against John Doe # 1 are **DISMISSED** without prejudice for failure to serve that defendant, despite notice of that requirement (Dkt.Nos.30, 39); and it is further

**ORDERED** that the complaint (Dkt. No. 2) is **DISMISSED** and the Clerk of the Court is directed to close this case; and it is further

**ORDERED** that a copy of this Memorandum–Decision and Order as well as all unpublished decisions cited above be served on the parties in accordance with the Local Rules.

### IT IS SO ORDERED.

### REPORT–RECOMMENDATION AND ORDER [1]

[1] This matter was referred to the undersigned for Report–Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Wilfredo Rosario ("Rosario"), a former inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant, Captain Patrick Anson ("Anson"), violated his constitutional rights under the Eighth Amendment. Compl. (Dkt. No. 2 at 1–12). Presently pending is Anson's motion for summary judgment pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ.P.") 56. Dkt. No. 63. Rosario did not oppose. For the reasons which follow, it is recommended that Anson's motion be granted.

#### I. Background

**\*4** The facts are related herein in the light most favorable to Rosario as the nonmoving party. *See* subsection III(A) *infra.* Pursuant to a Decision and Order of Chief District Judge Gary L. Sharpe dated September 17, 2013, two other defendants were dismissed, without prejudice, from the current action. Dkt. No. 39.

#### A. Failure to Respond

The Court notified Rosario of the response deadline. Dkt. No. 66. Defendants provided Rosario with notice of the consequences of failing to respond. Dkt. No. 63 at 3. Despite this notice, Rosario did not respond to the motion for summary judgment.

"[S]ummary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the

absence of a response, a defendant is entitled to judgment only if the material facts demonstrate his entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 65) are accepted as true as to those facts that are not disputed in Rosario's complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.").

### B. Introduction

On October 28, 2010, Rosario transferred from Lakeview Shock Incarceration Facility ("Lakeview") to Summit Shock Incarceration Correctional Facility ("Summit Shock").[2] Compl. at 8; Rosario Dep. (Dkt. No. 63–5) at 13.[3]

[2]      The Shock program is a voluntary boot-camp-style drug treatment program available to inmates with non-violent drug convictions; inmates who successfully complete the program can shorten their sentence. Rosario Dep. at 14–15, 17–18, 28–27.

[3]      The page numbers following Dkt. No. 63–5 refer to the pagination of the header numbers generated by CM/ECF, not the pagination provided by the transcript.

### C. November 1, 2010–November 11, 2010

On November 1, 2010, while at Summit Shock, Rosario was participating in a physical training session when he felt a "click" in his left knee. Compl. at 8. After returning to his dormitory, Rosario advised non-party Drill Instructor Pape of the pain he was experiencing, and Pape instructed him to fill out a sick "call slip" to be seen by medical staff the next day. *Id.*

On November 2, 2010, Rosario reported to sick call, where he was seen by defendant John Doe # 1, a facility nurse, who provided Rosario with anti-inflammatory

medication and Icy Hot, and advised Rosario that he could continue physical training. Compl. at 8; Rosario Dep. at 32, 34–35. That night, Rosario continued to experience pain in his knee and began to limp. Compl. at 8. Rosario informed Pape of his pain and filled out another call slip. *Id.*

**\*5** On November 3, 2010, Rosario continued to suffer from weakness in his left knee and had difficulty walking, but was ordered to participate in physical training, including a run. Compl. at 8. When Rosario arrived at sick call after physical training, he advised the medical staff that the physical training sessions were making his condition worse. *Id.* Medical staff told Rosario that the knee pain was not uncommon for someone of his weight and that he could continue with physical training. *Id.* at 8–9; Rosario Dep. at 37. Rosario also advised John Doe # 1 that he was asthmatic and his inhaler was half empty, but John Doe # 1 denied his request to refill his inhaler. Compl. at 9.

Upon returning to the dormitory, Rosario was advised that he was being sent to an "outside call out" to see John Doe # 2,[4] Dr. John McPhillips ("McPhillips"), a health care provider at Hale Creek Correctional Facility ("Hale Creek"). Compl. at 9. McPhillips advised Rosario that (1) he had a normal range of motion in his left knee, (2) there was no significant size difference between the left and right knees, (3) he would not be provided an inhaler because his respiratory levels were within normal limits, and (4) he was not actively asthmatic. Compl. at 8–9; McPhillips Decl. (Dkt. No. 63–2) ¶ 7–9, 14. As a result of these determinations, Rosario was cleared to continue participating in the physical training sessions. Compl. at 9; Anson Decl. (Dkt. No. 63–1) ¶ 10. According to McPhillips, he denied Rosario an inhaler because his respiratory levels were within normal limits. McPhillips Decl. ¶ 7, 11–12, 14–16. He further observed that Rosario made upper respiratory sounds with his mouth which were transmitted to his chest, but the sounds were not being made by his chest. *Id.* ¶ 7, 16. Additionally, McPhillips noted that Rosario's prescription for Albuterol Metered Dose Inhaler (MDI) had been filled on September 1, 2010, which should have lasted a minimum of three months, but had been used in approximately two months, which suggested overuse. *Id.* ¶ 11–12, 16.

All claims against John Doe # 2 were dismissed by a prior Order of this Court. *See* Dkt. No. 39, *supra.*

On November 5, 2010, Rosario's request for a referral to see a specialist due to his continued pain was denied. Compl. at 9. That same day, Rosario went to sick call with continued complaints of knee pain and chest pain. *Id.* Upon examination, John Doe # 1 again advised Rosario that his respiratory levels were within normal limits and that his knee pain was a result of physical exertion, hi poor physical conditioning, and his weight. Compl. at 8–9, 12; McPhillips Decl. ¶ 7–8. John Doe # 1 gave Rosario ibuprofen and analgesic balm and cleared him to continue with physical training. Compl. at 9; McPhillips Decl. ¶ 8. On November 10, 2010, John Doe # 1 took Rosario's empty inhaler and advised Rosario that the inhaler would not be replaced. *Id.* ¶ 12; Compl. at 9.

On November 10, 2010, during a physical training session, Rosario stopped running and began to walk. Compl. at 9. Defendant Blyth, [5] a correctional officer, told Rosario that if he continued to walk, in defiance of Blyth's orders given during training, Rosario would be written up for disobeying a direct order. *Id.* at 10. Rosario replied that he "was not dieing [sic] for anyone." *Id.* Subsequently, Blyth placed Rosario in the back of a pick-up truck, and non-party Sergeant Whittaker took Rosario to receive medical attention. *Id.* Medical staff again cleared Rosario to participate in physical training and determined that Rosario was not experiencing an asthmatic event. Compl. at 9; Galligan Affirmation Exhibit "A" (Dkt. No. 64 at 43); McPhillips Decl. ¶ 10, 12, 14–15; Anson Decl. ¶ 10. Upon returning to his dormitory, Rosario received a misbehavior report authored by Blyth for refusing to comply with a direct order. Compl. at 10, 41. On the same day, Rosario filed a contact slip to see the corrections counselor, non-party Moody, to discuss his pain and desire to leave the Shock program. *Id.* at 10, 13.

All claims against defendant Blyth were dismissed by prior Order of this Court. *See* Dkt. No. 39, *supra.*

### C. November 12, 2010–December 27, 2010

**\*6** On Friday, November 12, 2010, Rosario was called into Captain Anson's office to discuss his request to see Moody. Compl. at 10; Anson. Decl. ¶ 9. Rosario advised Anson of his medical conditions and that he wished to sign out of the program so that he may transfer facilities to receive proper medical care, and his fear that continued participation in the Shock program would hurt his knee. Compl. at 10, 11; Anson Decl. ¶ 10. Anson refused this request. Compl. at 11. According to Anson, he relied on the determinations of the Summit Shock medical staff that Rosario was fit to participate in physical training, and, instead, advised Rosario to take the weekend to think about his decision. Compl. at 11; Rosario Dep. at 43; Anson Decl. ¶ 10, 13. Anson contends that he advised Rosario to take the weekend to think over his decision to leave the Shock program, and advise the counselor of his decision that following Monday, because successful completion of the program could have shortened Rosario's time of incarceration. Anson Decl. ¶ 10–11. By contrast, Rosario contends that Anson advised him to think about his decision to leave the Shock program and that either Anson or Moody would follow-up with him that Monday. Compl. at 11; Rosario Dep. at 43. On Monday, November 15, 2010, Rosario did not receive a follow-up call from Anson or Moody, and did not submit a call slip to speak to Anson. Compl. at 11; Rosario Dep. at 43–45.

On Tuesday, November 16, 2010, Rosario was taken to Rikers Island on a family court trip where he was seen by medical staff and given medication and an ace bandage. Compl. at 11; Rosario Dep. at 44. Rikers Island medical staff advised Rosario to bring his condition to the attention of the medical staff at Summit Shock. Compl. at 11. While at Rikers Island, Rosario wrote a complaint to non-party DOCCS Commissioner Fischer, detailing the allegedly inadequate care he was receiving at Summit Shock. *Id.*

On December 3, 2010, Rosario returned from Rikers Island to Summit Shock. Rosario Dep. at 47; Dkt. No. 63–4 at 26. Rosario contacted Anson upon his return to Summit Shock, and the two discussed his participation in the program. Dkt. No. 63–5 at 4750. Following this conversation, Rosario refused to return to his dormitory or continue with the Shock program. Compl. at 57–58. For refusing to comply with this direct order, Rosario received a misbehavior report authored by non-party Sergeant Miller and was transferred to another facility, Mohawk Correctional Facility ("Mohawk"). *Id.;* Dkt. No. 63–4 at 26. Rosario contends that he refused to return to his dormitory because Anson advised that the only way out of the Shock program was to refuse a direct order so

that he would be transferred to another facility. Dkt. No. 63–5 at 49–50.

On December 16, 2010, non-party Carl J. Koenigsmann, M.D. responded to Rosario's complaint to Fischer, noting that Rosario went to sick call six times between October 28, 2010 and November 16, 2010, and a primary care physician found that Rosario's mild inflammation of the knee was not uncommon for someone of Rosario's weight. Compl. at 12, 42.

**\*7** On December 27, 2010, Rosario underwent an X-ray of his left knee. McPhillips Decl. ¶ 18. The radiology report concluded, "[m]inor degenerative changes. No acute radiographic findings." *Id.;* Compl. at 26. On September 12, 2011, Rosario underwent an MRI of his left knee. McPhillips Decl. ¶ 19. The radiology report impression states, "[s]mall popliteal cyst [benign fluid filled swelling]. No other significant abnormalities." *Id.;* Dkt. No. 64 at 63.

### III. Discussion

Rosario claims that his Eighth Amendment rights were violated when Anson denied his request to leave the Shock program so that he could receive medical treatment at another facility. Compl. at 10, 11. Anson contends that Rosario has failed to establish a prima facie claim for deliberate indifference to a serious medical need in violation of the Eighth Amendment. Dkt. No. 63–6 at 4–7. Anson alternatively argues that he is entitled to qualified immunity. *Id .* at 7–9.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. FED R. CIV. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are

resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1998).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law,"....

**\*8** *Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. The prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 837 (1994); *Hathaway v. Coughlin,* 37 F.3d

63, 66 (2d Cir.1994). In order to succeed on a claim that prison conditions imposed an excessive risk to an inmate in violation of the Eighth Amendment, a prisoner must demonstrate the defendant acted with, "deliberate indifference to serious medical needs...." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). This deliberate indifference standard includes both an objective and subjective component. *Hathaway,* 37 F.3d at 66. Objectively, the alleged deprivation must be "sufficiently serious." *Id.* Subjectively, the defendant "must act with a sufficiently culpable state of mind." *Id.*

Deprivation of medical treatment is "sufficiently serious" if the injury is one where there is, "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66 (internal citation omitted). " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no bright-line rule to determine whether a medical condition is sufficiently serious, the Second Circuit has identified several factors that are highly relevant to the inquiry such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal citation omitted)).

A prison official acts with a culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. "Non-medical personnel engage in deliberate indifference where they 'intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel.' " *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (internal citation omitted). "[M]ere disagreement over proper treatment does not create a constitutional claim ...." as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for

X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

**\*9** In this case, Rosario has alleged that he was suffering from two serious medical conditions, ongoing knee pain and asthma. Compl. at 8–10. Rosario alleges his complaint of knee discomfort and his need for an asthma inhaler were ignored by Anson and Shock medical staff. *Id.* at 8–11.

### 1. Sufficiently Serious Medical Conditions

#### A. Knee Pain

In addressing the first prong of the *Brock* factors, the record clearly demonstrates that from November 2, 2010 to November 16, 2010, Rosario returned to sick call on an almost daily basis, and was seen by numerous medical professionals, all of whom explained that Rosario's knee pain was normal for someone of his weight. 315 F.3d at 16263; Compl. at 8–9, 12, 42; Rosario Dep. at 37. During each visit, Rosario received authorization only for mild, over-the-counter pain medication to treat his knee, and was advised that he could continue with physical training. *Brock,* 315 F.3d at 162–63; Compl. at 8–9, 11, 14, 42; Rosario Dep. at 32, 34–35; McPhillips Decl. ¶ 8, 13; Anson Decl. ¶ 10. The medical staff agreed that the slight swelling was attributable to Rosario's size and the fact that he was not accustomed to physical exertion. Compl. at 8– 9, 12; Rosario Dep. at 37; McPhillips Decl. ¶ 2–3, 8. Here, because Rosario was repeatedly seen by medical staff, who determined that his knee pain was nothing more than slight swelling due to his physical shape, such a condition was not 'important and worthy of comment or treatment'. *Brock,* 315 F.3d at 162–63; Compl. at 8– 9, 12; Rosario Dep. at 37; McPhillips Decl. ¶ 2–3, 8. Accordingly, Rosario has failed to demonstrate that a "reasonable doctor or patient would perceive [his knee pain] as important or worthy of comment or treatment." *Brock,* 315 F.3d at 162–63 (internal quotation marks and citation omitted).

Addressing the second prong, whether the medical condition significantly affects the plaintiff's daily activities, Rosario alleges that the knee pain caused him to have difficulty walking, thereby affecting his

daily activities. *Brock,* 315 F.3d at 162–63; Compl. at 8, 12. Anson presents evidence in support of his motion that Rosario's slight knee swelling was due to his physical condition and was deemed not deemed significant enough to prevent him from participating in physical training. *Brock,* 315 F.3d at 162–63; McPhillips Decl. ¶ 23, 8, 20. Insofar as Rosario contends that his knee pain significantly affected the daily activities of physical training that he was required to perform in the Shock program, including a substantial amount of running, this may suffice to establish that his knee pain was sufficiently serious. *Brock,* 315 F.3d at 162–63; Compl. at 8, 12. However, as will be discussed, Rosario fails to meet the subjective part of the test—that Anson acted with a culpable state of mind and was, therefore, deliberately indifferent to his knee injury. *See* subsection III(B)(2) *infra.*

**\*10** Addressing the final *Brock* prong, existence of chronic and substantial pain, Rosario returned to sick call six times complaining of knee pain; however, during each visit Rosario received authorization only for mild, over-the-counter pain medication for his complaints, including some variation of ibuprofen, an ace bandage, and Icy Hot. 315 F.3d at 162–63; Compl. at 8, 9, 11–12, 14, 42; McPhillips Decl. ¶ 15, 17–18. Rosario contends that, as a result of Anson's deliberate indifference to his medical conditions, he suffered from knee pain and meniscus and ligament tears that may require surgery. Compl. at 3. However, McPhillips contends that Rosario's left knee inflammation was neither a permanent nor a serious condition, and that his symptoms would be alleviated with ibuprofen and use of analgesic balm. McPhillips Decl. ¶ 20. In addition to the aforementioned *Brock* analysis, courts have generally held that knee pain does not constitute a serious medical condition. 315 F.3d at 162–63; *See Johnson v. Wright,* 477 F.Supp.2d 572, 575 (W.D.N.Y.2007) (holding that a prisoner's torn meniscus suffered as result of a basketball injury was not a serious medical need) (citing *Moody v. Pickles,* No. 03–CV–850 (DEP), 2006 WL 2645124, at \*6 (N.D.N.Y. Sept. 13, 2006)) (holding that a "medial meniscal tear, with joint effusion" was not a serious medical need). [6] To the extent that Rosario claims he should have been given a more intensive form of treatment for his knee, an inmate's belief that he should have received different or stronger treatment than that provided by medical staff does not amount to a constitutional violation. *See Veloz v. New York,* 339 F.Supp.2d 505, 525 (S.D.N.Y.2004).

[6]    All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

Despite that disagreement with treatment does not establish a constitutional violation, as Rosario repeatedly sought medical care for his complaints of knee pain, there exists a question of fact whether his knee pain caused him chronic and substantial pain. *Brock,* 315 F.3d at 162–63; Compl. at 12.

Accordingly, Rosario has demonstrated a material question of fact as to whether his knee pain significantly affected his daily activities and caused him chronic and substantial pain. *Brock,* 315 F.3d at 162–63. Thus, there exists a question of fact whether plaintiff's knee pain was sufficiently serious under *Brock* and its progeny.

### B. Asthma

Addressing the first prong of the *Brock* test, from November 2, 2010 to November 16, 2010, Rosario returned to sick call on an almost daily basis, and was seen by numerous medical professionals during that time, all of whom concluded that Rosario was not asthmatic. 315 F.3d at 162–63; Compl. at 42; McPhillips Decl. ¶ 14. The medical staff agreed that his shortness of breath was attributable to Rosario's size and the fact that he was not accustomed to physical exertion. Compl. at 9; McPhillips Decl. ¶ 10, 12, 14–15; Dkt. No. 64 at 43. During each visit, medical professionals advised Rosario that he could continue physical training. Compl. at 9; Anson Decl. ¶ 10. Nothing in the complaint indicates that, as a result of asthma or the denied inhaler, Rosario's daily life had been affected, or that he suffered from chronic and substantial pain. *Brock,* 315 F.3d at 162–63; Compl. at 9. Further, McPhillips indicated that Rosario made respiratory sounds to mimic chest sounds although his chest was clear. McPhillips Decl. ¶ 7, 16. Additionally, McPhillips' medical opinion indicated that Rosario's shortness of breath as a result of physical exertion was not a serious medical condition. Compl. at 9; McPhillips Decl. ¶ 10, 12, 14–15. As noted, disagreement with the level of treatment provided does not constitute deliberate indifference. *Sonds,* 151 F.Supp.2d at 312.

**\*11** This Court has held previously that an asthma condition, absent a substantial asthma attack, does

not constitute a serious medical condition. *See Bost v. Bockelmann,* No. 9:04–CV–0246 (GLS/DEP), 2007 WL 527320, at *8–9 (N.D.N.Y. Feb. 20, 2007) (citing cases for the proposition that being asthmatic—a person susceptible to asthma attacks—is not a sufficiently serious condition, which is distinct from the situation in which an inmate is suffering an actual attack). Courts have also held that "[a]lthough an asthma condition alone may not be serious enough to constitute a sufficient medical condition, an asthma attack, depending on its severity, may be sufficient." *Carlisle v. Goord,* No. 9:03–CV–296 (FJS/GHL), 2007 WL 2769566, at *4 (N.D.N.Y. Sept. 21, 2007); *cf. Scott v. DelSignore,* No. 02–CV–029 (LGF), 2005 WL 425473, at *9 (W.D.N.Y. Feb. 18, 2005) (stating that active asthma symptoms may support an Eighth Amendment claim).

Here, although Rosario complained of having an asthma attack during a physical training session on November 10, 2010, he was examined by medical staff immediately following the session, who performed numerous tests and determined that Rosario was not suffering from an asthmatic event, nor was he actively asthmatic. Dkt. No. 64 at 43; McPhillips Decl. ¶ 12, 14–15. Further, Rosario does not allege to have suffered any significant or lasting harm as a result of the alleged attack.

Accordingly, Rosario has failed to present a material question of fact whether his asthma was a serious medical condition. *Brock,* 315 F.3d at 162–63.

### 2. Culpable State of Mind

Even if Rosario had raised a triable issue as to the objective prong of his Eighth Amendment medical care claim against Anson regarding both his knee pain and asthma, Rosario has not demonstrated that Anson had a culpable state of mind, and, therefore, was deliberately indifferent to his medical needs. *Hathaway,* 37 F.3d at 66.

On Friday, November 12, 2010, Rosario informed Anson of his desire to discontinue his participation in the Shock program and to be transferred to another facility. Compl. at 10, 11. Anson first learned of Rosario's alleged medical conditions during this meeting, and as a non-medical prison official, relied upon the medical opinions of Summit Shock medical staff that Rosario's knee discomfort and shortness of breath were neither excessive

risks to Rosario's health, nor serious medical conditions, and that Rosario was cleared to continue participating in physical training. Compl. at 9, 11; Anson Decl. ¶ 10, 13. Thus, Anson was not aware of a substantial risk of harm when he recommended that Rosario continue in the program for the weekend. *Farmer,* 511 U.S. at 837. Moreover, Anson did not intentionally deny or delay Rosario's access to medical care; rather, he recommended that Rosario defer his decision to voluntarily withdraw from the Shock program for just three days. *Baumann,* 36 F.Supp.2d at 512; Compl. at 11; Anson Decl. ¶ 10–11. Thus, in instructing that Rosario take the weekend to consider and balance the pros and cons of leaving Shock or remaining in the program and reducing his incarceration time, Anson was not aware that Rosario would suffer any serious harm. *Baumann,* 36 F.Supp.2d at 512; Compl. at 11; Anson Decl. ¶ 10–11. Further, a three-day wait for medical care is not the type of delay that constitutes deliberate indifference. *See Taylor v. Kurtz,* No. 00–CV–700 (LGF), 2004 WL 2414847, at *1–4 (W.D.N.Y. Oct. 28, 2004) (finding no Eighth Amendment violation where prisoner complained of a failure to perform knee surgery for nine months after discovering the torn meniscus).

**\*12** Moreover, Rosario fails to present any specific evidence to demonstrate the connection between the alleged dilatory actions of Anson and the need for medical attention. That Rosario could not follow up with Anson because he had a family court visit early that week or that he believed Anson would contact him that Monday also does not constitute deliberate indifference. Compl. at 11; Rosario Dep. at 44. Rosario contacted Anson upon his return to Summit, and the two discussed his participation in the program. Dkt. No. 63–5 at 47–50. Rosario has demonstrated no intentional delay in access to care. *Baumann,* 36 F.Supp.2d at 512. McPhillips' medical opinion indicated that neither Rosario's left knee inflamation, nor his asthma, were serious medical conditions. McPhillips Decl. ¶ 8, 15, 20. Anson was entitled to rely on these findings. *See Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 183 (N.D.N.Y.1996) (citing cases for the proposition that supervisory, non-medical personnel are entitled to rely on the opinion of medical staff concerning the proper course of treatment); *see also Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). Moreover, there is no indication that Anson was present during Rosario's alleged asthma attack or knee injury, and refused to provide Rosario care or

notify medical staff. Thus, Rosario has failed to raise a material question of fact whether Anson knew of and disregarded an excessive risk to his health or safety. *Farmer*, 511 U.S. at 837.

Accordingly, although Rosario has arguably demonstrated a material issue of fact as to whether his knee pain was a sufficiently serious condition, Rosario has failed to demonstrate that Anson was deliberately indifferent to a serious medical condition, and it is, therefore, recommended that defendant's motion on this ground be granted.[7]

[7]    Although the undersigned has concluded Rosario has not shown that his asthma was sufficiently serious, even if he had made this showing, his medical indifference claim would still fail because no deliberate indifference to his asthma was shown.

### C. Qualified Immunity

Anson claims that, even if Rosario's constitutional claim is substantiated, he is entitled to qualified immunity. Dkt. No. 63–6 at 7–10. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); *Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir.1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken v. Nixon*, 236 F.Supp.2d 211, 230 (N.D.N.Y.2002).

**\*13**  Here, Rosario has not established a constitutional violation to satisfy the first prong of the inquiry. However,

even if Rosario had met the first prong, Rosario fails to meet the second prong because it was objectively reasonable for Anson to believe that, by telling Rosario to take the weekend to think about his decision to voluntarily withdraw from the Shock program—because remaining in the program could benefit Rosario and reduce his incarceration time—he was not violating Rosario's constitutional rights.

Accordingly, in the alternative, it is recommended that defendant's motion on this ground be granted.

### IV. Conclusion

For the reasons stated above, it is hereby:

**RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 63) be **GRANTED;** and it is further

**RECOMMENDED** that plaintiff's claims against John Doe # 1 be dismissed without prejudice for failure to serve that defendant, despite notice of such requirement (Dkt.Nos.30, 39); and it is further

**ORDERED** that a copy of this Report–Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within **fourteen (14) days** after being served with a copy of the ... recommendation." N.D.N.Y.L .R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 72, 6(a), 6(e).

**IT IS SO ORDERED.**

Filed July 31, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5692550

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Arnett v. Shojaie, C.D.Cal., November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony

was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R.

§§ 701.5, 701.6(g), 701.7. [1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence. [2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

[1] *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

[2] The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of

Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied. [3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process. [4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number. [5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative. [6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

[3] *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

[4] 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step.); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez*

*v. Hamm,* 04-CV-1159, 2009 WL 3486379, at \*13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at \*11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at \*6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at \*15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at \*10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at \*14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at \*11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at \*3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at \*4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5      *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at \*2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies,

plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6      *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at \*16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at \*7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at \*3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). [7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, [8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. [9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim, [10] (b) the inmate was specifically informed that the claim in question was grievable, [11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC, [12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion, [13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC. [14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim, [15] and/or (b) the inmate did not appeal his disciplinary hearing conviction. [16]

[7]     The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled

any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8   *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9   *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10   *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007)

(McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11   *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12   *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13   *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14   *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

15   *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied

his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

16    *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [17]

17    *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner

plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court. [18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury. [19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law. [20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.) [21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue

for a judge. See *Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,* --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury. [22]

18   *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

19   *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

20   *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating

to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.") [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21   *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law.

The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22  *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* ---U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims,

and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at *8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during

the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [25]

[23]     The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

[24]     In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restraints against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance Number

GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

[25]     For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

## B. Estoppel

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

[26]     *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008)

(Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone

employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

## C. Special Circumstances

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at *8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was

not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations,[27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order.[28]

[27]  *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

[28]  The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a

letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is *DISMISSED* **in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1235591

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 6935254
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
|
Oct. 4, 2012.

**Attorneys and Law Firms**

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Everton Bailey, a federal prison inmate, has commenced this *Bivens* [1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

[1]    *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative remedies, I recommend that his complaint be dismissed on this procedural basis, without addressing its merits.

**I.** *BACKGROUND*

Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84. [2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

[2]    The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. ____".

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see also* VanWeelden Decl. (Dkt. No. 10–4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face. [3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–14; Tr. 32, 84–85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59–60, 85.

3

    According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 *et seq.; see also Macias v. Zenk,* 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint. [4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances. [5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

4

    Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

5

    Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr.

43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for commencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor. [6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

6

    Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was required to visit inmates in the

SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No." [7] *Id.*

[7] During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

## II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Officer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his

failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties. [8], [9]

[8] The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco,* 814 F.2d 859, 862 (2d Cir.1987). At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

[9] Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

## III. *DISCUSSION*

A. *Governing Legal Principles*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at *4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements. [10] , [11] *Id.*

[10]    In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantively exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford* would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings

of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

11    In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

### B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003)); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for example—that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

*6 Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at * 4 and n. 17 (N.D.N.Y. Mar.31, 2010)

(Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

### C. *Application of Governing Legal Principles*

#### 1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison

officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

### 2. *Presentation of Defense/Estoppel*

**\*7** The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff clearly failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)."). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at \*3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at \*5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at \*4 (citing *Bennett v. James,* 737 F.Supp.2d 219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and cooperate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at \* 3. Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

### 3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at \*10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at \*10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at \*6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

**\*8** During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative

remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

## IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from

the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 6935254

---

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2159199
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

Donald Mack BENNETT, Plaintiff,
v.
Edith ONUA, Edwin Oduro, and
June Yazzo Liason, Defendants.

No. 09 Civ. 7227(SAS).
|
May 26, 2010.

**Attorneys and Law Firms**

Donald Mack Bennett, Valhalla, NY, pro se.

Robert F. Meehan, Westchester County Attorney, Fay Angela Jones, Senior Assistant Westchester County Attorney, White Plains, NY, for Defendants.

***OPINION AND ORDER***

SHIRA A. SCHEINDLIN, District Judge.

### I. INTRODUCTION

**\*1** Donald Mack Bennett, presently incarcerated and proceeding pro se, brings this action against Edith Onua, Edwin Oduro, and June Yazzo Liason[1] pursuant to section 1983 of Title 42 of the United States Code. Bennett seeks monetary damages in the amount of $5,000,000 for alleged emotional distress, negligence, deliberate indifference, and medical malpractice. Defendants now move to dismiss pursuant to Federal Rule of Civil Procedure 12(c) for failure to exhaust administrative remedies under 42 U.S.C. § 1197e(a) and failure to state a claim under 42 U.S.C. § 1983. For the reasons stated below, the motion to dismiss is granted.

[1]   Hereinafter, "Defendants."

### II. BACKGROUND [2]

[2]   The facts recited here are drawn from the Complaint ("Compl."), attached as Ex. A to the Declaration of Fay Angela Jones ("Fay Decl."), Senior Assistant County Attorney.

Bennett was incarcerated at the Westchester County Jail ("WCJ") from February 20, 2009, through February 27, 2009.[3] On February 20, 2009, Bennett was examined by Edwin Odoro, a physician's assistant ("P.A.").[4] At the time of the examination, Bennett had in his possession a hospital discharge paper with all his prescribed medications.[5] During the week of February 20, 2009 until Bennett's court date (on February 27, 2009), he allegedly submitted five "sick-call slips" but was not contacted until Edith Onua, also a P.A., called to tell him she could not prescribe his "life sustaining medication."[6]

[3]   See Compl. Section II–D.

[4]   See id.

[5]   See id.

[6]   Id.

On February 27, 2009, Bennett was taken to court without being given his medication.[7] Bennett subsequently became ill and was taken to Sound Shore Medical Center, where he was treated and released.[8] Bennett claims defendant June Yazzo Liason, also a P.A., purposely informed the WCJ staff that nothing was wrong with him because she is racially biased against him.[9] Bennett further claims that Yazzo denies any grievance he files on the same racially-motivated grounds.[10]

[7]   See id.

[8]   See id. Bennett alleges he had a "massive heart attack, grand mal seizure, and almost had a stroke" and that he "ran blood pressure 196 over 145, heart rate running over 230 beats." Id. Defendants include WCJ documentation of Bennett's lengthy medical problems. See Ex. C to Fay Decl.

[9]   See Compl. Section II–D.

[10]   See id.

### III. APPLICABLE LAW

#### A. Rule 12(c)

Under Rule 12(c), after the pleadings close but before the trial begins, a party may move for judgment on the pleadings provided that the motion is made early enough so as not to delay the trial. [11] Judgment on the pleadings should be granted if it is clear that the moving party is entitled to judgment as a matter of law. [12] In evaluating a motion for judgment on the pleadings, the court applies the same standard as that applicable to Rule 12(b)(6) motions to dismiss for failure to state a claim. [13] As in the context of a motion to dismiss, the court "must accept as true all of the factual allegations contained in the complaint" [14] and "draw all reasonable inferences in the plaintiff's favor." [15] Even so, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness." [16] In deciding a motion for judgment on the pleadings, a court may consider

[11]     See Fed.R.Civ.P. 12(c).

[12]     See Burns Int'l Sec. Servs. v. International Union, 47 F.3d 14, 16 (2d Cir.1995).

[13]     See Patel v. Contemporary Classics, 259 F.3d 123, 126 (2d Cir.2001).

[14]     Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 572 (2007). Accord Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir.2009).

[15]     Ofori–Tenkorang v. American Int'l Group, Inc., 460 F.3d 296, 298 (2d Cir.2006).

[16]     In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir.2007) (quotation omitted).

the pleadings and exhibits attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings. [17]

[17]     Prentice v. Apfel, 11 F.Supp.2d 420, 424 (S.D.N.Y.1998) (citing Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.1993)).

**B. Prison Litigation Reform Act**

**\*2** The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust all administrative remedies before

bringing an action regarding prison conditions. [18] The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [19] "[A]s long as other forms of relief are obtainable through administrative channels, the provision is applicable even to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings." [20]

[18]     See 42 U.S.C. § 1997e(a) (providing that "no action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."). See also Porter v. Nussle, 534 U.S. 516, 516 (2002).

[19]     Porter, 534 U.S. at 532.

[20]     Booth v. Churner, 532 U.S. 731, 741 (2001) (requiring an inmate to complete the prison administrative process before suing over prison conditions even where the inmate sought only money damages, which could not be recovered through the administrative process).

Failure to exhaust is an absolute bar to an inmate's action in federal court as "[section] 1997e(a) requires exhaustion of available administrative remedies before inmate-plaintiffs may bring their federal claims to court at all." [21] Failure to exhaust is an affirmative defense, however. [22] As such, plaintiff need not plead exhaustion in the complaint. [23]

[21]     Neal v. Goord, 267 F.3d 116, 122 (2d Cir.2001), rev'd. on other grounds (quotation marks and citation omitted) (emphasis in original).

[22]     See Jenkins v. Haubert, 179 F.3d 19, 28–29 (2d Cir.1999).

[23]     See Jones v. Bock, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

when (1) administrative remedies are not available [24] to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [25]

[24] To be available, an administrative remedy must "afford the possibility of some relief for the action complained of." *Booth,* 532 U.S. at 738. In some circumstances, the behavior of the defendant may render administrative remedies unavailable. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (remanding case to the district court to determine whether some seemingly available remedies were rendered unavailable by threats made by correction officers).

[25] *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

When any of the above are present, the affirmative defense of non-exhaustion fails. [26] Where (1) administrative remedies were available to the plaintiff, (2) defendants are not estopped and have not forfeited their non-exhaustion defense, and yet (3) plaintiff did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged to justify "the prisoner's failure to comply with administrative procedural requirements." [27]

[26] *See Hemphill,* 380 F.3d at 686.

[27] *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought' ... does not constitute proper exhaustion." [28] "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " [29]

[28] *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005)) (noting that Braham cannot survive *Woodford v. Ngo,* 548 U.S. 81, 94–95 (2006), which states that plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to [prison] staff.").

[29] *Id.* (quoting *Woodford,* 548 U.S. at 95).

### C. Westchester County Department of Corrections Inmate Grievance Program

The Westchester County Department of Corrections ("WCDOC"), Jail Division, has an established Inmate Grievance Program ("IGP") approved by the New York State Commission on Correction ("NYSCOC") . [30] A "grievance" is defined as "any inmate/detainee complaint relating to any facility policies, procedures, rules, practices, programs or the action or inaction of any person within the facility ." [31] In 2009, the IGP allowed inmates to make informal complaints to the Block Officer, who would log such complaint and attempt to resolve them. [32] Grievances that could not be resolved in this manner entered a formal process affording two levels of subsequent appeal. [33]

[30] *See* Affidavit of Anthony Amicucci ("Amicucci Aff."), Warden of the Westchester County Department of Correction, ¶ 5; *see also* Ex. 1 to Amicucci Aff. (copy of the WCDOC grievance procedures).

[31] Amicucci Aff. ¶ 8.

[32] *See id.* ¶ 9.

[33] *See id.* ¶¶ 11–13. *See also* Westchester County Department of Correction Policy and Procedure, Ex. 1 to Amicucci Aff. at 4 (attached as Ex. E to Fay Deck) (chart showing time schedule for grievance filing and appeal).

### IV. DISCUSSION

#### A. Defendants Have Adequately Demonstrated Bennett's Failure to Exhaust Administrative Remedies

**\*3** Despite Bennett's claim that he filed a grievance at WCJ that was denied, [34] a search of the grievance

log records maintained by WCDOC between February 20 and February 27, 2009 did not reveal any record of a grievance by Bennett concerning his medical care. [35] Bennett claims he informed Warden Amicucci of his grievance. [36] Warden Amicucci states in his sworn affidavit that Bennett never contacted him about any claims. [37] Regardless, notice to a prison official is insufficient. [38] As such, Defendants have adequately supported the affirmative defense of failure to exhaust.

[34]     *See* Compl. Section IV–F.

[35]     *See* Amicucci Aff. ¶ 17. Although Bennett completed Complaint Section IV–F, which asks the inmate to describe the grievance claim if one had been made, he also completed Section IV–G, which states, "If you did *not* file a grievance, did you inform any officials of your claim(s)?" Also, in describing "all efforts to appeal [the instant claim] to the highest level of the grievance process," Bennett simply writes that he has "always appeal [sic] and never sign agreeing." Compl. Section IV–F(3). Bennett cannot have appealed if he never filed an initial grievance.

[36]     *See* Compl. Section IV–G

[37]     *See* Amicucci Aff. ¶ 18.

[38]     *See Macias,* 495 F.3d at 44.

## B. Bennett Has Not Sufficiently Alleged Facts Supporting an Exemption From the Exhaustion Requirement

In light of Defendants' affirmative defense of non-exhaustion, the instant motion now presents three issues: (1) whether administrative remedies were available to Bennett, (2) whether Defendants are estopped from asserting exhaustion as a defense, and (3) whether special circumstances excuse Bennett's failure to exhaust administrative remedies. Bennett has not alleged any facts to support an exemption from the exhaustion requirement.

*First,* Bennett does not allege that all available administrative remedies were procedurally unavailable at WCJ. When first processed into WCJ, inmates receive a packet called "The Inmate Rules and Regulations." [39] The Inmate Rules and Regulations advise inmates that grievance forms are available from the correction staff and from the Law Library. [40] Bennett does not allege that these forms were not available to him or that they did not "afford the possibility of some relief for the action complained of." [41]

[39]     *See* Amicucci Aff. ¶ 6; *see also* Ex. 2 to Amicucci Aff. (copy of the Inmate Rules and Regulations packet).

[40]     *See* Amicucci Aff. ¶ 6.

[41]     *Booth,* 532 U.S. at 738. Bennett was allegedly familiar with the WCJ grievance process, having filed an unrelated grievance about two years prior to commencing this action. *See* Amicucci Aff ¶ 19; *see also* Ex. 3 to Amicucci Aff. (photocopy of WCJ's log of Bennett's unrelated May 2007 grievance).

*Second,* Bennett does not allege that all available administrative remedies were rendered unavailable by any action of any defendant. *Third,* Bennett does not allege that any defendant ever acted in any way that would estop Defendants from asserting non-exhaustion as a defense, or that any special circumstances exist to justify Bennett's failure to exhaust all possible remedies.

## V. CONCLUSION

Because Defendants have adequately supported the affirmative defense of failure to exhaust and because Bennett has not presented any facts on which this Court could base an exception, his Complaint is dismissed without prejudice. Bennett may file a new action once he has exhausted all remedies, as required by PLRA section 1997e(a). Accordingly, Defendants' motion to dismiss is granted. The Clerk of the Court is directed to close this motion [Docket No. 17] and this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2159199

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

1994 WL 519902
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martin HODGE, Plaintiff,

v.

Thomas A. COUGHLIN III, Commissioner of
the New York State Department of Correctional
Services; Robert Greifinger, Deputy Commissioner
and Chief Medical Officer of the New York State
Department of Correctional Services; Gustav
Gavis, Regional Medical Director of the New
York State Department of Correctional Services;
and Guy Tufau, Director Facility Health Services
of Sullivan Correctional Facility, Defendants.

No. 92 Civ. 0622 (LAP).
|
Sept. 22, 1994.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW OPINION

PRESKA, District Judge.

**\*1** Plaintiff brings this action under 42 U.S.C. §
1983 for violation of his Eighth Amendment rights
under the Constitution. Plaintiff alleges that defendants,
officials of the New York State Department of
Correctional Services ("DOCS"), have been deliberately
indifferent to his serious medical needs. The case
centers around the treatment of Mr. Hodge's right eye,
eyelid and surrounding tissue. Plaintiff seeks declaratory
judgment; an injunction directing defendants to provide
constitutional medical care; and compensatory and
punitive damages.

A bench trial was held over six days following which
time the Court reserved judgment. The Court has made
the following findings of fact and conclusions of law
pursuant to Fed.R.Civ.P. 52. The Complaint is dismissed,
and judgment in favor of defendants shall be entered.

I. *Findings of Facts*

A. Plaintiff's Medical Condition

Plaintiff Martin Hodge contracted herpes zoster
ophthalmicus when he was thirteen years old. Tr. at 16. [1]
Herpes zoster ophthalmicus is a viral infection that affects
the first branch of the trigeminal nerve. Tr. at 99. The
trigeminal nerve is one of the cranial nerves affecting the
eye, face and forehead. *Id.* Some of the effects of herpes
zoster ophthalmicus are deep inflammation and scarring
of the skin, neuralgia, [2] corneal scarring, atrophy of the
iris, neurotrophic keratitis, keratouveitis [3] and pain. Tr.
at 99, 100, 377.

Herpes zoster presents one of the most difficult corneal
problems that a corneal specialist can encounter in his
or her practice. Tr. at 362. Very few patients with herpes
zoster ophthalmicus undergo corneal transplant surgery
because of the very high risk involved and due to the
reluctance among many corneal specialists to perform the
surgery. Tr. at 363. For example, between 1941 and 1973
at Johns Hopkins University, approximately 1000 corneal
transplants were performed. Out of that 1000, only three
transplants were performed on patients with herpes zoster
ophthalmicus. Tr. at 362. Similarly, between 1980 and
1985 at the University of Michigan, approximately 1300
transplants were performed. Of the 1300 transplants, only
ten were performed on patients with herpes zoster. Tr. at
362.

One of the risks associated with herpes zoster is that
wounds will not heal properly because of the lack of nerve
stimulation to the cornea. Tr. at 367. Herpes zoster is a
complicated medical condition. While there is corrective
surgery available to treat an eye inflicted with herpes, there
is no treatment for the disease. Surgery is only a remedial
action for something that may occur again and again. Tr.
at 323.

Plaintiff's attack of herpes zoster was acute and severe. He
suffered severe pain, blistering of the right eye, scabbing
and scarring of the internal and external surfaces of the
lid, damage to the tear duct of his eye and scabbing and
scarring to his forehead. As a result of the disease, he was
afflicted with entropion, or a turning in of the eyelid, and
trichiasis, a condition in which the eye lashes rub against
the surface of the eye, resulting in irritation and disease.
Tr. at 16, 17, 54, 55, 100, 101, 320, 323.

**\*2** Subsequent to the acute episode of herpes, plaintiff
had several skin grafts at Jacobi Hospital to repair his

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

right eyelid. These grafts did not succeed in enabling plaintiff's right eye to close. Tr. at 17. Ultimately, despite the risk involved, plaintiff had plastic and optic surgery from Lester Silver, M.D. and Murray Meltzer, M.D., which included a corneal graft. [4] Tr. at 18, 54, 55.

Notwithstanding the surgery, plaintiff has suffered and continues to suffer pain. For example, he experiences post herpetic neuralgia during weather changes. Pain travels down the right side of his forehead and flares out across the eye. Tr. at 19, 320. He also needs to use artificial tears to lubricate the eye and predforte, a medication to prevent corneal graft rejection. [5] Tr. at 19. However, he has a normal left eye, with perfect vision that may exceed 20/20. Tr. at 68, 351; Trial Exh. 5 ("Exh.—").

### B. Plaintiff's Entry into the Prison System

In 1986, plaintiff was incarcerated at Riker's Island, which is part of the New York City Correctional System. At Riker's Island plaintiff's vision in his right eye became blurry due to a cataract, which was probably induced by the steroid medication prescribed to keep the corneal graft from rejecting. Tr. at 105, 106. The cataract was removed in 1986, but a new lens was not inserted. Tr. at 20. A flap of skin created by the cataract surgery caused him discomfort, which plaintiff attempted to relieve with advil and motrin. Tr. at 21. When plaintiff entered the New York State prison system in November 1986, he was still suffering from the effects of this condition. Tr. at 23.

### C. Initial Medical Care

Upon becoming an inmate in the prison system of the New York State Department of Correctional Services, plaintiff was referred to ophthalmology and plastic surgery clinics for plastic surgery consultations to treat the ptosis or drooping right eyelid. From June 1987 until the end of 1988, plaintiff was seen intermittently at ophthalmology or plastic surgery clinics. Exh. 27. The surgeons who evaluated Mr. Hodge's condition had differing opinions as to the correct course of treatment and whether plastic surgery was advisable. In July of 1987, a surgeon concluded that the ptosis could be treated, however, plaintiff would risk exposure, infection and possible loss of the globe. Tr. at 359; Exh. 27 at 180, 183. In October of 1987, a plastic surgeon recommended that the eyelid should not be lifted. Exh. 27 at 183. This doctor noted

on a previous visit that plaintiff was "able to close eye completely." *Id.* at 180.

Nonetheless, surgery to correct the ptosis and entropion was performed on December 12, 1988 at the Albany Medical Center ("AMC"). Tr. at 24, 25, 359–362; Exh. 27 at 189–196. After the surgery, plaintiff received numerous follow-up appointments. A few months after the surgery, plaintiff developed bullous keratopathy, which is a swelling of the cornea with blistering, and graft rejection. This was noted during an examination at AMC by Peter Zloty, M.D., who was an attending physician and Director of the AMC Ophthalmology Clinic. Tr. at 360; Exh. 27 at 197. Richard Smith, M.D., former chairman of the ophthalmology department at AMC, confirmed the graft rejection at AMC on January 3, 1989, noting graft failure with exposure keratopathy in his report. Tr. at 360; Exh. 27 at 196, 197, 198, 201. Exposure occurs when the lids do not meet. Tr. at 553.

**\*3** Defendants' expert, Gregory J. Pamel, M.D., a board-certified ophthalmologist, explained that it appeared from the medical records of plaintiff's condition directly after the plastic surgery that "because the eye was exposed, the surface layer broke down," causing graft rejection. Tr. at 360, 552–53. The eye, which apparently had full or near closure before the plastic surgery, may have slightly overcorrected. *Id.* Therefore, the concerns of some of the ocular plastic surgeons who had examined Mr. Hodge prior to the surgery appear to have been realized. Tr. at 360.

However, plaintiff's expert, Dr. Zloty, testified that the graft rejection occurred due to the failure of defendants to treat plaintiff's trichiasis effectively. Tr. at 112, 113. Based on all of the evidence, including observation of the witnesses, this Court found Dr. Pamel's testimony (citing exposure as the probable cause) more credible than that of Dr. Zloty. As noted by Dr. Pamel, the treating doctor listed exposure, and not trichiasis, as the cause of the graft rejection, Tr. at 553. Furthermore, from his review of the medical records, Dr. Pamel noted that plaintiff's trichiasis was documented intermittently and appropriately controlled. Tr. at 412, 553.

After the rejection was diagnosed, plaintiff received frequent examinations and treatments by resident and attending ophthalmologists at AMC, and by Gregory Goldman, M.D., also an ophthalmologist, at

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

Shawangunk Correctional Facility ("Shawangunk"). Tr. at 26–29; Exh. 27 at 196–198, 201. On April 4, 1989, plaintiff was diagnosed at AMC as having an ulcer in his right eye. After being treated, he was scheduled to return to AMC on April 12, 1989.

He was instead referred to the Shawangunk Eye Clinic and treated by Dr. Goldman on April 8, 1989. Tr. at 60–62, 677. Dr. Goldman did not observe an ulcer on the eye, which had evidently healed, and he treated Mr. Hodge for a blep or blister. Tr. at 677; Exh. A at 251. The blep was probably the result of the corneal graft rejection process. Tr. at 678. For follow-up care, Dr. Goldman instructed medical personnel at Sullivan Correctional Facility ("Sullivan") to telephone him on April 14th. Pursuant to his instructions, Dr. Goldman was called on April 14, 1989. Tr. at 678–79, 688–689; Exh. A at 120. Subsequently, plaintiff's eye was examined on many occasions at the Sullivan Clinic, and on May 19, 1989, a provider noted that plaintiff's right eye looks "very good." Exh. 27 at 98.

At times, follow-up care was provided by a general practitioner, who consulted with a corneal specialist. Dr. Pamel testified that under ideal circumstances it is best that a patient be followed by an ophthalmologist, but it is not unreasonable to have a general practitioner provide follow-up care in consultation with an opthalmologist. In fact, Dr. Pamel testified that in his own private practice there are instances when he speaks with a relative and prescribes medication over the phone because the patient is not able to come to his office. Tr. at 386–87.

**\*4** After plaintiff was diagnosed with corneal graft rejection, physicians began to consider performing a new corneal transplant and lens insertion. Exh. 27 at 222, 224. On July 31, 1989, the ophthalmologist at the AMC ophthalmology clinic recommended that plaintiff be given a follow-up appointment with Dr. Goldman at Shawangunk for a corneal transplant. However, the physician also requested that Mr. Hodge return to AMC in at least six months for "any eye infection/severe pain/abrupt loss of vision OD." Exh. 27 at 224. Thereafter, Dr. Goldman informed Guy Tufau, M.D., Sullivan's Medical Director and a defendant in this case, that since AMC was able to provide tertiary care, Mr. Hodge should return to AMC for evaluation regarding the proposed corneal transplant rather than to the Shawangunk clinic. Exh. 27 at 225. Dr. Goldman's practice is limited to

general ophthalmology and the treatment of cataracts and glaucoma, and therefore the AMC clinic was the more appropriate place for Mr. Hodge to undergo evaluation. Tr. at 673.

Moreover, plaintiff had a history of continuous treatment at AMC. In the past, he had been treated by Dr. Smith, who was in charge of corneal transplants at AMC, and Mr. Hodge was already on the waiting list at AMC for a corneal transplant. However, AMC could not determine when the procedure would occur. Exh. 27 at 108, addendum to 9/7/89. There was a shortage of corneal tissue in the upstate New York area at that time, Tr. at 242, 578–79, and the waiting list for corneal transplant tissue was twelve to sixteen months. Tr. 578–579. Mr. Hodge believed that he might have to wait as long as two years. Tr. at 333, 461, 716, 720.

### D. Plaintiff's Treatment By Murray Meltzer, M.D.
Frustrated with the waiting list at AMC and Dr. Goldman's reluctance to perform the corneal graft, plaintiff suggested to Sharon Lilly, the nurse administrator at Sullivan, that Dr. Meltzer, the ophthalmologist who performed his original corneal graft in 1983, be contacted. Dr. Tufau concurred with plaintiff's suggestion. Nurse Administrator Lilly, therefore, telephoned Dr. Meltzer and scheduled an appointment. Tr. at 34, 64, 65, 463, 464, 465, 466, 717, 718.

Thereafter, beginning March 16, 1990, plaintiff's ophthalmological problems were treated by Dr. Meltzer. Plaintiff was transported to Dr. Meltzer's office in New York City on approximately five occasions. Tr. at 34, 64, 65, 463 and Exh. 27 at 237 (March 16, 1990); Exh. 27 at 238 (April 4, 1990); *Id.* at 239 (April 25, 1990); *Id.* at 240 (June 1, 1990); *Id.* at 244 (September 21, 1990). It is not the policy of DOCS, and is in fact quite unusual, for correction officers to transport and escort an inmate to the private physician the inmate used prior to incarceration. Tr. at 480. During the period of Dr. Meltzer's treatment, plaintiff was also sent to the ophthalmology clinic at AMC for an examination after an altercation in which Mr. Hodge was struck in the right eye. Exh. 27 at 242.

**\*5** In a letter to Dr. Tufau dated March 15, 1991, Dr. Meltzer recommended surgery consisting of penetrating keratoplasty (corneal graft) and IOL insertion (lens transplant), to be performed at Elmhurst General Hospital. Tr. at 34, 460; Exh. 27 at 237, 239, 244–245.

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

Dr. Tufau approved the surgical plan, and Nurse Lilly scheduled the appointments and made inquiries about setting up the necessary arrangements for security. Tr. at 336–40, 718. After learning of Dr. Meltzer's surgical plan, Exh. 27 at 245, Deputy Superintendent Clement Capuano, who, as Deputy Superintendent for Administration at Sullivan, has jurisdiction over the administration of the medical department, contacted Gustav Gavis, M.D. Tr. at 516. As Regional Medical Director, Dr. Gavis, who is also a defendant in this case, was the appropriate person to contact in order to coordinate the treatment of plaintiff. Tr. at 523–524.

Initially, Dr. Gavis supported the decision that plaintiff's surgery would be performed in New York City by Dr. Meltzer. Tr. at 308. When he learned that the surgery was scheduled at Elmhurst General Hospital, however, a problem arose because Elmhurst General Hospital does not accept New York State inmates. Tr. at 309. This policy originated in 1984, when a shooting occurred at Elmhurst General Hospital involving a New York State inmate and two corrections officers. Tr. at 310; Exhs. D1, D2. As a result of the shooting, Esta Armstrong, former director of prison services for the New York City Health and Hospital Corporation ("NYCHHC"), barred state inmates from utilizing the services of Elmhurst General Hospital, which is part of NYCHHC. Exh. D1. This policy continues to exist for all NYCHHC hospitals. Tr. at 616, 617, 664, 665.

Dr. Meltzer did not offer to perform surgery at any other of the medical centers at which he is on the staff. This may have been because physicians are often reluctant to perform surgical procedures on prisoners in private hospitals. Tr at 642–43. In any event, it was the NYCHHC policy, and not cost and security arrangements, which was the determinative factor in the decision that the surgery could not take place at Elmhurst General Hospital. Although the need for security and the added cost are always considerations in deciding whether to place an inmate in a nonsecure hospital, security has frequently been arranged to facilitate such a placement. Tr. at 466–67, 493–94, 504–05, 526, 616–18).

### E. Plaintiff's Surgical Procedures at Albany Medical Center

Because the surgery could not be performed at Elmhurst General Hospital, and Dr. Meltzer did not propose any alternate site for the surgery, Dr. Gavis contacted AMC to arrange for the surgery to be performed there after all. Tr. at 315. Although in the past there had been difficulties scheduling some New York State inmates at AMC, there were never problems in scheduling plaintiff for examination and treatment at AMC. This was principally because Mr. Hodge was a former AMC patient with a unit number, which insured that he would remain a patient of AMC. Tr. at 324, 635, 636. [6] The delay experienced by plaintiff in having surgery performed at AMC was no different than that endured by all AMC patients requiring corneal surgery. Tr. at 324, 715.

**\*6** Therefore, shortly after Dr. Gavis' involvement and approximately four months after defendants received notice of Dr. Meltzer's surgical plan and the fact that Dr. Meltzer could not perform the surgery, plaintiff received an appointment at AMC. Exh. 27 at 244; Exh. 25 at 3, 4. On July 29, 1991, plaintiff was evaluated for a corneal transplant and lens insertion by Dr. Zloty. Tr. at 94; Exh. 27 at 247.

Dr. Zloty planned a staged surgical procedure where he would perform a lens implant first and, after allowing the eye to "quiet down," proceed with the corneal transplant in a separate procedure if the initial procedure was sufficiently successful. Tr. at 140–41, 170. On August 22, 1991, he initially performed a corneal photocoagulation (laser treatment) to shrink the blood vessels in the cornea. Exh. 27 at 247. He saw Mr. Hodge on at least two or three other dates before performing a lens insertion on November 5, 1991. Exh. 27 at 251. Finally, additional photocoagulation treatments and a YAG capsulatomy were performed to open up the membrane of the posterior capsule. Exh. 27 at 260; Exh. 25 at 40. During the surgery itself, Dr. Zloty removed a region of blood vessel ingrowth, a small conjunctival tag and three or four of the largest bumps on the upper side of the cornea. Tr. at 139–144; 166–168; Exh. 25; Exh. 27 at 242–273.

Dr. Zloty saw Mr. Hodge six to ten times for post operative care. Tr. at 181–83; Exh. 25. In fact, the medical records show that between his initial consultation on July 29, 1991 through the surgery and follow-up appointments, which apparently concluded on March 4, 1992, plaintiff had fourteen consultations at AMC. Exh. 27 at 242, 247–48, 250–51, 253–558, 260, 262, 264–65. Each time Dr. Zloty scheduled a follow-up appointment, DOCS transported plaintiff to AMC. Tr. at 219.

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

While Dr. Zloty's surgical procedures did alleviate some of Mr. Hodge's pain, they did not improve his vision and in fact his vision may have deteriorated. Tr. at 144–45, 155–56, 186–97. After the lens was inserted, it displaced. Tr. at 196. In addition, the YAG capsulatomy was not successful, in that the opening in the membrane resealed itself. Tr. at 195–98. Indicative of this lack of success, on November 13, 1991, eight days after the surgery, Dr. Zloty noted "[m]arkedly changed appearance since last visit? Trauma. (Pt. [patient] denies). Wound leaks interiorly." Exh. 27 at 255. Then on June 4, 1992 he noted "no improvement to aphakic correction (+ 12.00 lens)." Exh. 25 at 43.

In actuality, it was unlikely that Dr. Zloty's surgical plan would significantly improve plaintiff's vision. Pre-operatively, plaintiff's vision in the right eye was 20/400, and with a lens placed in front of his eye, the vision only improved to 20/200. Tr. at 364–65; Exh. 25 at 6–7. More importantly, Dr. Zloty's plan of performing the lens implantation and corneal graft during two different surgeries was questionable, as this doubled the risk of hemorrhage, infection, inflammation, and other dangers associated with eye surgery. Tr. at 367–368.

### F. Plaintiff's Scheduled Surgery
### with Richard Smith, M.D.

**\*7** After Dr. Zloty's surgical procedures, plaintiff was seen almost monthly at either the Fishkill or AMC clinic up until his referral to Dr. Smith for corneal transplant evaluation on February 4, 1993. [7] Dr. Gavis personally contacted Dr. Smith, the former chairman of the ophthalmology department at AMC, to ascertain if he would be willing to see Mr. Hodge in his private practice, and Dr. Smith agreed. Tr. at 315–16, 579, 583, 637–639. At his initial visit, plaintiff was examined at Dr. Smith's private office in Albany. At that time, Dr. Smith recommended a corneal graft, an anterior vitrectomy, a relocation of the displaced lens and possible removal of scar tissue. Tr. at 567–68, 572; Exh. 28 at 36.

Dr. Smith scheduled plaintiff's surgical procedure, including the corneal graft, for September 29, 1993. On September 29, 1993, DOCS transported Mr. Hodge to Memorial Hospital for the surgery. The corneal tissue was in the refrigerator adjacent to the operating room ready to be used in the surgery. Tr. 574–75. Immediately prior to the surgery, Dr. Smith visited the ambulatory room to

see Mr. Hodge and to insure that preoperative procedures had been taken. At this time, Mr. Hodge handed Dr. Smith two very detailed letters from Dr. Zloty addressed to plaintiff's attorney, William D. Rold, Esq., providing Dr. Zloty's prognosis and recommending specific surgical techniques and post operative care. Tr. at 569.

Dr. Smith disagreed with several points of Dr. Zloty's treatment. However, plaintiff informed Dr. Smith that he strongly wished Dr. Smith to treat him according to the procedure outlined in Dr. Zloty's letter. Since Dr. Smith believed that Dr. Zloty's treatment plan was not appropriate, Dr. Smith was compelled to cancel the surgery. Tr. at 569–571, 574–575; Exh. A at 271, 273–276). As testified by Dr. Smith:

> So it put me in the no win position of either going against Dr. Zloty's treatment plan and Mr. Hodge's expressed strong wishes or else going along with it and doing something that I didn't think was appropriate based on my personal clinical judgment.

Tr. at 571. As he further stated in his letter dated October 1, 1993:

> Based on all of the above, I felt that Mr. Hodge's actions had irretrievably broken the doctor/patient relationship, and I cancelled the surgery because I felt severely threatened by the situation.

Exh. A at 273–274. Dr. Smith's decision not to perform the surgery was a reasonable and appropriate exercise of his professional judgment. Other surgeons in his position would have made the same decision. Tr. at 389, 637–640. Mr. Hodge's own conduct in insisting on a certain surgical procedure caused the surgery, which was moments away from being performed, to be cancelled.

Plaintiff interfered with his medical treatment on other occasions as well by failing to keep medical appointments and refusing medications. Tr. at 71–72, 723; Exh. A at 25, 49, 85, 104, 108, 134, 251. While at least one of Mr. Hodge's failures to appear was due to his being in court, Exh. A at 25, on one occasion he refused to leave for a medical appointment on time because he wanted to finish

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

his lunch. Exh. A at 104. Mr. Hodge also failed to provide the medical department with advance notice that he was going to run out of his medications, which would have permitted the facility to renew his prescriptions in a timely manner. Tr. at 713; Exh. A at 59, 61.

**\*8** Plaintiff contends that not only did he provide sufficient advance notice, many times defendants failed to provide him with the proper artificial tears prescription, and, on one occasion, delayed twelve days before providing him with a graft rejection medication. Tr. at 146. Nurse Lilly testified that when prescribed medicine was out of stock, the inmate's doctor was called and a substitute medicine was provided. Tr. at 711–12. [8] For example, Dr. Pamel testified that there are many substitute medications for Mr. Hodge's prescribed artificial tear medication, celluvisc. Tr. at 394–95, 543. Furthermore, there is no evidence that Mr. Hodge suffered specifically because of the twelve-day delay in receiving the graft rejection medication.

G. Plaintiff's Overall Medical Care

Since 1989 plaintiff has been transported to a total of 52 consultations by medical specialists. Tr. at 739. This averages to almost one specialty consultation per month. *Id.;* Exh. I. Moreover, from 1989 through 1993, plaintiff has experienced a total of 402 health care encounters with physicians, nurses and physician assistants at the facility clinics. [9] Tr. at 739–749; Exh. I. Altogether, over a five year period, plaintiff averaged 1.7 encounters each week with some kind of health care provider.

Plaintiff argues that while he may have been "seen" by "medical staff" extensively, he did not receive continuous or adequate treatment from specialists. In support of this argument, plaintiff asserts that Dr. Meltzer's treatment plan was aborted, Dr. Smith never treated plaintiff and plaintiff did not receive continuous treatment at AMC, but merely had visits at AMC.

Rather than finding defendants' understanding of the term "treatment" as all-encompassing, however, the Court finds plaintiff's understanding of that term to be overly narrow. In the very least, when a patient is examined and diagnosed, the plaintiff has been "treated" by the physician. Although surgery by Dr. Meltzer was necessarily cancelled, plaintiff had approximately six appointments with Dr. Meltzer and

at each visit he was examined, diagnosed and provided with a recommendation. Exh. 28 at 238–44. Plaintiff was also examined, diagnosed and provided with a recommendation by Dr. Smith. Exh. 28 at 36. As noted above, when Dr. Smith was to perform the surgery, plaintiff required him to adhere to another doctor's treatment plan, causing Dr. Smith, not unreasonably, to cancel the surgery. Tr. at 569–71. Finally, plaintiff's appointments at the AMC clinic are too numerous to document, but the record is replete with evidence of plaintiff's being examined and diagnosed at AMC on numerous occasions.

H. Current Prognosis and Treatment Plan

Despite the cancellation of Mr. Hodge's surgery with Dr. Smith, he is still under consultation at Albany Medical Center. Tr. at 49, 324, 721–723. Subsequent to the aborted surgery, plaintiff was treated and/or evaluated at AMC on October 25, 1993, November 11, 1993, December 6, 1993, December 22, 1993, January 13, 1994 and February 4, 1994. Exh. 66 at 44–45, 48; Exh. 71 at 44–49; Exh. 72; Exh. V. [10]

**\*9** Mr. Hodge was examined on December 10, 1993 by Dr. Belin, an Associate Professor and Director of Corneal External Disease and Refractive Surgery at Albany Medical College. Tr. at 581. After examining plaintiff, Dr. Belin concluded that plaintiff represents a high-risk corneal transplant patient, given his previous graft rejection and heavy vascularization.

Dr. Belin recommended against surgery for a number of reasons. First, plaintiff has normal vision in his left eye. Therefore, in placing the surgical risks and benefits in perspective, since plaintiff is not in a "professional and/or social environment that requires binocular vision, this is a case that [Dr. Belin] normally would not recommend for surgical intervention." Exh. 70 at 2.

Secondly, the complexity and high risk of regrafting requires multiple and frequent examinations, which is difficult for an incarcerated person. Nevertheless, Dr. Belin's decision to recommend "no further surgical intervention is significantly not different from how [he would] evaluate non-incarcerated patients." Exh. 70 at 1–2. Given the risk-benefit ratio, Dr. Belin strongly urged no further intervention, since Mr. Hodge has only a limited potential benefit. Exh. 70 at 2.

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

Dr. Smith testified that he believed the conclusions reached by Dr. Belin were medically reasonable. Tr. at 581–82. Although Dr. Smith had originally agreed to perform the surgery, Dr. Smith recognized that there was a very guarded chance of success since plaintiff had a difficult case with a past history of surgeries and lid deformities. Tr. at 572. Additionally, Dr. Smith noted that the herpes zoster had attacked the eye causing loss of sensation in the cornea and affecting the tissue. As a result, the eye, especially the surface of the eye (which is critical in a corneal transplant) would not heal well. Tr. at 580–81. Dr. Smith summed up his prognosis:

> The bottom line is that almost anyone who has a severe enough damage to their cornea from shingles has a very poor prognosis for corneal grafting because of all these factors. They just don't heal well, they don't keep a clean graft, and they don't recover vision. Nevertheless, we try to do things, but we have to tell the patient that the outlook is not good.

Tr. at 581. Therefore, Dr. Smith estimated the chance of success as well below fifty percent. Tr. at 573.

Likewise, Dr. Pamel opined that even if there was a period of quiescence within which to perform surgery, major risks, such as infection and hemorrhage, would still be involved with surgery. Tr. at 547. Additionally, he explained that surgery causes inflammation which promotes graft rejection. He also agreed that Mr. Hodge's herpes zoster would create further wound healing problems. Tr. at 367. He estimated Mr. Hodge's chance of successful surgery at between thirty and forty percent. Tr. at 559.

Dr. Zloty, who was plaintiff's expert witness, also expressed doubt that a new corneal graft would be successful. As stated in his deposition:

> **\*10** To do more extensive surgery, such as a cornea transplant, has a risk of being counterproductive in that it can set up more inflammation.

Exh. 61 at 46; Tr. at 206. As further stated in his deposition:

> It would be an option for him if he wanted to take the risk of proceeding with an additional surgical procedure. Anytime you do any surgery, there is risk of infection and bleeding, and, particularly with a corneal transplant, a risk that it would reject it and become uncomfortably painful and make the situation even worse.

Exh. 61 at 50; Tr. at 210. Finally, in Dr. Zloty's letter dated August 26, 1993 to William I. Rold, Esq. he wrote:

> With vessel ingrowth noted 360 degrees, I would be hesitant to perform a repeat transplant. The patient would be at a high risk for rejection as well as a recrudescence of the inflammation often seen in zoster patients. Unfortunately, the posterior capsule is too fibrotic to be adequately incised with the YAG laser, as was my original intention.

Exh. 16 at 3.

Therefore, it seems that, although any type of surgery is inherently risky, with Mr. Hodge's added poor eye condition, more extensive surgery could very likely worsen his condition.

## II. *Conclusions of Law*

Recovery under the Eighth Amendment based on inadequate medical care is limited to those cases in which a prisoner can establish "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). There is an objective component to this standard, "was the deprivation sufficiently serious, violating contemporary standards of decency," *Helling v. McKinney,* 113 S.Ct. 2475, 2480–82 (1993); and a subjective component, "did the officials act with a sufficiently culpable state of mind?" *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 2324–26 (1991). In analyzing the objective component, the

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

Supreme Court has stated that "only those deprivations denying 'the minimal civilized measures of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (quoting *Rhodes v. Chapman, 452 U.S. 337, 347 (1981)*).

With respect to the subjective component, a plaintiff must prove that the defendant acted wantonly or with deliberate indifference. *Romano v. Howarth, 998 F.2d 101, 105 (2d Cir.1993)*. Proper allegations of "deliberate indifference" include allegations of callous indifference to medical needs; intentional denial or delay of an inmate's access to medical care; or intentional interference with treatment. *Estelle, 429 U.S. at 104–05; Harding v. Kuhlman, 588 F.Supp. 1315, 1316 (S.D.N.Y.1984), aff'd, 762 F.2d 990 (2d Cir.1985)*.

Negligence or mere allegations of malpractice on the part of a diagnosing or treating physician will not state a valid Eighth Amendment claim. *Estelle, 429 U.S. at 106 & n. 14.* "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle, 429 U.S. at 106*. Rather, the plaintiff must allege conduct that is " 'repugnant to the conscience of mankind' " or incompatible with the "evolving standards of decency that mark the progress of a maturing society." *Id. 429 at 102, 105* (citations omitted).

**\*11** A prisoner's disagreement with the diagnostic techniques or forms of treatment utilized by prison medical personnel does not give rise to a cognizable Eighth Amendment claim: "A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment." *Estelle, 429 U.S. at 107; accord, Tomarkin v. Ward, 534 F.Supp. 1224, 1230 (S.D.N.Y.1982)*. Nor does an allegation of "misdiagnosis or faulty [medical] judgment" state a claim. *Tomarkin, 534 F.Supp. at 1230*. Furthermore, a dispute between two doctors as to the proper course of medical treatment will not give rise to an Eighth Amendment violation. *Estelle, 429 U.S. at 107; Martinez v. Mancusi, 443 F.2d 921, 924 (2d Cir.1970), cert. denied, 401 U.S. 983 (1971)*.

The same standards apply to a claim of deliberate indifference to serious medical needs on the part of nonmedical prison personnel. To establish such a claim plaintiff must prove that prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known

to the attendant prison personnel or that the inmate suffered a complete denial of medical treatment. *Harding v. Kuhlman, 588 F.Supp. at 1315–16* (quoting, *Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir.1984)* and *Ferranti v. Moran, 618 F.2d 888, 890 (1st Cir.1980)*). "At a minimum, there must be at least some allegations of a conscious or callous indifference to a prisoner's rights." *Zaire v. Dalsheim, 698 F.Supp. 57, 59 (S.D.N.Y.1988), aff'd, 904 F.2d 33 (2d Cir.1990)*.

In the present case, the facts simply do not support the type of egregious lack of medical care that would establish a claim of "deliberate indifference" to serious medical needs. [11] On the contrary, although there were some short periods of delay in treatment at AMC, Mr. Hodge's eye condition was never ignored. The evidence demonstrates that plaintiff was seen on a regular basis by the health care providers at Green Haven, Sullivan, Newburgh, Fishkill and Shawangunk Correctional Facilities. Plaintiff's treatment was continuous and conformed with good medical judgment.

### 1. Alleged Delay in Providing Plastic Surgery

Mr. Hodge contends that there was a delay in providing him medical treatment for ptosis, since surgery was first recommended in April or May of 1987 and was not performed until December 12, 1988. As aforementioned, there were differing opinions as to whether plastic surgery to raise plaintiff's eyelid would place plaintiff's eye at risk, and the surgery likely did cause Mr. Hodge's subsequent graft rejection. Furthermore, far from being ignored during this period, plaintiff was seen quite often at ophthalmology and plastic surgery clinics. Therefore, especially due to the difference in medical opinion as to the advisability of the plastic surgery, the delay in performing the actual surgery was not unreasonable and certainly not "repugnant to the conscious of mankind." *Estelle, 429 U.S. at 102*.

### 2. Alleged Delay in Treating the Ulcer

**\*12** Mr. Hodge additionally argues that defendants delayed in treating his eye for an ulcer. On April 4, 1989 a doctor at AMC noted that plaintiff had an ulcer. Dr. Goldman testified that he examined plaintiff four days later and plaintiff did not have an ulcer, but a blep, or blister, induced by the graft rejection. In addition to the follow-up treatment by Dr. Goldman, plaintiff was seen

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

and evaluated at Sullivan by Dr. Tufau, who consulted with Dr. Goldman. Evidently, therefore, appropriate care was provided for this condition.

### 3. Alleged Delay in Further Corneal Surgery

In 1989, Dr. Smith placed Mr. Hodge on a twelve- to sixteen-month long waiting list at AMC for a corneal transplant. Tr. at 578–579. Being placed on a waiting list was not a denial of medical care, but normal for a person waiting for a corneal transplant. Tr. at 682. Indeed, Mr. Hodge's own expert, Dr. Zloty, testified that only a limited supply of corneal tissue exists in this country. Tr. at 242. The initial four-month delay in receiving an appointment with Dr. Zloty at AMC for evaluation of corneal transplant surgery (after Dr. Meltzer's surgical plan was aborted) was not sufficiently egregious to constitute an Eighth Amendment violation. Likewise, the seven-month delay in receiving the appointment with Dr. Smith for evaluation of corneal surgery (after Dr. Zloty left New York), especially in light of the intermittent care provided by the AMC and Fishkill clinics during the seven months, was also not sufficiently extreme to constitute deliberate indifference.

Plaintiff has additionally argued throughout the litigation that his claim that defendants' failure to render possible the surgery by Dr. Meltzer constituted an Eighth Amendment violation. Quite to the contrary, the fact that defendants facilitated plaintiff's treatment by his personal physician in the first place demonstrated their concern for plaintiff. Indeed, arranging for a prisoner's treatment by his private physician, with the attendant expense of transporting him under guard to Dr. Meltzer's unsecured private office, is a striking exception to prison protocol. Tr. at 307. In any case, it is not constitutionally required that an inmate be treated by a physician of his own choosing. *See Ross v. Kelly,* 784 F.Supp. 35, 46–47 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 113 S.Ct. 828 (1992); *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988). As recently stated by the District Court:

> We reject completely the notion that a prisoner has a constitutional right to select the doctor who treats him —a privilege not normally available even to those who pay for their own treatment at Health Maintenance Organizations.

*Gayle v. Howard,* No. 93–3267 (Goettel, J.) (S.D.N.Y. Jan. 11, 1994).

Furthermore, the additional delay in further corneal surgery was caused by Mr. Hodge's own conduct in insisting, on the verge of surgery, that Dr. Smith follow Dr. Zloty's surgical procedure and technique. The failure of defendants to obtain an early date for plaintiff's second corneal transplant, a procedure noted by many experts to be quite risky for Mr. Hodge, does not rise to the level of "deliberate indifference." *Estelle,* 499 U.S. at 104.

### 4. Alleged Shortages of Medication

**\*13** Plaintiff also alleges that defendants failed to provide him with prescribed medications. This allegation is without merit. The evidence shows that, at times, Sullivan was caught short of medications because plaintiff failed to notify the nurse before he ran out of medications. Nurse Administrator Lilly also facilitated plaintiff's receipt of medications that were difficult to obtain by arranging with AMC to fill prescriptions directly. Finally, as recently stated by the district court:

> The fact that the specific medication sought by plaintiff was merely out of supply belies the intentionality required to sustain an Eighth Amendment claim based on improper medical treatment.

*Leroy McBride v. Nurse Sandy Gomez, et al.,* 1994 WL 37816, at *2 (McKenna, J.) (S.D.N.Y. Feb. 8, 1994). *See also, United States ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2d Cir.1970) (prisoner's preference for pills as opposed to liquid form of medication did not make out an actionable claim).

### 5. Level of Plaintiff's Medical Care

The total number of health care encounters experienced by plaintiff, along with his frequent and steady appointments with ophthalmologists with corneal and anterior specialties hardly constitute a deprivation that denies "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). Nonetheless, the Second Circuit has recognized that despite receiving extensive medical care, a plaintiff could still have an Eighth Amendment claim where the quality of care is quite low or the care is

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

ineffective. *Kaminsky v. Rosenblum,* 929 F.2d 922, 924 (2d Cir.1991) (proof of three-month gap in care and failure to monitor plaintiff's condition despite alarming deterioration, resulting in death); *Archer v. Dutcher,* 733 F.2d 14, 15–17 (2d Cir.1984) (plaintiff identified intentional efforts of defendant to delay access to medical care when defendant knew that plaintiff was in extreme pain); *see also Williams v. O'Leary,* 805 F.Supp. 634, 638 (N.D.Ill.1992) (prison doctors prescribed ineffective medicine for over two years causing inmate constant pain).

Yet, while incarcerated persons are entitled to quality medical care, the level of care must be seriously low before an Eighth Amendment violation is established. As also recently stated by Judge Goettel:

> As "guests" of the state, prisoners are entitled to receive medical care. While their medical care is not necessarily of the highest quality (although it does exceed that available to many taxpayers who are paying for the prisoner's treatments), it must fall to a low level with serious repercussions before it constitutes a civil rights violation.

*Gayle v. Howard,* No. 93–3267 (Goettel, J.) (S.D.N.Y. Jan. 11, 1994); *Archer,* 733 F.2d 14, 17 ("[w]e have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital"). After hearing and reviewing the evidence in this case, this Court has found the quality of care to meet standards of reasonableness.

**\*14** Finally, throughout this litigation, plaintiff has also argued that defendants have failed to fund adequately and provide specialty medical consultations to plaintiff and other inmates in the New York State prison system. The care provided to inmates as a class is not at issue in this action. The evidence shows that plaintiff was provided with frequent, continuous and effective treatment with ophthalmologists who specialize in corneal and anterior eye diseases. Sharon Lilly, R.N., who, as nurse administrator at Sullivan, was responsible for scheduling specialty consults, testified that she never experienced a problem setting up timely consultations for specialty services.

Plaintiff argues, however, that the low rate of reimbursement to medical providers restricts the availability of specialists, especially surgeons, to treat inmates and that it has had a direct impact on his care. Individual providers are as a rule reimbursed at the Medicaid Rate. Presently, the rate for ophthalmology and plastic surgery is twenty-four dollars for initial and follow-up visits. Tr. at 653. As stated previously, however, plaintiff never suffered from the unavailability of ophthalmological services—the evidence clearly shows that the defendants were far from indifferent to the needs of Mr. Hodge for specialty medical services. Thus he has failed to prove the objective component of an Eighth Amendment claim.

Plaintiff has also failed to establish the subjective component of his claim, *i.e.,* that the defendants had the requisite state of mind necessary to show an Eighth Amendment violation. The defendant's conduct, together will all reasonable inferences to be drawn therefrom, does not come remotely close to meeting the standard of deliberate indifference; throughout plaintiff's incarceration in the state system he received good and adequate medical care and continues be provided with such care.

*Conclusion*

Plaintiff has not established a claim for violation of his Eighth Amendment rights, and, therefore, the Complaint is dismissed and judgment shall be entered for the defendants.

SO ORDERED.

1  The trial transcript is referred to as "Tr. at —".

2  Neuralgia is a pain that occurs after shingles from nerve inflammation. Tr. at 377.

3  Both neurotrophic keratitis and keratouveitis are types of inflammations. Tr. at 100.

4  A corneal graft, or corneal transplant, is a transplant of the front surface of the eye. Tr. at 102.

5  During a corneal transplant, part of the patient's cornea is removed and replaced with donor tissue. Corneal graft rejection occurs when the patient rejects

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

the donor tissue. Such rejection is a risk with any transplant. Tr. at 102, 104.

[6] Whether AMC was open to New York State inmates was an issue frequently raised during the trial. However, Nurse Administrator Sharon Lilly testified that she never had a problem scheduling a Sullivan inmate at AMC. Tr. at 332, 715. Hodge had a total of 20 consults at AMC, and was on the waiting list for a transplant as early as September 7, 1989. Exh. 27 at 108; Tr. at 333.

[7] Dr. Zloty had left New York and therefore could no longer treat plaintiff. In support of his claim, plaintiff asserts that there was a seven month delay from when he last saw Dr. Zloty at AMC on June 25, 1992 until he saw another ophthalmologist—Dr. Smith—in February 1993. However, this assertion is misleading. Upon review of the records, Mr. Hodge was seen at either the Fishkill or AMC clinic on the following dates in 1992 (unless otherwise noted): July 16, Ex. 28 at 31; August 26, plaintiff requested to see Dr. Tufau only, Ex. 28 at 7; September 17, Ex. 28 at 33; October 23, Ex. 28 at 34; November 18 and 27, a general practitioner consulted with an AMC ophthalmologist, who stated that there was no need for a consultation with Mr. Hodge until his regular check-up, Ex. 28 at 14, 15; January 18, 1993, Ex. 28 at 35. Far from being completely neglected for nine months, plaintiff was seen at least monthly at the plastic or eye clinic outside Sullivan.

Furthermore, the fact that Mr. Hodge had not seen an ophthalmologist regarding corneal transplant surgery since June 1992 is not unreasonable. After Dr. Zloty's surgery in November 1992, further corneal surgery could not be performed until a sufficiently long period of quiescence existed. The Court credits Dr. Pamel's testimony that for corneal graft surgery, a quiescent period of at least two to three years would be necessary. Tr. at 544. During the seven month period between seeing Dr. Zloty and Dr. Smith, Mr. Hodge's eye was certainly not "quiet." Ex. 28 at 11, 13, 31, 33.

[8] Plaintiff also cites inventory problems and inefficiency in providing medication at Sullivan due to the loss of its pharmacist. Plaintiff argues that the

pharmacist has not been replaced due to the low, uncompetitive salary offered for the position and that this has had a negative effect on his medical care. Nurse Lilly testified that, to the best of her knowledge, she does not recall a patient suffering because of medications being out of stock. Tr. at 711–12. When the pharmacist was phased out, the facility simply filled prescriptions from a central pharmacy or a local pharmacy. *Id.* She also testified that, although there were times that Mr. Hodge did not receive his necessary medication, this did not occur frequently. Tr. at 712.

[9] Approximately 36 of these visits were not eye-related.

[10] The latest examination of Mr. Hodge on February 4, 1994, occurred after trial and is therefore not a part of the trial record.

[11] The *Estelle* Court illustrated the type of conduct that would give rise to a cause of action under this standard by citing to several Circuit Court decisions: *See, e.g., Williams v. Vincent,* 508 F.2d 541 (C.A.2 1974) (doctor's choosing the "easier and less efficacious treatment" of throwing away the prisoner's ear and stitching the stump may be attributable to "deliberate indifference ... rather than an exercise of professional judgment"); *Thomas v. Pate,* 493 F.2d 151, 158 C.A.7), cert. denied sub nom. *Thomas v. Cannon,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974) (injection of penicillin with knowledge that prisoner was allergic, and refusal of doctor to treat allergic reaction); *Jones v. Lockhart,* 484 F.2d 1192 (C.A.8 1973) (refusal of paramedic to provide treatment); *Martinez v. Mancusi,* 443 F.2d 921 (C.A.2 1970), cert. denied, 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971) (prison physician refuses to administer the prescribed pain killer and renders leg surgery unsuccessful by requiring prisoner to stand despite contrary instructions of surgeon). 429 U.S. at 104, n. 10.

## All Citations

Not Reported in F.Supp., 1994 WL 519902

2010 WL 985184
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Rodney BROWN, Plaintiff,
v.
J. WHITE, Franklin
Correctional Facility, Defendant.

Civil Action No. 9:08-cv-200 (GLS/ATB).
|
March 15, 2010.

**Attorneys and Law Firms**

Rodney Brown, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Dean J. Higgins, Esq., of Counsel, Albany, NY, for the Defendants.

## *ORDER*

GARY L. SHARPE, District Judge.

 **\*1** The above-captioned matter comes to this court following a Report-Recommendation by Magistrate Judge Andrew T. Baxter, duly filed February 18, 2010. Following ten days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report-Recommendation for clear error, it is hereby

ORDERED, that the Report-Recommendation of Magistrate Judge Andrew T. Baxter filed February 18, 2010 is ACCEPTED in its entirety for the reasons state therein, and it is further

ORDERED, that defendant White's motion for summary judgment (Dkt. No. 44) is GRANTED and the complaint is DISMISSED IN ITS ENTIRETY, and it is further

ORDERED, that the Clerk enter judgment in favor of the defendant against the plaintiff, and it is further

ORDERED, that the Clerk of the court serve a copy of this order upon the parties in accordance with this court's local rules.

IT IS SO ORDERED.

## REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Gary L. Sharpe, United States District Judge.

In this amended civil rights complaint, plaintiff alleges that defendant denied him adequate medical care, in violation of the Eighth Amendment, from October 11, 2007 until January 15, 2008, while plaintiff was an inmate in the custody of the Franklin Correctional Facility ("Franklin"). (Dkt. No. 10). The defendant also construes the amended complaint as alleging that she retaliated against the plaintiff for demanding necessary medical care by lodging an unfounded misbehavior report against him. Plaintiff seeks unspecified monetary damages.

Presently before this court is the motion for summary judgment, pursuant to FED. R.CIV. P. 56, filed by the sole defendant, J. (Jerre) White, a nurse at Franklin. (Dkt. No. 44). Plaintiff filed an unsworn response which did not include a memorandum of law, affidavit, or response to the defendant's statement of material facts, as required by Local Rule 7.1(a). (Dkt. No. 48). For the following reasons, this court recommends that the defendant's motion for summary judgment be granted and the complaint dismissed in its entirety.

## DISCUSSION

### I. *Facts*

Plaintiff alleges that on February 27, 2007, he suffered head and lower back injuries due to a "slip and fall" at the Riker's Island Correctional Facility (Riker's Island).

Plaintiff states that he received medical treatment from, *inter alia,* a neurologist at Bellevue Hospital. Plaintiff was eventually transferred to Franklin on September 7, 2007 and initiated several sick-call visits to seek further treatment for the injuries purportedly resulting from the prior accident. (Amended Complaint (AC), Dkt. No. 10 at 7; Supplemental Ex. to AC, Dkt. No. 12 at 1).

**\*2** The Declaration of Nancy Armstrong [1] filed in support of the defendant's motion for summary judgment and related medical records (Ex. B, Dkt. No. 44-5) establish that the plaintiff was examined by the medical staff at Franklin upon his arrival on September 7, 2007, and by sick-call nurses on September 17, October 7, and October 9,2007. [2] (Dkt. No. 44-12 & Ex. B, Dkt. No. 44-5). The report of plaintiff's initial medical screening at Franklin indicates that he claimed to have "left back problems" resulting from a fall in February 2007; but the medical records at Franklin did not include prior documentation of the Riker's Island accident. (Armstrong Decl. ¶ 3; Ex. B at 27). On September 17, 2007, the medical staff scheduled an appointment for the plaintiff with a doctor to address his medical complaints, provided ibuprofen and an analgesic balm, and instructed the plaintiff to use moist heat to address his lower back pain. (Armstrong Declaration, ¶¶ 8,9; Ex. B at 27). [3]

[1]    Nancy Armstrong is the Nurse Administrator at Franklin and is not a defendant in this action. (Armstrong Decl., Dkt. No. 44-12, ¶ 2).

[2]    In his deposition, plaintiff admits setting up sick call visits at Franklin on multiple occasions. (Ex. F., Dkt. No. 44-9 at 15, 19). (Page numbers cited for Ex. F, plaintiff's deposition are the transcript page numbers, not the numbers assigned and printed in the CM-ECF header. Similarly, the page number for medical records in Ex. B are the page numbers printed by the Attorney General's Office in the bottom right-hand corner, not the CM-ECF page numbers. Otherwise, page number cited for the record those assigned in the CM-ECF header.)

[3]    During his September 17th visit, plaintiff advised the nurse that he had previously been provided more potent pain killers-Tylenol 3 and Percocet. (Armstrong Decl. (refers to "Percodan") ¶ 9; Ex. B at 27 (refers to "Percocet")). In his deposition, the plaintiff mentioned, at least twice, that he was prescribed Percocet and Tylenol-3

with codeine by medical staff before he arrived at Franklin. (Ex. F., Dkt. No. 44-9 at 8, 12, 14). (According to the DailyMed website, a service of the National Library of Medicine of the National Institutes of Health: (1) Percocet is a medication that combines oxycodone hydrochloride and acetaminophen–see http:/ /dailymed.nlm.nih.gov/ dailymed/drugInfo.cfm?id=13307; (2) Percodan combines the same active ingredient, oxycodone hydrochloride, with aspirin–see http:// dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?  id =13309.)

On October 9, 2007, plaintiff again complained of pain in his back and elsewhere. (Armstrong Declaration, ¶ 11; Ex. B at 26). An examination by a nurse of his back was negative, although the plaintiff was having slight difficulty bending at the waist. *Id.* The plaintiff refused Ibuprofen and stated that he would "take all of" whatever medication the nurse would give him. (Armstrong Decl. ¶ 13). Because the nurse was concerned that plaintiff would not take the medication as prescribed, and because he still had a doctor's appointment scheduled, she did not issue plaintiff the Ibuprofen. (Armstrong Decl. ¶¶ 14-16; Ex. B at 26).

On the morning of October 11, 2007, plaintiff sought emergency medical attention because of "serious pain" in his head and lower back and was seen by defendant, nurse Jerre White. [4] According to plaintiff's amended complaint and his deposition (Def. Ex. F., Dkt. No. 44-9 at 22, 23, 32), Nurse White refused to examine or assist him, accused him of lying about his medical condition, and caused him to be "locked up" by issuing a misbehavior report. The amended complaint suggests that Nurse White had made a prior threat to take action against the plaintiff if he came to sick call again.

[4]    Plaintiff's amended complaint (which does not have numbered paragraphs) erroneously states that he saw Nurse White on October 11, 200**8;** but his attached exhibits make clear that the relevant events started in October 200**7.** Several of the dates set forth in this factual statement were not specified in the amended complaint, but were determined by reference to other documents included in the record and do not appear to be in dispute.

In her sworn declaration, Nurse White states that, when the plaintiff appeared at Franklin's urgent care center on October 11th, she completed a "full exam" of the patient, and found that his vital signs were normal and

that he was not in any kind of distress. (White Decl. ¶ 1, Dkt. No. 44-11). She states that plaintiff's complaint was "chronic, but not acute," that he was issued over-the-counter pain medication, and was scheduled to see a doctor. Plaintiff's medical records corroborate that Nurse White examined the plaintiff and recorded his vital signs. (Ex. B at 25). Nurse White's contemporaneous progress notes also indicate that the plaintiff was referred for a psychiatric interview, and the social worker concluded he was fine, but manipulative. (Ex. B at 25; Armstrong Decl. ¶ 22).

**\*3** Nurse White concluded, based on her examination of the plaintiff and review of his prior medical records, that his complaint was not an emergency and should have been addressed in a regular nursing call. She issued a misbehavior report accusing plaintiff of falsely claiming an emergency and interfering with her regular duties. Nurse White averred that she issued the misbehavior report, not because the plaintiff was complaining of medical problems, but because he was deliberately abusing the facility's emergency sick call policy. (White Declaration ¶¶ 5-9; Ex. B at 25).

Nurse White stated that she did not treat the plaintiff at any time before or after October 11th, implicitly denying the suggestion in the plaintiff's amended complaint that she had previously threatened him with retaliation if he made further sick call visits. There is no indication in the plaintiff's medical records that he ever had a confrontation with any of the medical staff at Franklin. (Ex. C, Dkt. No. 44-6 at 20; Ex. B, Dkt. No. 44-5 at 21-30).[5]

[5]   In his deposition, plaintiff claimed that he was threatened with retaliation at one point if he made another sick call request, but could not identify who on the medical staff made that alleged threat. (Ex. F., Dkt. No. 44-9 at 31). He also testified that, prior to October 11, 2007, he had not experienced any problems with Nurse White or anyone else with the Department of Corrections. (Ex. F., Dkt. No. 44-9 at 31).

The Declaration of Carolyn St. Denis[6] (Dkt. No. 44-13) and the disciplinary records from Franklin (Ex. G, Dkt. No. 44-10) confirm that Nurse White's October 11, 2007 inmate misbehavior report resulted in the plaintiff being confined in his regular room, but only until the next morning. A disciplinary hearing on October 16, 2007 resulted in a guilty disposition and imposition of certain

sanctions on the plaintiff that were never implemented.[7] On October 18, 2007, the Superintendent of Franklin granted plaintiff's appeal, reversed the guilty finding, and vacated the sanctions. (Ex. G at 5).

[6]   Carolyn St. Denis is a records coordinator at Franklin. (St. Denis Decl. ¶ 1).

[7]   The sanctions imposed were 15 days of lost privileges of various kinds. In his deposition, plaintiff claimed that he "did some of the 15 days" before the Superintendent reversed the decision. (Ex. F., Dkt. No. 44-9 at 26-27).

At some point in this process, the plaintiff apparently showed the staff personal copies of his medical records (which apparently were not in the files of the medical staff at Franklin), corroborating his prior accident in February 27, 2007, and some of the subsequent medical treatment at other institutions. (Ex. G, Dkt. No. 44-10 at 5; Ex. C, Dkt. No. 44-6 at 21-22). These documents appear in the defendant's exhibit containing plaintiff's grievance documents. (Ex. C at 20-22). In response to plaintiff's grievance, Nurse Armstrong wrote a memorandum, indicating that there was "no documentation of [plaintiff's] previous injuries in his chart." (Ex. C at 20).

Although Nurse White's misbehavior report against the plaintiff was dismissed within one week, plaintiff's amended complaint suggests that he was deterred from seeking further medical treatment for months because of fear of retaliation from Nurse White or perhaps others on the medical staff.[8] The plaintiff was scheduled to see a doctor on December 15, 2007, but the appointment was postponed because he was in the special housing unit (SHU) at that time, for reasons unrelated to the merits of this action.

[8]   In the grievance report attached to the amended complaint, plaintiff alleges that he was threatened by unnamed nurses to leave sick call "or else," which placed him in fear for his safety. (Dkt. No. 10-1 at 5).

On December 15th, a nurse in the special housing unit at Franklin saw the plaintiff, who complained of headaches. The plaintiff said at that time that, unless the nurse could give him Percocet, she had nothing to offer him. On January 15, 2008, plaintiff, complaining of headaches and low back pain, was examined by a doctor who prescribed Naproxen 500 mg for his discomfort and ordered x-rays.

(Armstrong Decl. ¶¶ 23-26; Ex. B at 22-23). Plaintiff was transferred to Coxsackie in February 2008; his outgoing medical examination report from Franklin noted "chronic back pain," but "no acute health care issues," and reflected a continuing prescription for Naprosyn 500 mg. [9] (Ex. B at 21).

[9]      Naproxen is the generic name for a commonly-used nonsteroidal anti-inflammatory drug (NSAID). Naprosyn is one of several brand names for Naproxen. *See* DailyMed website-http:// dailymed.nlm.nih.gov/ dailymed/drugInfo.cfm?id=8862# nlm34089-3.

**\*4** As reflected in the attachments to the amended complaint and Exhibit C to the summary judgment motion, plaintiff filed a grievance at Franklin, complaining about denial of appropriate medical attention and alleged threats by the medical staff to deter him from seeking further treatment. The grievance was denied by the Superintendent of the institution, and then appealed by the plaintiff. The decision of the Superintendent was upheld by the Central Office Review Committee (CORC) of the Department of Corrections.

## II. *Summary Judgment*

The amended complaint alleges that defendant White showed deliberate indifference to plaintiff's medical needs by refusing to treat him during his visit to the urgent care center at Franklin on October 11, 2007. He also accuses Nurse White of issuing an unfounded inmate misbehavior report on the same day, which purportedly deterred him from seeking needed medical care for several months thereafter.

Defendant White has moved for summary judgment on the plaintiff's Eighth Amendment cause of action, arguing that there are no material facts in dispute to support the claim that (1) the plaintiff had a serious medical need that was not met or (2) that defendant was deliberately indifferent to any such medical need.

The defendant construes the amended complaint as alleging that the inmate misbehavior report filed by Nurse White constituted retaliation for the exercise of his purported First Amendment right to demand necessary medical attention. [10] In support of the summary judgment motion, the defendant argues (1) even if the misbehavior report was unfounded, the defendant received procedural

due process in the adjudication of the report; (2) it is doubtful that the First Amendment encompasses a right to demand medical care in a prison; and (3) the misbehavior report did not constitute an "adverse action" which would deter a similarly situated individual of ordinary firmness in seeking necessary medical attention.

[10]      The issues raised in the amended complaint relating to the filing of defendant White's inmate misbehavior report against the plaintiff, which he claims effectively deterred him from seeking medical care for several months, could reasonably be considered solely as part of his explicitly-stated Eighth Amendment claim. *Williams v. Director of Health Services, Dept. of Correctional Services,* 542 F.Supp. 883 (S.D.N.Y.1982), cited in defendant's amended complaint, as well as *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), considered disciplinary actions against the inmates relating to their medical care only as part of a deliberate indifference claim. However, since the defendant construes the amended complaint to raise a distinct First Amendment/retaliation claim, the court will address it.

Finally the defendant argues that the amended complaint should be dismissed on qualified immunity grounds because (1) even if his claims are accepted as true, plaintiff has failed to establish that the defendant violated his constitutional rights and (2) it was objectively reasonable for the defendant to believe that her conduct did not violate plaintiff's federally protected rights.

### A. Legal Standard for Summary Judgment

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion. *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**\*5** In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the nonmovant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the nonmovant's claims or (2) identifying those portions of the nonmovant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 323). The second method requires the movant to identify evidentiary insufficiency, not merely to deny the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, all factual inferences must be drawn in favor of the nonmoving party. *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (citing *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998)).

In *Govan v. Campbell,* U.S. District Judge Gary L. Sharpe summarized the standards for evaluating summary judgment motions involving *pro se* litigants:

> ... [I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated

that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)....

This liberal standard, however, does not excuse a *pro se* litigant from following the requisite formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a) (3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002) *(inter alia citing Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

**\*6** Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

*Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007).

In this case, although plaintiff received proper notice of his obligation to respond to defendant's motion in accordance with Local Rules (Dkt. No. 44-1), the plaintiff did not file a statement of undisputed material facts in compliance with Local Rule 7.1(a)(3). Consequently, the court may accept the properly supported facts contained in the defendant's Rule 7.1 statement (Dkt. No. 44-2) as true for purposes of this motion. *See Govan v. Campbell,* 289 F.Supp.2d at 295-96. However, the court will carefully

review the entire record in determining if there are any material facts in dispute.

### B. Inadequate Medical Care

#### 1. Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

#### a. Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id* . (citing *Helling v. McKinney,* 509 U.S. 25, 32-33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185-86 (2d Cir.2003)). However, in cases such as this one, where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and

the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

#### b. Subjective Element

**\*7** The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839-40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature

and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

### 2. Application of Legal Standards

#### a. Analysis of Purported Factual Disputes

 **\*8** In this case, plaintiff alleges that, when he visited the urgent care center at the Franklin facility on October 11, 2007, defendant White caused him to be "locked up" without examining him or providing him with any assistance. Defendant's Statement Pursuant to Rule 7.1(a)(3), amply supported by the Declaration of Nurse White and her contemporaneous medical records, negates plaintiff's claims. The record reflects that the defendant examined the plaintiff, took his vitals, reviewed his prior medical records (which revealed that he was a frequent visitor to sick call and had a doctor's appointment pending), and referred him for a consultation with the mental health staff before concluding that he was in no obvious distress and did not present any medical emergency. (Dkt. No. 44-2, ¶¶ 17-24).

Particularly in light of his failure to respond to defendant's Rule 7.1(a)(3) statement, plaintiff's conclusory suggestion that Nurse White completely refused to provide any medical attention on October 11, 2007 is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record. *See Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, 1995 U.S. Dist. LEXIS 10431 (S.D.N.Y. July 27,

1995) (plaintiff's conclusory allegation that he was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")). [11] While plaintiff may have disagreed with Nurse White's medical judgment as to his condition and the level of care he required, there is no factual support for his claim that he was completely refused medical care. *See Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107) (disagreements over diagnostic techniques and forms of treatment implicate medical judgments and not the Eighth Amendment).

[11]    See also *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

Plaintiff claims that he was deterred from seeking medical attention at Franklin from October 11, 2007, the date Nurse White issued an inmate misbehavior report against him for abusing emergency sick call, for several months- apparently until January 15, 2008, when he was seen by a prison doctor. He also alleged that he was warned by unnamed prison officials not to return to the prison medical facility "or else," and avoided seeking treatment in fear for his safety. (Dkt. No. 10-1 at 5). However, the declarations and documents filed in support of defendant's summary judgment motion, to which plaintiff did not respond, vitiate these conclusory allegations.

The record shows that plaintiff was seen by the medical staff at Franklin on December 15, 2007, and at that time, he essentially refused treatment unless he was provided Percocet. Plaintiff reacted similarly on the sick call visit on October 9, 2007, when he effectively refused Ibuprofen by threatening to ignore the directions of the medical staff by taking all of his medications at once. (Armstrong Decl. Dkt. No. 44-12, ¶¶ 11-15, 23-24, 26; Ex. B, Dkt.

No. 44-5 at 23). *See Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986) (plaintiff's history of declining treatment by prison doctors undermined his claim that they were deliberately indifferent in failing to treat his back issues).

**\*9** Plaintiff did not refute Nurse White's sworn declaration that she saw him only once (on October 11, 2007), and thus could not have made a prior threat to him about the alleged repercussions for returning for further medical attention. Even if the court were to accept as true plaintiff's unsupported allegations that someone threatened to retaliate against him before October 11, 2007 if he sought further treatment, this defendant cannot be liable for such conduct in which she was clearly not personally involved. *See, e.g ., Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (personal involvement is a prerequisite to the assessment of damages in a section 1983 case); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Plaintiff's conclusory and inconsistent allegations that he was effectively deterred by conduct of the defendant from seeking all medical attention from October 11, 2007 until January 15, 2008 is insufficient to create a disputed issue of fact in light of the contrary facts stated in the defendant's sworn declarations and supporting documents.

**b. Objective Element**

As of October 11, 2007, the medical records at the Franklin regarding the plaintiff did not reflect his prior accident and related injuries and indicated that he had a doctor's appointment pending. The medical staff who previously examined plaintiff on several occasions did not find any objective evidence of serious problems with his back. The available records further suggested that plaintiff would be satisfied with his treatment only if he were prescribed a more potent pain killer than the medical staff was prepared to provide. Under those circumstances, and based on her examination of the plaintiff, there is no material issue of fact suggesting that Nurse White unreasonably responded to his medical needs on October 11th when she concluded that (1) he did not require further immediate treatment and (2) he had abused the facility's emergency sick call procedures. However, even if we accept as true plaintiff's unsupported allegation that the defendant completely refused plaintiff all medical attention on that date and deterred him from seeking needed medical attention for several months, the delay in his treatment did not involve sufficiently serious possible negative consequences to violate his rights under the Eighth Amendment. [12]

[12]   In his amended complaint, plaintiff cites the *Williams v. Director of Health Services, Dept. of Correctional Services,* 542 F.Supp. 883 (S.D.N.Y.1982) in support of his cause of action. The court in *Williams* denied a defendant's motion for summary judgment against an inmate who claimed that the Department of Corrections denied him constitutionally adequate medical care for chronic and severe internal bleeding by (1) repeatedly transferring him from one facility to another just as he was about to undergo treatment; (2) failing to advise the transferee prison of his medical needs; and (3) threatening him with disciplinary sanctions for requesting medical assistance for his serious medical problem. The instant case is factually distinguishable from *Williams* on many fronts: (1) plaintiff Brown's medical issues were not serious, as compared to the severe internal bleeding from which Williams suffered; (2) while plaintiff Brown was transferred on several occasions, his complaint focuses on the alleged inadequacy of his treatment in only one facility over a period of, at most, three months; (3) although a few of plaintiff Brown's medical records were apparently not transferred to Franklin, he has sued only Nurse Jerre White, not anyone who was personally involved in or responsible for the transfer of his records from other institutions; and (4) defendant White was involved only in filing one inmate behavior report against the plaintiff, which, as discussed elsewhere herein, did not prevent plaintiff from seeking medical care and did not infringe his constitutional rights.

*Evans v. Manos* suggests how a prison inmate's claim for a delay in medical treatment should be evaluated under the Eighth Amendment:

"Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where 'the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "

*Evans v. Manos,* 336 F.Supp.2d 255, 262 (W.D.N.Y.2004) (citations omitted). The Second Circuit has not resolved whether actual adverse medical effects are required, as a threshold matter, to state a viable Eight Amendment claim

relating to delayed medical care; but has indicated that a plaintiff must at least show that the delay significantly increased the risk for medical injury or similar serious adverse consequences. *Smith v. Carpenter,* 316 F.3d at 188-89, n. 14, n. 15. The Court in *Smith* also observed, in the post-trial context, that, "although demonstrable adverse medical effects may not be required under the Eighth Amendment, the absence of present physical injury will often be probative in assessing the risk of future harm." *Smith v. Carpenter,* 316 F.3d at 188.

**\*10** The plaintiff's medical records document that, while at Franklin, he, at most, suffered from chronic, but not acute, lower back pain and occasional headaches and dizziness. He was examined by the medical staff at the facility approximately seven times between his admission in September 2007 and his discharge in February 2008, and no serious underlying medical problems (such as degenerative disk disease) were observed or diagnosed. On at least two occasions, the plaintiff essentially refused treatment and medication because he wanted more potent pain killers. His subjective claims of "serious pain," unaccompanied by substantial medical complications are not sufficient to create a factual issue as to whether he was suffering from a "serious," unmet medical need. *Evans v. Manos,* 336 F.Supp.2d at 260; *Livingston v. Goord,* 225 F.Supp.2d 321, 329 (W.D.N.Y.2002) (collecting cases).

Even assuming plaintiff's conclusory and inconsistent allegations as true, notwithstanding the compelling contrary evidence in defendant's declarations and supporting documents, his access to medical treatment was interrupted for a maximum period of three months-between October 11, 2007 and January 15, 2008. [13] There is no evidence that this purported delay resulted in any material change in plaintiff's condition or significantly altered his treatment. The physician who examined the plaintiff in January 2008 ordered x-rays and prescribed Naproxen 500 mg; the more potent pain killers plaintiff sought were not prescribed.

[13] The court would emphasize that plaintiff's medical records clearly show that he was seen by a nurse in the SHU on December 15, 2007, at which time, plaintiff refused any treatment unless the nurse could give him Percocet. (Ex. B at 23).

Under these circumstances, the court finds no material fact in dispute that would support a claim that the alleged delay in the treatment of plaintiff at Franklin

caused a serious risk of medical harm or extreme pain contemplated by the Eighth Amendment. *See, e .g., Evans v. Manos,* 336 F.Supp.2d at 261-62 (delay of up to six weeks to treat prisoner who claimed "extreme" back pain, which did not result in substantial harm to plaintiff or significantly change the course of his eventual treatment, was not a serious disruption of his medical care). *See also Benitez v. Pacenco,* 1995 WL 444352 at *3-*4, 1995 U.S. Dist. LEXIS 10431 ("Given plaintiff's refusal to cooperate with his medical care, his sporadic complaints of [back] pain [with no objective evidence that it was severe or excruciating], the extensive record of his treatment, and the complete absence of any credible evidence of a serious medical condition, a reasonable jury could only conclude that plaintiff did not suffer from a serious medical condition."); *Salaam v. Adams,* 9:03-CV-0517, 2006 WL 2827687, at *10, 2006 U.S. Dist. LEXIS 70963 (N.D.N.Y. Sept.29, 2006) (prisoner's sporadic and moderate complaints of lower back pain, even when considered in conjunction with prisoner's sporadic complaints of gastrointestinal problem, were not sufficiently serious for purposes of Eighth Amendment, as a matter of law).

**c. Subjective Element**

As discussed above, plaintiff's conclusory suggestion that the defendant completely refused to provide him any medical attention on October 11, 2007 is overcome by the defendant's Rule 7.1(a)(3) statement and supporting sworn declaration and documents, which plaintiff did not rebut. Based on the information before her, Nurse White's medical judgment that the plaintiff was not suffering from a health emergency and did not require further treatment at that time was indisputably reasonable. Other than his bald accusations, plaintiff has not responded to the defendant's well-supported motion with any evidence backing his claim that Nurse White acted recklessly, or that she knew of and disregarded an excessive risk to the inmate's health or safety. He has not done anything to rebut the defendant's sworn declaration, which indicates that she had no intention to cause him serious harm or extreme pain. *See, e.g., Estelle v. Gamble,* 429 U.S. at 100-101, 106-107 (inmate who alleged doctors did not credit his repeated assertions that severe back pain should preclude him from manual labor did not state a claim for deliberate indifference where the medical staff repeatedly saw and treated him, even if their lack of diagnosis and inadequate treatment constituted malpractice).

**\*11** Even if one were to accept the plaintiff's unsupported allegations that Nurse White was completely dismissive of his complaints on October 11th, there would be no support for his claim that she acted with deliberate indifference to a serious medical need. *See, e.g., Savage v. Brue,* 9:05-cv-857, 2007 WL 3047110 at \*9, 2007 U.S. Dist. LEXIS 77643 (N.D.N.Y. Oct.18, 2007) (nurse refused pain medication to an inmate confined in a special housing unit for 48 hours with no mattress who complained of "extreme" back and neck pain due to a recent injury, and advised the inmate that he would need to "adjust to it"; while the nurse may have been negligent in her care, she was not reckless or deliberately indifferent); *Evans v. Manos,* 336 F.Supp.2d at 261-62, 263 (terminating and postponing, for two more weeks, the medical appointment of a prisoner who claimed "extreme" back pain because he complained about his care did not constitute deliberate indifference where the doctor had no intention of doing the inmate harm).

Plaintiff's primary objection to the course of his treatment at Franklin seemed to be that the medical staff did not prescribe him a more potent pain killer such as Percocet. As stated above, differences in opinions as to the appropriate treatment clearly do not support a claim that "serious" medical needs were recklessly ignored. *See, e.g., Evans v. Manos,* 336 F.Supp.2d at 262, 263) (inmate's opinion that doctor should have prescribed something stronger than Advil and a back brace does not give rise to an issue of fact as to whether his constitutional rights were violated); *Morrison v. Mamis,* 08 Civ. 4302, 2008 WL 5451639, 2008 U.S. Dist. Lexis 106416 (S.D.N.Y. Dec.18, 2008) (doctor refusing to switch prescription pain killers or allow use of Ben Gay by an inmate complaining of back pain and migraines does not give rise to an deliberate indifference claim), Report and Recommendation adopted by 2009 WL 2168845, 2009 U.S. Dist. Lexis 61772 (S.D.N.Y. July 20, 2009); *Nelson v. Rodas,* 01CIV7887, 2002 WL 31075804 at \* 14-\* 15, 2002 U.S. Dist. LEXIS 17389 (S.D.N.Y. Sept.17, 2002) (inmate's complaint that the prison refused his request for a CAT scan and consultation with a specialist concerning his back spasms was not the proper basis for an Eighth Amendment claim).

### C. Retaliation

### 1. Legal Standards

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett,* 343 F.3d at 137.

**\*12** The Second Circuit has defined "adverse action" in the prison context, as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)) (omission in original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.* [14]

[14] Defendant's Memorandum of Law cites several Second Circuit cases, outside of the prison context, which suggest that a plaintiff must establish that alleged retaliatory conduct actually and effectively chilled his First Amendment rights to state a § 1983 action for retaliation for the exercise of such rights. *See, e.g., Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir.2001). More recent cases such as *Gill v. Pidlypchak,* 389 F.3d at 381-82 make clear that the Second Circuit still applies a strictly objective standard in prison cases, even when the alleged retaliation involves First Amendment rights.

### 2. Application of Legal Standards

Defendant construes the amended complaint as alleging that her filing of an unfounded inmate misbehavior report against the plaintiff for seeking emergency medical treatment on October 11, 2007 constituted retaliation for his exercise of the purported First Amendment right to

demand necessary medical treatment. The misbehavior report, guilty finding, and sanctions imposed after a disciplinary hearing, were vacated a week later by the Superintendent, without comment.

As the Defendant's Memorandum of Law notes, a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, [15] as long as the prisoner is provided with procedural due process. (Dkt. No. 44-14 at 6-7). *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if the defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff were entitled to, and did receive, full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588-89 (2d Cir.1988). Any action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

[15] In this case, the minor sanctions imposed on plaintiff implicated no protected liberty interest for which due process protections would have been required. *See Sandin v. Conner,* 515 U.S. 472, 486, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (rejecting a claim that thirty days in segregated confinement was sufficient to create a liberty interest). Plaintiff in this case spent a day confined to his room, and at worst, suffered a few days of restricted privileges prior to the reversal of the discipline imposed. Because there was no liberty interest infringed, any claims of unfounded accusations would not be actionable. *Smith v. Taylor,* 149 Fed. Appx. 12, 13, 2005 WL 2019547 at *1 (2d Cir.2005). In any event, in this case, there appears to be no issue that the plaintiff received due process through the disciplinary hearing and subsequent appeal to the superintendent. (Higgins Decl. ¶ 9 & Ex. G, Dkt. Nos. 44-3, 44-10; Plaintiff's Deposition, Ex. F, Dkt. No. 44-9 at 24-26).

The court has found no Supreme Court authority as to whether the First Amendment confers upon a prisoner the right to demand necessary medical attention and courts in the Second Circuit have not decided the issue. *See, e.g., Benitez v. Pacenco,* 1995 WL 444352 at *5, 1995 U.S. Dist. LEXIS 10431 ("... I do not believe that an inmate has a constitutional right to 'repeatedly' complain about his medical ailments ...."); *Maxwell v. City of New York,* 272 F.Supp.2d 285, 299-300

(S.D.N.Y.2003) (noting the absence of conclusive Second Circuit authority and observing that an inmate's insistence that she receive medical treatment is not "the typical protected speech most commonly considered protected"), *aff'd in part, vacated in part on other grounds,* 380 F.3d 106 (2d Cir.2004), *opinion supplemented by* 108 Fed. Appx. 10, 12 (2d Cir.2004) (agreeing with the District Court that "even if her request for medical attention can be considered a constitutionally protected statement," the alleged retaliatory delays in treatment were *de minimis). Cf. West v. McCaughtry,* 971 F.Supp. 1272, 1277 (E.D.Wisc.1997) (in *dicta:* "If a prisoner were disciplined solely because of his requests for proper medical treatment, it would surely be a constitutional violation.")

**\*13** We will assume, for the purpose of the motion for summary judgment with respect to a retaliation claim, that the First Amendment recognizes an inmate's right to demand necessary medical care or complain about inadequate care. It is unnecessary to make this specific determination because, even assuming that a constitutional right existed, a retaliation claim fails for two reasons. First, plaintiff did not rebut defendant's sworn statement that she filed the misbehavior report because "she concluded that Plaintiff had abused emergency sick call," negating any suggestion that plaintiff's constitutionally protected conduct was the substantial motivating factor for her actions. [16] Second, it is questionable that the misbehavior report constituted an "adverse action," sufficient to meet the standard for retaliation.

[16] Although defense counsel does not advance this argument in his memorandum of law, defendant While clearly includes this statement in her sworn declaration. As this court found above, based on the information before her, Nurse White's conclusion that plaintiff was not suffering from a medical emergency was indisputably reasonable. Accordingly, her filing of a misbehavior report, based on a violation of the prison regulations governing emergency sick call, was also reasonable, and, thus, not motivated by an intent to retaliate against plaintiff for the exercise of any constitutional right.

**a. Substantial Motivation**

In defendant White's sworn declaration, she states that she "believed, based on my examination and observations,

[that] plaintiff was deliberately abusing the emergency sick call policy about which he was aware." (White Decl. ¶ 9). The medical records support defendant White's statement. It is clear from the October 11, 2007 entry that notwithstanding plaintiff's complaints of dizziness, he was oriented in three spheres; his blood pressure, pulse, respiratory rate, and temperature were normal, and he was in no obvious distress. (Ex. B at 25). Nurse White further states that plaintiff was a "frequent visitor for various complaints," and on the medical record there is stamped language indicating that the inmate was advised of the proper procedures for sick call and emergencies. *Id.*

Defendant alleges that the misbehavior report was filed for what she believed was a violation of facility rules, based upon a medical judgment, and not in retaliation for plaintiff's medical complaints. The conclusory suggestion of retaliation by the plaintiff is not sufficient to overcome the declaration of Nurse White and supporting documents. The record strongly supports the position that Nurse White made a considered and sincere medical judgment that the plaintiff did not require emergency medical attention on October 11, 2007 and that she did not harbor a "retaliatory" motivation. The Superintendent's dismissal of the disciplinary charges, while not explained, could be attributed to the plaintiff's disclosure of medical records corroborating his claims of a prior injury, which were not in his medical files at Franklin as of October 11th. Thus, plaintiff cannot show that the issuance of the misbehavior report was "substantially motivated" by plaintiff's constitutionally protected conduct.

#### b. Adverse Action

Defendant also argues that the misbehavior report could not be considered an "adverse action." Unfortunately, defendant's basis for this argument, that the misbehavior report against plaintiff could not be considered an "adverse action" because it did not actually deter him from exercising his First Amendment rights is, as noted in footnote 14 above, inconsistent with Second Circuit authority. We have rejected plaintiff's unsupported claim that the misbehavior report, for which, ultimately, he was confined in his cell for about 24 hours, deterred *him* from seeking further medical attention for several months (see Section II. B. 2. a., above).

**\*14** However, the issue is not whether this plaintiff was actually deterred from seeking medical help, but whether the initiation of such disciplinary action would

have deterred an inmate "of ordinary firmness" from demanding medical attention at least for the week or so before the Superintendent vacated the disciplinary charges. Notwithstanding the difference in the standard, this court agrees that plaintiff did not suffer an "adverse action."

In *Bartley v. Collins,* 95 Civ. 10161, 2006 WL 1289256 at *7, 2006 U.S. Dist. LEXIS 28285 (S.D.N.Y. May 10, 2006), the court held that misbehavior reports which resulted in loss of privileges, but not significant time in keeplock [17], were *de minimis* and did not constitute adverse action. Plaintiff's "full bed" restriction for one day and minor privilege restrictions are more akin to the *de minimis* deprivations that have not been found to constitute adverse action. Thus, defendant's "implied" cause of action for retaliation may be dismissed.

[17]     "Keeplock" is a form of disciplinary confinement where the inmate is confined to his own cell for the duration of the disciplinary sanction. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989).

#### D. Qualified Immunity

The court also finds that even if it could somehow be determined that the defendant's actions were somehow retaliatory, defendant would be entitled to qualified immunity in any event.

#### 1. Legal Standards

In *Delisser v. Goord,* then Magistrate Judge Gary L. Sharpe summarized the legal standards regarding qualified immunity of public employees:

Qualified immunity protects government officials who perform discretionary functions in the course of their employment. It shields them from liability for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)....

The question of whether qualified immunity will protect a public official depends upon " 'the objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations

omitted). Furthermore, the contours of the right violated must be sufficiently clear that a reasonable official might understand that his actions violate that right. *Id.* at 640, 107 S.Ct. at 3039; [*Warren v.] Keane,* 196 F.3d 330] at 332 [ (2d Cir.1999) ]. In other words, "in evaluating whether a right was clearly established at the time a § 1983 defendant acted [the court must determine]: '(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful.' " *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002). *See also, Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000).

**\*15** *Delisser v. Goord,* 9:02-cv-073, 2003 WL 133271 at \*2, 2003 U.S. Dist. LEXIS 488 (N.D.N.Y. Jan.15, 2003)

### 2. Application of Legal Standards

Defendant has invoked qualified immunity with respect to the plaintiff's claim for deliberate indifference to his serious medical needs under the Eighth Amendment, arguing that, even accepting plaintiff's allegations as true, no such constitutional violation was established. Based on the clear findings above, the court concludes that the qualified immunity argument regarding the Eighth Amendment claim need not be addressed.

The court will, however, address the invocation of qualified immunity by the defendant with respect to the imputed First Amendment/retaliation claim as an additional basis for dismissal. As discussed in Section II.

C. 2. above, at the time of defendant's conduct in this case, inmates did not have a "clearly established right" under the First Amendment to demand or complain about medical care. The Second Circuit has not decided the issue and the court has found no other Second Circuit or Supreme Court precedent that would, with reasonable specificity, clearly support such a right. A reasonable state employee in the defendant's position would not have understood that her acts on October 11, 2007 might have unlawfully abridged the First Amendment rights of the defendant. Defendant White would, therefore, also be entitled to the protection of qualified immunity with respect to a imputed retaliation claim.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant White's motion for summary judgment (Dkt. No. 44) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY** and it is;

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 985184

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Benitez v. Pecenco, Not Reported in F.Supp. (1995)

1995 WL 444352

1995 WL 444352
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Henry BENITEZ, Plaintiff,
v.
Patricia A. PECENCO, Defendant.

No. 92 Civ. 7670 (DC).
|
July 27, 1995.

**Attorneys and Law Firms**

Henry Benitez, Comstock, NY, pro se.

Dennis C. Vacco, Atty. Gen. of the State of N.Y. by Richard T. Mathieu, Judy E. Nathan, New York City, for defendants.

### MEMORANDUM DECISION

CHIN, District Judge.

**\*1** *Pro se* plaintiff Henry Benitez brings this action under 42 U.S.C. § 1983 alleging that defendant violated his constitutional rights by failing to provide him with adequate medical attention and by endorsing a false disciplinary report against him. Before me are the parties' cross-motions for summary judgment. For the following reasons, defendant's motion is granted. Plaintiff's motion is denied.

### BACKGROUND

Plaintiff is an inmate at the Greenhaven Correctional Facility ("Greenhaven") and is housed in the Special Housing Unit (the "SHU"). He was transferred to Greenhaven from another prison on May 5, 1992. Defendant Pecenco is a registered nurse at Greenhaven; in the spring and summer of 1992, she worked in the clinic area during the day shift. Her responsibilities included attending to inmates in the SHU.

Upon his arrival at Greenhaven, plaintiff was given a medical checkup by a Nurse Berthold during which he complained of low back pain but denied chronic medical problems. (Pl.Exh. A). The Ambulatory Health Record ("AHR") for that day states that an examination of plaintiff did not reveal any signs of "fresh trauma." (*Id.*). Plaintiff was checked again the next day by another nurse, and the AHR indicates that plaintiff stated he had "no medical problems at this time" and is not on any prescribed medication. (*Id.,* AHR dated May 6, 1992). The AHR also reveals that plaintiff had no signs or symptoms of distress.

Between May 8, 1992 and June 5, 1992, plaintiff was examined by various medical personnel (but not defendant Pecenco) 24 times. The record reveals that plaintiff intermittently complained of low back pain and a sore throat and that he requested band-aids. (Pl.Exh. A). The AHRs also reflect the medical staff's assessments that plaintiff showed no signs of acute distress and walked with a normal gait. Nevertheless, plaintiff was prescribed a painkiller, Robaxin, and was given the nonprescription medicines Advil and Motrin.[1] (*See, e.g.,* Pl.Exh. A, AHRs dated May 10, 21, 23, 24, 26, 27, and June 3, 1992).

On Friday, June 5, 1992, plaintiff was examined by Dr. Chander, who ordered a prescription pain killer, Fioricet, for his back pain and who referred the case to a physiatrist for consultation.[2] On Saturday, June 6, plaintiff complained of back pain to defendant and requested his prescription. Defendant informed plaintiff that she could not check on the prescription over the weekend and told him he would have to wait until Monday, June 8. She offered to give plaintiff Advil, which he refused. (Pl.Exh. A, AHR dated June 8, 1992).[3]

On Monday, June 8, plaintiff complained of back pain to another medical staff member but refused to accept either the Fioricet that had been prescribed or Motrin. (Pl.Exh. A, AHR dated June 8). On June 9, 1992, plaintiff complained again of back pain but his condition was evaluated as a "non-emergency" by a Nurse Ryan, due to the fact that plaintiff had been recently examined by a doctor and had refused to accept medication. (Pl.Exh. A, AHR dated June 9). Plaintiff was sent to a physiatrist for an examination on June 15, 1992, but refused to cooperate or give any information with respect to his back pain. He was therefore returned to his cell without being examined. (Pl.Exh. B, Physiatrist's Consultation Report dated June 15, 1992).

Benitez v. Pecenco, Not Reported in F.Supp. (1995)

1995 WL 444352

**\*2** Defendant did not see plaintiff again until June 20, 1992 at which time plaintiff requested band-aids, which defendant provided. Defendant examined plaintiff for the last time on July 4, 1992 when plaintiff asked for pain medication that purportedly had been prescribed.[4] Defendant informed plaintiff that she had no knowledge of any prescription and told him to speak with the doctor. None of the AHRs between June 9 and July 3 indicate that prescription drugs had been ordered.

Defendant also noted on the July 4th AHR that plaintiff became verbally abusive to her at which point a corrections officer Zemkin intervened and warned plaintiff that he was abusing his sick call privileges. Zemkin later filed an inmate misbehavior report concerning the incident, which was signed by defendant as an "employee witness." Plaintiff was found guilty after a disciplinary hearing of verbal interference with prison employees and verbal harassment (a charge of making threats was dismissed). (Pl.Exh. C).

An AHR dated July 5, 1992 reveals that plaintiff had MRIs ordered to determine the cause of his lower back pain, but had refused to go for them. (See Pl.Exh. A, AHR dated July 5). The final AHR indicates that plaintiff was to be examined after July 31, 1992.

The parties have cross-moved for summary judgment. Plaintiff alleges that defendant refused to give plaintiff medication for back pain and signed a "trumped-up" disciplinary report against plaintiff. Defendant asserts that she did not give plaintiff his medication because she is not authorized to provide medication without an order from a physician. She also claims that the disciplinary report was not falsely made.

### DISCUSSION

#### I. Standards for Summary Judgment

The standards applicable to motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but [to] determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248–49, 106 S.Ct. at 2510–11 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 159, 90 S.Ct. 1598–1609 (1970)). To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 1356 (1986). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. Anderson, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. As the Court held in Anderson, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249–50, 1065 S.Ct. at 2511 (citations omitted). With these standards in mind, I turn to the parties' motions for summary judgment.

### II. Plaintiff's Medical Treatment

**\*3** Plaintiff complains that defendant violated his Eighth Amendment right against cruel and unusual punishment by refusing to check on the status of his prescription medication or provide "emergency medical treatment." To succeed on a claim under section 1983 for inadequate medical care, an inmate must show "deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291 (1976). Thus, two elements must be satisfied: first, the inmate's medical conditions must be, in objective terms, sufficiently serious; and second, defendant must have acted with a sufficiently culpable state of mind. See id.; see also Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994); Holmes v. Fell, 856 F.Supp. 181, 183 (S.D.N.Y.1994) (section 1983 claim based on deliberate indifference requires intentional disregard to "affected medical needs that were serious"). Plaintiff cannot satisfy either of these elements; accordingly, his claim must be dismissed.

#### A. Serious Medical Need

Apart from plaintiff's conclusory assertions, there is nothing in the record to support his claim that he suffered from a serious medical condition. First, plaintiff's own conduct refutes any claim that his back pain was serious: plaintiff refused to cooperate with the

Benitez v. Pecenco, Not Reported in F.Supp. (1995)

1995 WL 444352

physiatrist for an examination and would not leave his cell for scheduled MRIs. (Pl.Exhs. A and B). *See Jones v. Smith,* 784 F.2d 149, 151–52 (2d Cir.1986) (prisoner's back condition not deemed serious medical need given his constant refusal to be examined by doctors). Furthermore, plaintiff was offered both over-the-counter and prescription medication for back pain on several occasions but refused to accept it. (*See, e.g.,* Pl.Exh. A., AHRs dated May 21, 24, 25, and June 8, 1992). [5] In fact, his refusal to accept medication caused another nurse, not the defendant, to classify his condition as "non-emergency." (Pl.Exh. A). [6]

Second, there is nothing in the record to suggest that plaintiff's back pain was severe or excruciating. Plaintiff was visited by various medical staff members, including prison doctors, 43 times over a period of two months. None of the 43 AHRs registered by the medical staff indicate that plaintiff was in acute distress or had any difficulty standing or walking. Furthermore, his complaints of back pain were only sporadically made and were interspersed with complaints of a sore throat and sore finger, all of which were treated as requested. [7]

Plaintiff's intermittent complaints of back pain simply do not constitute a serious medical need. The Second Circuit has required medical conditions more serious than those posed in this case to find an Eighth Amendment violation. *See, e.g., Liscio v. Warren,* 901 F.2d 274, 276 (2d Cir.1990) (in holding that doctor exhibited deliberate indifference by failing to examine prisoner for three days, court contrasted prisoner's alcohol withdrawal, which was life-threatening and fast-degenerating, with the back condition at issue in *Estelle,* which did not require immediate attention and thus was not a serious medical condition); *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (prisoner with degenerative hip condition requiring corrective surgery including the placement of pins held to have serious medical needs); *Kaminsky v. Rosenblum,* 929 F.2d 922, 924 (2d Cir.1991) (high blood pressure, diabetes, angina, gout and an enlarged spleen held to be serious medical needs, particularly in light of prisoner's extreme weight loss and "alarmingly deteriorating" condition).

**\*4** Given plaintiff's refusal to cooperate with his medical care, his sporadic complaints of pain, the extensive record of his treatment, and the complete absence of any credible

evidence of a serious medical condition, a reasonable jury could only conclude that plaintiff did not suffer from a serious medical condition. Accordingly, defendant's motion for summary judgment on this claim is granted.

### B. *Deliberate Indifference*

Even assuming that plaintiff's back condition did constitute a serious medical need, the record before me does not contain any evidence from which a jury could reasonably find that defendant exhibited deliberate indifference to plaintiff's condition.

To succeed on his claim, plaintiff must show that defendant intentionally denied him needed medical care over a period of time or completely withheld medical care. *See Hathaway v. Coughlin,* 841 F.2d 28, 50 (2d Cir.1988). Plaintiff argues that on June 6, June 20 and July 4, 1992, defendant "deliberately refused, on each occasion, either to ascertain the status or whereabouts of plaintiff's prescribed medication and/or to summon a doctor, even though empowered to do so." (Pl.Mem. at 7). This argument fails, however, for several reasons.

First, plaintiff has adduced no proof that defendant intentionally interfered with or intentionally delayed treatment prescribed by doctors. *See Bowman v. Campbell,* 850 F.Supp. 144, 147 (N.D.N.Y.1994) (defendant nurse's motion for summary judgment granted where prisoner failed to adduce any proof that nurse intentionally withheld treatment). Plaintiff claims that defendant exhibited deliberate indifference on June 6 by informing him that "she was not going to issue plaintiff medication because there was no way of her investigating the matter." (Pl.Aff., ¶ 19). The AHR from that day, which plaintiff cites, notes defendant's statement that she could not ascertain the status of a prescription from the pharmacy over the weekend and that plaintiff would probably receive the medicine on Monday. (Pl.Exh. A; Pl.Mem. at 9). At worst, defendant's conduct arguably constituted negligence, which is not sufficient to state a claim under section 1983. *Estelle,* 429 U.S. at 106–07, 97 S.Ct. 292–93; *Bryant v. Maffucci,* 923 F.2d 979, 982–83 (2d Cir.), *cert. denied,* 112 S.Ct. 152 (1991).

Furthermore, the record clearly reveals that plaintiff was not prescribed any medication by a doctor prior to being seen by defendant on June 20 or July 4. Since defendant had no authority to dispense medication without a

Benitez v. Pecenco, Not Reported in F.Supp. (1995)

1995 WL 444352

prescription by a physician, she could not provide plaintiff with medical treatment.

Second, plaintiff's claim that he complained of severe back pain to defendant on June 20 and that she wilfully ignored his request for emergency medical care has no support in the record. The AHR from that day simply indicates that plaintiff requested band-aids from defendant. Indeed, plaintiff was examined by a different nurse on June 21, who noted only that plaintiff again requested band-aids. (Pl.Exh. A, AHR dated June 21, 1992). *See Bowman, 850 F.Supp. at 147* (no evidence of deliberate indifference where record established that nursing staff attended to prisoner no fewer than eighteen times during his incarceration). Plaintiff has not disputed the accuracy of the AHR for that day; indeed, he relies on it himself.

**\*5** Finally, plaintiff's complaint that he experienced severe back pain "as a result of having been denied requested pain relieving medication by defendant Pecenco for a herniated disc" on May 9, 1992 (Cmplt. ¶ IV(A)), is rejected. The uncontested record (including exhibits plaintiff himself attaches to his motion papers) reveals that defendant attended to plaintiff *for the first time* on June 6, 1992. [8]

Since plaintiff has not shown that defendant exhibited deliberate indifference to his serious medical needs, his claim must be dismissed.

### III. *The Disciplinary Report*

Plaintiff alleges that defendant's endorsing the allegedly false disciplinary report interfered with his First Amendment right to complain about his illnesses. Generally, a prison inmate does not have a "constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in deprivation of protected liberty interest," so long as the prisoner is provided with due process. *Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir.1986), cert. denied, 485 U.S. 982, 108* S. Ct. 1273 (1988). Where the false report is issued in retaliation for a prisoner's having exercised his substantive constitutional rights, however, a constitutional violation occurs and subsequent procedural due process does not correct the violation. *Franco v. Kelly, 854 F.2d 584 (2d Cir.1988)* (claim that prison officials intentionally filed false disciplinary charges against inmate in retaliation for his cooperation with a state investigation into reported

incidents of inmate abuse at the prison sufficiently stated a claim under § 1983). Because retaliation claims may easily be fabricated, however, they should be viewed "with skepticism and particular care." *Colon v. Coughlin, 1995 WL 383310, \*5 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)).* As the Second Circuit held in *Flaherty:*

> We agree ... that claims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse. Virtually every prisoner can assert such a claim as to every decision which he or she dislikes.

*713 F.2d at 13.*

Of course, the initial question is whether defendant's conduct in endorsing the disciplinary report abridged any of plaintiff's substantive constitutional rights. This is not an instance where plaintiff was disciplined in retaliation for bringing a lawsuit against defendant or otherwise petitioning the government for a redress of grievances. *See, e.g., Colon, 1995 WL 383310* (alleged retaliation for instituting lawsuits); *Franco, 854 F.2d at 589* (cooperation with state investigation); *Flaherty v. Coughlin, 713 F.2d 10 (2d Cir.1983)* (participation in a class action suit against prison officials). Nor is plaintiff contending that he was deprived of medical treatment in retaliation for complaining. Rather, he alleges that his First Amendment rights were violated because he was retaliated against, *i.e.,* disciplined, for "repeatedly" complaining about his medical ailments. While I do not believe that an inmate has a constitutional right to "repeatedly" complain about his medical ailments, *see Garrido v. Coughlin, 716 F.Supp. 98, 101 (S.D.N.Y.1989)* (section 1983 claim dismissed where prisoner alleged that prison officials filed false disciplinary report against him in retaliation for his verbal confrontation with a guard over the guard's treatment of another inmate; court held that confrontation did not affect any constitutional right), I need not reach that question, for I will assume for purposes of this motion that a substantive constitutional right has been implicated.

**\*6** Even assuming that plaintiff's complaints about his health implicated his First Amendment rights, there is no substantial evidence in the record to support his conclusory allegation that defendant endorsed the disciplinary report in retaliation for his exercise of his First Amendment rights. The sum of plaintiff's evidence is that

Benitez v. Pecenco, Not Reported in F.Supp. (1995)

1995 WL 444352

he complained about his health three times to defendant as reflected in the AHRs, that defendant indicated on the July 4, 1992 AHR that "each time [she] make[s] rounds on SHU [plaintiff] demands something," and that a disciplinary report was filed by officer Zemkin following a verbal exchange between defendant and plaintiff. (Pl.Exhs. A, C). No reasonable jury could conclude from this barest of circumstantial evidence, when considered in the context of all the evidence in the record, that defendant endorsed the disciplinary report in retaliation for plaintiff's complaints regarding his health.

Significantly, the misbehavior report was issued not by defendant but by officer Zemkin, who was personally involved in the incident. Indeed, the report states that plaintiff told officer Zemkin that he was only "fucking security" and that he should mind his "fucking business."[9] It was Zemkin who observed in the report that "in the past every medical staff person that goes by [plaintiff's] cell he tries ... to get them to authorize medication." (Pl.Exh. C). Defendant had only seen plaintiff three times and she merely endorsed the report as an "employee witness." There is no concrete proof in the record that she caused the disciplinary proceedings to be commenced against plaintiff or that she retaliated against him in any way.

The Second Circuit's recent decision in *Colon* is instructive. There, the inmate had filed two lawsuits complaining about the conditions of his confinement. Shortly after he was to begin participating in a Family Reunion Program that had been the subject of one of his lawsuits, he was brought up on disciplinary charges (possession of marijuana and a weapon) that prevented him from participating. In addition, the inmate presented evidence that he had never previously been found to be in possession of weapons or drugs. While the Second Circuit noted that the temporal proximity between the inmate's lawsuits and disciplinary action and the evidence of prior good conduct presented some circumstantial evidence of retaliation, the Court held that if this circumstantial evidence had represented "the sum total" of the inmate's proof, "we might be inclined to affirm the grant of summary judgment based on the weakness of [the inmate's] case." *Colon,* 1995 WL 383310 at *7. Because there also existed direct evidence of retaliation, however (the defendant's alleged admission of a retaliatory scheme), the Court reversed.

Plaintiff's proof of retaliation in the present case is not even as strong as the circumstantial evidence in *Colon* that the Second Circuit suggested might not be enough. Based on the record before me, a reasonable jury could only conclude that defendant did not retaliate against plaintiff for his exercising any substantive constitutional rights. Accordingly, plaintiff's claim is dismissed.[10]

*CONCLUSION*

**\*7** Defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied. The complaint is dismissed.

SO ORDERED.

1    On May 8, 1992, plaintiff complained of low back pain to a prison doctor, who prescribed Robaxin. An AHR dated May 10, 1992 reveals that plaintiff requested the Robaxin on May 10 from a Nurse Maier.

2    An inmate at the Facility can obtain prescription drugs only after being examined by a prison physician. After the examination, the physician writes out an order for the drug which is filled by the Greenhaven pharmacy. The medication is then dispensed by nurses or guards. If the inmate refuses either the prescription or the nonprescription drug, he is not forced to take it; the prescription medicine, however, will be returned to the pharmacy. In addition, once an inmate patient refuses a prescription drug, a physician must provide another prescription before the inmate can be given the drug again.
         Nurses at the Facility cannot dispense prescription medication without a physician's order and cannot write a prescription. A nurse may, however, provide nonprescription medicine. (Pl.Aff. ¶¶ 6, 7; Stevens Aff. ¶¶ 4, 5).

3    On Monday, June 8, medical staff checked on the status of plaintiff's prescription and discovered that it had been sent to SHU the previous Friday.

4    Other medical staff attended to plaintiff's needs on nine separate occasions between June 8 and June 19. Plaintiff's complaints included back pain, sore throat and requests for band-aids. Plaintiff was examined by medical staff three times between June 21 and July 3.

Benitez v. Pecenco, Not Reported in F.Supp. (1995)

1995 WL 444352

5    Plaintiff claims that the record supports his allegation that he was never issued over-the-counter medication. The record, however, clearly shows that he was issued the medication and refused it. Plaintiff does not allege that the AHRs were falsified and, indeed, sometimes relies on their notations in an effort to bolster his claims. (*See, e.g.,* Pl.Mem. at 9, quoting AHR dated June 6, 1992). Thus, apart from plaintiff's conclusory allegations, there is no factual dispute presented by the record with respect to the issuance of the nonprescription medicine. *See Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)* ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case") (*citing SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978)*).

6    Plaintiff's later refusal to cooperate with the physiatrist or to attend his MRI sessions caused yet another medical staff member to classify his condition as a "non-emergency." (Pl.Exh. A, AHR dated July 5, 1992).

7    Plaintiff's conclusory allegations that it was the medical staff's policy to indicate that prisoners were not in distress when they were experiencing excruciating pain is simply preposterous. Plaintiff does not offer any evidence to support such a charge. Moreover, the record is replete with notes concerning plaintiff's medical treatment, from complaints of back pain to a tender writing finger. If defendant, or any of Greenhaven's medical staff, were intent on concealing plaintiff's true medical condition, they would not have made such a detailed record of his care.

8    Plaintiff argues that because defendant admitted she was assigned to the SHU during the spring and summer of 1992, she must have seen him on May 9 and wilfully opted not to complete an AHR. Plaintiff's argument is untenable. The uncontroverted record shows that many medical staff attended to the needs of the SHU inmates. In fact, plaintiff himself was seen by numerous medical staff over a period of a few weeks. Furthermore, if defendant wanted to conceal her allegedly poor treatment of plaintiff, she would not have completed the other three AHRs.

9    Plaintiff denies making these statements to Zemkin. Whether plaintiff actually harassed Zemkin in this manner, however, is not a material fact with respect to *defendant's* participation in the disciplinary report that would preclude summary judgment.

10   I do not need to determine whether the disciplinary hearing with respect to the July 4, 1992 incident was infirm since plaintiff does not allege that his procedural due process rights were violated by that hearing.

## All Citations

Not Reported in F.Supp., 1995 WL 444352

---

**Freeman v. Lundrigan, Not Reported in F.Supp. (1996)**

1996 WL 481534

1996 WL 481534
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Millicient FREEMAN, Plaintiff,

v.

Kevin LUNDRIGAN, C.O., Defendant.

No. 96–CV–1190 (RSP/RWS).
|
Aug. 22, 1996.

**Attorneys and Law Firms**

Millicient Freeman, Oriskany, NY, Pro se.

McLane and Smith, L.L.P., Utica, NY (Steven A. Smith, of counsel), for Defendant.

ORDER

POOLER, District Judge.

**\*1** By Order dated February 5, 1996 ("Order"), I approved the Order and Report–Recommendation of Magistrate Judge Ralph W. Smith, Jr., dated October 5, 1995, and dismissed this action as against Daniel Middaugh, Michael Durant, Todd Egger, Robert Stanton and Daryl Bourant. *See* Dkt. No. 11.

A copy of the Order was served on Freeman at her last known address by regular mail on February 6, 1996. On February 12, 1996, the Order was returned to the Court marked "No Longer at This Facility—Please Return to Sender." *See* Dkt. No. 12.

On June 19, 1996, Steven A. Smith, Esq., attorney for the defendant, filed an affidavit with the Court stating that he had attempted to serve a first set of interrogatories on Freeman at the address listed on the summons, and that it was returned to him by the Post Office marked "RTS" or return to sender. *See* Dkt. No. 14.

Rule 41(b) of the Federal Rules of Civil Procedure provides that a court may, in its discretion, dismiss an action based upon the failure of a plaintiff to prosecute an action or comply with any order of the court. *Link v. Wabash Railroad County Independent School District,*

370 U.S. 626 (1962). This power to dismiss an action may be exercised when necessary to achieve orderly and expeditious disposition of cases. *See Rodriguez v. Walsh,* No. 92–Civ–3398, 1994 WL 9688, \*1 (S.D.N.Y. Jan. 14, 1994) (citations omitted).

Additionally, this Court specifically cautioned Freeman that her failure "to promptly notify the Clerk's Office of any change in her address ... [would] result in the dismissal of the instant action." *See* Dkt. No. 3 at 7.

Moreover, a plaintiff has the duty to inform the Court of any address changes. As I have stated:

> It is neither feasible nor legally required that the clerks of the district courts undertake independently to maintain current addresses on all parties to pending actions. It is incumbent upon litigants to inform the clerk of address changes, for it is manifest that communications between the clerk and the parties or their counsel will be conducted principally by mail. In addition to keeping the clerk informed of any change of address, parties are obliged to make timely status inquiries. Address changes normally would be reflected by those inquiries if made in writing.

*Dansby v. Albany Cty Corr. Facility,* No. 95–CV–1525, 1996 WL 172699, \*1 (N.D.N.Y. Apr. 10, 1996) (Pooler, J.) (quoting *Perkins v. King,* No. 84–3310, slip op. at 4 (5th Cir. May 19, 1985) (other citations omitted)); *see generally* Rule 41.2(b) of the Local Rules of Practice for the Northern District of New York.

This matter cannot proceed without notification to the Court by Freeman of her current address. Therefore, it is hereby:

ORDERED, that this action is dismissed, *See* Rule 41.2(b) of the Local Rules of Practice for the Northern District of New York, and it is further;

ORDERED, that the Clerk serve a copy of this Order on Freeman by regular mail at her last known address and on Steven A. Smith, Esq., attorney for the defendant.

**Freeman v. Lundrigan, Not Reported in F.Supp. (1996)**

1996 WL 481534

**\*2** IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1996 WL 481534

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 2205816
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Wattie FOLK, Plaintiff,

v.

P. RADEMACHER, et al., Defendants.

No. 00-CV-199S.
|
Sept. 9, 2005.

**Attorneys and Law Firms**

Wattie Folk, Great Meadow Corr. Facility, Comstock, NY, pro se.

William Lonergan, New York State Attorney General's Office, Stephen F. Gawlik, Assistant Attorney General, Buffalo, NY, for Defendants.


DECISION AND ORDER

SKRETNY, J.

I. INTRODUCTION

**\*1** Plaintiff commenced this action under 42 U.S.C. § 1983 on March 3, 2000, by filing a Complaint in the United States District Court for the Western District of New York. Presently before this Court is a Motion to Dismiss filed by the remaining defendants in this case-P. Rademacher, Sgt. Stachewiez, Lt. Hendel, W.Kelley, Hartman, Fleming, Booker, Piasa and Sgt. Baker ("Defendants")-on September 2, 2004. Defendants bring their motion pursuant to Rules 41(b) and 37(b) of the Federal Rules of Civil Procedure. This is the third motion filed by Defendants on these grounds. For the reasons stated below, Defendants' motion is granted and this case is dismissed with prejudice.


II. BACKGROUND

This motion arises from a discovery ruling issued by the Honorable Hugh B. Scott, United States Magistrate Judge. On October 15, 2002, Defendants filed a Motion

to Compel Plaintiff to respond to their First Set of Interrogatories because Plaintiff's initial response had been inadequate. On May 27, 2003, Judge Scott granted Defendants' Motion to Compel and directed Plaintiff to file appropriate interrogatory responses within twenty days. Despite being granted an extension of time in which to respond, Plaintiff failed to file his interrogatory response. As a result, on August 19, 2003, Defendants filed a Motion to Dismiss pursuant to Rules 41(b) and 37(b) of the Federal Rules of Civil Procedure.

On November 5, 2003, this Court denied Defendants' Motion to Dismiss after Plaintiff satisfactorily explained the reason he failed to comply with Judge Scott's Order. This Court granted Plaintiff an additional thirty days within which to file his response to Defendants' First Set of Interrogatories. Plaintiff filed and served his response to Defendants' First Set of Interrogatories on November 21, 2003. This response, however, was simply a photocopy of the response Plaintiff initially filed on August 29, 2002, the one Judge Scott found to be inadequate.

Consequently, Defendants filed a second Motion to Dismiss on December 19, 2003. Plaintiff filed a response in opposition. Therein, Plaintiff did not deny that he simply re-filed his initial interrogatory response. Rather, he argued that Judge Scott did not have dispositive jurisdiction, and therefore lacked the proper authority to find his initial interrogatory response inadequate. Further, Plaintiff argued that he did not fail to respond as Defendants alleged because he did indeed file a response.

On May 24, 2004, this Court denied Defendants' Second Motion to Dismiss. In doing so, however, this Court rejected Plaintiff's arguments and excuses for not complying with Judge Scott's Order. Nonetheless, because Plaintiff is proceeding *pro se,* this Court determined that granting the relief Defendants requested would be too drastic a measure at that stage of the litigation. *See Bobal v. Rensselaer Polytechnic Inst.,* 916 F.2d 759, 764 (2d Cir.1990) ( "dismissal with prejudice [under Rule 37] is a harsh remedy to be used only in extreme situations ...."). This Court warned Plaintiff that his lawsuit may be dismissed with prejudice if he did not file and serve appropriate responses to Defendants' First Set of Interrogatories within thirty days. *Cf. id.* at 764 (discussing that a court may dismiss an action brought by a *pro se* plaintiff if such plaintiff has been advised by

the court that further non-compliance with a court order could result in dismissal of the case with prejudice).

**\*2** On June 17, 2004, Plaintiff filed a Motion to Extend the thirty-day response deadline. By Order filed July 7, 2004, this Court directed Defendants to provide Plaintiff with another copy of their First Set of Interrogatories, extended Plaintiff's deadline to respond to August 30, 2004, and warned Plaintiff that this was his final extension of time and that his failure to respond could result in his case being dismissed with prejudice. On August 13, 2004, Plaintiff filed his response to Defendants' First Set of Interrogatories.

On September 2, 2004, Defendants filed their instant Third Motion to Dismiss pursuant to Rules 41(b) and 37(b) of the Federal Rules of Civil Procedure. By Order filed October 7, 2004, this Court directed Plaintiff to file a response to Defendants' motion on or before October 29, 2004. On October 29, 2004, Plaintiff filed a Motion for Extension of Time to respond. By Order filed November 4, 2004, this Court extended Plaintiff's response deadline to November 29, 2004, and warned Plaintiff that his failure to file a response could lead to Defendants' motion being granted as uncontested. To date, Plaintiff has not filed a response to Defendants' motion.

## III. DISCUSSION

A. Dismissal under Rule 41(b) For Failure to Prosecute
This case first warrants dismissal based on Plaintiff's failure to prosecute, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, which provides that:

> [f]or failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant. Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

FED. R. CIV. P. 41(b).

Rule 41(b) does not define what constitutes failure to prosecute. However, the Second Circuit has stated that failure to prosecute "can evidence itself either in an action lying dormant with no significant activity to move it or in a pattern of dilatory tactics." *Lyell Theatre Corp. v. Loews Corp.,* 682 F.2d 37, 42 (2d Cir.1982). Dismissal pursuant to Rule 41(b) falls within the court's discretion. *See id. at 42-43* ("the scope of review of an order of dismissal is confined solely to whether the trial court has exercised its inherent power to manage its affairs within the permissible range of its discretion"). It is, however, "a harsh remedy to be utilized only in extreme situations." *Harding v. Fed. Reserve Bank,* 707 F.2d 46, 50 (2d Cir.1983) (quoting *Theilmann v. Rutland Hosp., Inc.,* 455 F.2d 853, 855 (2d Cir.1972) (per curiam); *see also Chira v. Lockheed Aircraft Corp.,* 634 F.2d 664, 665 (2d Cir.1980) (discussing the sanction of dismissal for failure to prosecute as "pungent, rarely used, and conclusive"). This is particularly true in cases involving *pro se* litigants, where dismissal for failure to prosecute should only be granted "when the circumstances are sufficiently extreme." *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996) (citing *Nita v. Connecticut Dep't of Envtl. Prot.,* 16 F.3d 482, 487 (2d Cir.1994)).

**\*3** The following factors, none of which is dispositive, must be considered in determining whether dismissal for failure to prosecute is warranted: (1) the duration of the plaintiff's failures, (2) whether the plaintiff received notice that further delays would result in dismissal, (3) whether the defendant is likely to be prejudiced by further delay, (4) whether an appropriate balance has been struck between alleviating the court's calendar congestion and protecting the litigants' due process rights, and (5) whether lesser sanctions would be appropriate. *See United States ex rel. Drake v. Norden Sys., Inc.,* 375 F.3d 248, 255 (2d Cir.2004); *Nita,* 16 F.3d at 485; *Feurtado v. City of New York,* 225 F.R.D. 474, 477 (S.D.N.Y.2004) (quoting *Jackson v. City of New York,* 22 F.3d 71, 74 (2d Cir.1994)). In the present case, these factors weigh in favor of dismissal.

### 1. Duration of Failures

The relevant inquiry on this factor is twofold: (1) whether the plaintiff is at fault for failing to prosecute, and (2) whether the plaintiff's failures were of significant duration. *See Norden Sys.,* 375 F.3d at 255.

In this case, Plaintiff has failed in two ways. First, as noted above, Plaintiff has failed to respond to Defendants' Third Motion to Dismiss, despite twice being directed by this Court to do so. Second, and more significant, Plaintiff has failed to adequately comply with Judge Scott's discovery Order of May 27, 2003. Plaintiff has been afforded numerous opportunities to file an appropriate response to Defendants' First Set of Interrogatories. This Court alone has twice extended Plaintiff the benefit of the doubt by denying two Motions to Dismiss for Plaintiff's failure to engage in discovery. While Plaintiff did, in fact, file a response to Defendants' First Set of Interrogatories on August 13, 2004, his response is wholly inadequate. Plaintiff's response contains multiple objections to Defendants' basic interrogatory requests and does not provide anything by way of meaningful discovery. In fact, no useful information whatsoever is contained in Plaintiff's response. Clearly, Plaintiff alone is responsible for repeatedly filing inadequate responses to Defendants' discovery request. As a result, Defendants still have not received any meaningful response to their interrogatory requests.

With respect to the second inquiry, which concerns the duration of Plaintiff's failures, it has been almost one year that Plaintiff has failed to file a response to Defendants' Third Motion to Dismiss. The delay caused by Plaintiff's failure to response to Defendants' interrogatory request is even more significant. Defendants filed and served their First Set of Interrogatories on August 17, 2001. It has thus been more than *four years* and Plaintiff still has not filed an adequate response. This is a failure of significant duration. *Cf. Chira,* 634 F.2d at 666-67 (delay of six months sufficient to warrant dismissal for failure to prosecute); *Antonios A. Alevizopoulos & Assoc., Inc. v. Comcast Int'l Holdings, Inc.,* No. 99 Civ. 9311, 2000 WL 1677984, at *2 (S.D.N.Y. Nov.8, 2000) (delay of four months warranted dismissal). Thus, this Court finds that this factor weighs in favor of dismissal. In this Court's view, all delay in this case is attributable to Plaintiff and it is of significant duration.

### 2. Notice of Dismissal

**\*4** The Second Circuit requires that the plaintiff receive adequate notice that the case could be dismissed due to inaction. *See Martens v. Thomann,* 273 F.3d 159, 180-81 (2d Cir.2001). In the present case, Plaintiff had adequate notice. First, both the initial Scheduling Order

on Defendants' Third Motion to Dismiss and the Order granting Plaintiff's request for an extension of time warned Plaintiff that his failure to file a response as directed could lead to Defendants' motion being granted as uncontested. Second, this Court's Decision and Order denying Defendants' First Motion to Dismiss explicitly stated that Defendants were free to seek dismissal of Plaintiff's Complaint if he failed to respond to the First Set of Interrogatories as directed. Moreover, this Court's Decision and Order denying Defendants' Second Motion to Dismiss warned Plaintiff that his failure to file appropriate responses to Defendants' First Set of Interrogatories could result in this action being dismissed with prejudice. Because Plaintiff was repeatedly put on notice that his case could be dismissed due to his continued inaction, this factor strongly weighs in favor of dismissal. *See Lyell Theatre,* 682 F.2d at 42-43 (Rule 41(b) dismissal upheld where plaintiff was warned by opposing counsel and the court that dismissal for failure to prosecute was possible).

### 3. Prejudice to Defendants

The third factor requires an inquiry into whether the defendant has been prejudiced by the plaintiff's inaction. "Prejudice to defendants resulting from unreasonable delay may be presumed, but in cases where delay is more moderate or excusable, the need to show actual prejudice is proportionately greater." *Lyell Theatre,* 682 F.2d at 43 (citations omitted). In *Lyell Theatre,* the court presumed prejudice where the plaintiff on numerous occasions failed to file documents as directed by the court. *Id.* at 39-40, 43. Similar to the present case, the plaintiff in *Lyell Theatre* continued to ignore the court's orders even after he had been warned that he was risking dismissal. *Id.* at 39. Under *Lyell Theatre,* the prejudice to Defendants in this case may be presumed. Thus, this factor weighs in favor of dismissal.

### 4. Balance between Calendar Congestion and Due Process Rights

The fourth factor requires the court to consider the balance between calendar congestion and the plaintiff's right to present his or her case. *See Norden Sys.,* 375 F.3d at 257. In this regard, " 'a court must not let its zeal for a tidy calendar overcome its duty to justice.' " *Feurtado,* 225 F.R.D. at 480 (quoting *Davis v. United Fruit Co.,* 402 F.2d 328, 331 (2d Cir.1968)). Plaintiff's failure to comply with Judge Scott's discovery order has resulted in this Court

having to prepare and file numerous scheduling orders, as well as decide three separate motions to dismiss. While this has been a needless expenditure of judicial resources, this Court cannot conclude that the overall effect on docket congestion has been significant.

**\*5** This Court notes, however, that Plaintiff has been afforded Due Process rights in that he has been provided numerous opportunities to comply with the Orders of this Court. Thus, Plaintiff's own failure to litigate this matter is not a denial of Due Process. *See Dodson v. Runyon,* 957 F.Supp. 465, 470 (S.D.N.Y.1997) ("any claim that plaintiff's due process rights were violated thus cannot prevail because the delay and resultant dismissal of plaintiff's case are of his own making"); *cf. Feurtado,* 225 F.R.D. at 480 (repeated failure to comply with court orders diminishes a plaintiff's right to present his claims). Accordingly, this factor also weighs in favor of dismissal.

### 5. Consideration of Lesser Sanctions

Finally, the Second Circuit requires district courts to consider whether lesser sanctions would sufficiently remedy any prejudice resulting from the plaintiff's inaction. *See Norden Sys.,* 375 F.3d at 257. Upon reviewing the entire record in this case, it is the opinion of this Court that Plaintiff has no intention of complying with this Court's Orders or properly litigating this case. Plaintiff has repeatedly ignored court orders by failing to file a response to Defendants' Third Motion to Dismiss and to Defendants' First Set of Interrogatories. Given the procedural history of this case, this Court finds that any sanction short of dismissal would be ineffective. *See Smith v. Human Res. Admin. of New York City,* 2000 WL 307367, at \*3 (S.D.N.Y. Mar.24, 2000) (finding lesser sanctions inappropriate where past court orders did not motivate the plaintiff to move the case forward); *Alevizopoulos,* 2000 WL 1677984, at 4 (finding lesser sanctions inappropriate based on repeated failures to comply with court orders). Thus, this final factor also weighs in favor of dismissal.

Accordingly, this Court finds that dismissal of this case is warranted under Rule 41(b) for Plaintiff's failure to prosecute.

### B. Dismissal under Rule 37(b) For Failure to Comply with Discovery Orders

"A district court may impose sanctions when 'a party ... fails to obey an order to provide or permit discovery.' " *Burns v. Imagine Films Entm't, Inc.,* 164 F.R.D. 594, 598 (W.D.N.Y.1996) (quoting FED. R. CIV. P. 37(b)). Rule 37 of the Federal Rules of Civil Procedure, which concerns the discovery obligations of civil litigants, vests district courts with "broad power" and discretion to impose sanctions, including dismissal, on parties who fail to adhere to discovery orders. *See Friends of Animals, Inc. v. United States Surgical Corp.,* 131 F.3d 332, 334 (2d Cir.1997) (per curiam); *see also Jones v. J.C. Penney's Dep't Stores, Inc.,* 228 F.R.D. 190, 195 (W.D.N.Y.2005) (identifying dismissal of the action as an available sanction under Rule 37); *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,* No. 03 Civ. 5562, 2005 WL 1958361, at \*9 (S.D.N.Y. Aug. 16, 2005).

**\*6** While Rule 37 dismissal is a drastic remedy to be reserved only for extreme circumstances, it "is warranted ... where a party fails to comply with the court's discovery orders willfully, in bad faith, or through fault." *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.,* 845 F.2d 1172, 1176 (2d Cir.1988) (and cases cited therein); *see also Societe Int'l v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958) (sanctions under Rule 37 justified where responding party has control over information requested and fails or refuses production without showing of inability to comply with court's order). Moreover, "dismissal with prejudice may be imposed even against a plaintiff who is proceeding pro se, so long as a warning has been given that noncompliance can result in dismissal." *Valentine v. Museum of Modern Art,* 29 F.3d 47, 50 (2d Cir.1994) (per curiam).

For all of the reasons discussed above, this Court finds that dismissal of this case is also proper under Rule 37(b) for Plaintiff's failure to comply with discovery orders.

### IV. CONCLUSION

Mindful of the fact that *pro se* cases should not easily be dismissed for procedural deficiencies, this Court concludes that Plaintiff's failures in this case go beyond procedural deficiencies, and constitute actual neglect. Plaintiff has failed to diligently prosecute this action in any manner, and has failed to comply with orders of this Court. As such, because each of the factors relevant to the

Rule 41(b) and Rule 37(b) analysis favor dismissal, this Court will dismiss this case with prejudice.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Third Motion to Dismiss (Docket No. 145) is GRANTED.

FURTHER, that this case is dismissed with prejudice pursuant to Rules 41(b) and 37(b) of the Federal Rules of Civil Procedure.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2205816

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Keitt v. Doe, W.D.N.Y., December 5, 2013

2008 WL 1758644

United States District Court,

S.D. New York.

John NOLAN, Plaintiff,

v.

PRIMAGENCY, INC. et al., Defendants.

No. 07 Civ. 134(RJS).

|

April 16, 2008.

*MEMORANDUM AND ORDER*

RICHARD J. SULLIVAN, District Judge.

**\*1** On January 31, 2008, this Court issued an Order to Show Cause (the "OSC") *sua sponte,* directing counsel for plaintiff John Nolan, Mr. Louis A. Piccone, Esq., and counsel for defendants Primagency, Inc., Steven Lebetkin, and Conrad J. Isoldi ("Defendants"), Mr. Neil R. Flaum, Esq., to show cause why this case should not be dismissed and/or why sanctions and a finding of civil contempt on Mr. Piccone and/or Mr. Flaum should not issue given the failure of plaintiff to diligently prosecute this case, and the failure of the parties to follow Court orders. After counsel for plaintiff failed to appear on the return date of the OSC, the Court issued an order on March 3, 2008 imposing sanctions on the parties, but declining to dismiss the case, provided that the parties complied with the directives contained in that order. *See Nolan v. Primagency, Inc.,* No. 07 Civ. 134(RJS), 2008 WL 650387 (S .D.N.Y. Mar. 3, 2008) ("*Nolan I*"). Plaintiff failed to comply with that order in each and every respect. Accordingly, pursuant to Federal Rule of Civil Procedure 41(b), this action is dismissed with prejudice.

### I. BACKGROUND

The Court presumes the parties' familiarity with the facts relevant to this Order, which are recounted in detail in the OSC, as well as prior orders and transcripts in this matter, including *Nolan I.* However, certain facts post-date those orders and are recounted here.

The Court in *Nolan I* imposed civil contempt sanctions on Mr. Piccone and Mr. Flaum, in the amounts of $750.00 and $200.00, respectively. *See Nolan I* at \*1-4. *Nolan I* also included the following directives:

> Additionally, Mr. Piccone has until March 17, 2008, to comply with the Court's November 1, 2008 and January 3, 2008 orders. This means that by March 17, 2008, Mr. Piccone must (1) properly file the Amended Complaint via the Court's electronic case system ("ECF"); (2) submit a courtesy copy of the Amended Complaint to chambers in accordance with the Individual Practices of the undersigned; (3) confer with Defendants' counsel, Mr. Flaum, regarding a joint proposed Case Management Plan; (4) submit a proposed Plan to the Court by hand delivery, email, or regular mail, provided that it reaches chambers by March 17, 2008; and (5) submit a joint status letter, along with Mr. Flaum, outlining what, if anything, has transpired in this case since the November 1, 2007 conference. Mr. Piccone is also directed to forward a copy of this order to his client, plaintiff John Nolan and file proof of service electronically with the Court .... ***Failure to comply with this Order in any respect shall result in dismissal of this case pursuant to Rule 41(b) of the Federal Rules of Civil Procedure.***

*Nolan I,* 2008 WL 650387 at \*3 (emphasis added). With regard to Mr. Flaum, *Nolan I* contained the following directives:

> In addition, Mr. Flaum is given a limited amount of time in which to comply with past orders. This means that Mr. Flaum must (1) properly file an answer to the Amended Complaint via the Court's ECF system by April 7,

2008, assuming, of course, that the Amended Complaint has been filed as of March 17, 2008; (2) submit a courtesy copy of the Answer to chambers in accordance with the Individual Practices of the undersigned; (3) confer with Plaintiff's counsel, Mr. Piccone, regarding a joint proposed Case Management Plan; (4) submit a proposed Plan to the Court by hand delivery, email, or regular mail, provided that it reaches chambers by March 17, 2008; and (5) submit a joint status letter, along with Mr. Piccone, no later than March 17, 2008, outlining what, if anything, has transpired in this case since the November 1, 2007 conference. If for some reason a joint letter is not possible, Mr. Flaum shall submit a status letter to the Court by March 17, 2008 explaining why the submission of a joint letter was not possible. Additionally, Mr. Flaum shall be present at the conference on Tuesday, April 8, 2008 at 10:30 a.m., and is also directed to forward a copy of this Order to his clients and file proof of service electronically with the Court. Failure to strictly comply with this order shall result in further sanctions.

**\*2** *Id.* at \*4. The Court in *Nolan I* stated three separate times that the case would be dismissed if plaintiff failed to comply with any of these directives. *Id.* at \*1-5.

Incredibly, as of April 8, 2008, as noted in the record on that day's conference, **the parties collectively had failed to comply with even one of the directives contained in *Nolan I.*** (*See* Apr. 8 Tr. at 3.) Mr. Piccone admitted on the record that he had not complied with any of the directives in *Nolan I,* and that his failure to comply with *Nolan I* was due to personal issues that the Court does not recount here but are referenced, at least in part, in the transcript of the April 8, 2008 telephone conference. [1] (*See id.* at 3-4.) Mr. Flaum noted that although he had also "missed the boat" (*id.* at 8), he sent in payment of the $200.00 sanction

on April 7, 2008 and filed the status letter that day (*see id.*), 21 days after the deadline contained in *Nolan I.* [2] It is unclear whether Mr. Flaum ever forwarded a copy of *Nolan I* to his clients as directed, but it is certainly clear from the docket sheet in this case that Mr. Flaum failed to file the required proof of service. *See Nolan I,* 2008 WL 650387, at \*4.

1  Mr. Piccone asserted on the record at the April 8, 2008 conference that he had in fact filed the amended complaint in November, 2007, and that he could submit proof demonstrating this fact. (*See* Transcript of April 8, 2008 Conference ("Apr. 8 Tr.") at 5-7.) While it may be true that Mr. Piccone did technically file a hard copy of the amended complaint in this matter, the amended complaint was never *properly* filed on ECF, because he never emailed the amended complaint to case_openings@nysd . uscourts.gov, pursuant to ECF procedure. As a result of his failure to do so, the amended complaint is not available on ECF. This is exactly what the Court sought to ameliorate when it ordered Mr. Piccone to "properly file" the amended complaint on ECF. *See Nolan I,* 2008 WL 650387, at \*3. In any event, regardless of the extent of Mr. Piccone's non-compliance with this portion of *Nolan I,* this dismissal is based on plaintiff's counsel's failure to follow numerous other directives, as outlined in this and prior orders.

2  A letter from Mr. Flaum addressed to the Court and dated April 7, 2008 was received in Chambers on April 9, 2008, and contained a check payable to the Clerk of the Court in the amount of $200.00. That check was tendered to the cashier in the Clerk's office on April 9, 2008.

## II. DISCUSSION

A. Legal Standard for Dismissal Pursuant to Rule 41(b)

Rule 41(b) expressly authorizes involuntarily dismissal "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order." Fed.R.Civ.P. 41(b); *see also LeSane v. Hall's Sec. Analyst, Inc.,* 239 F.3d 206, 209 (2d Cir.2001). The "primary rationale" for dismissal pursuant to Rule 41(b) is "the failure of plaintiff in his duty to process his case diligently." *Lyell Theatre Corp. v. Loews Corp.,* 682 F.2d 37, 43 (2d Cir.1982). Dismissal pursuant to Rule 41(b) is committed to the discretion of the district court, and may be imposed *sua sponte. See Link v. Wabash*

*Railroad Co.,* 370 U.S. 626, 633 (1962); *LeSane,* 239 F.3d at 209. Rule 41(b) provides that such a dismissal "operates as an adjudication on the merits" unless the dismissal order states otherwise. *See Lyell Theatre,* 682 F.2d at 42-43.

Dismissal is an extreme and "harsh" remedy only to be imposed in the most "extreme" situations, and the Court must consider the entire record in deciding whether dismissal is appropriate. *See Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996); *Minnette v. Time Warner,* 997 F.2d 1023, 1027 (2d Cir.1993). However, in appropriate cases, dismissal must be available, "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 643 (1976). While dismissal based on the actions of a party's attorney may have serious consequences for the represented party, the Supreme Court has recognized that "[t]here is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client." *Link,* 370 U.S. at 633.

**\*3** The Second Circuit has instructed that a district court weighing dismissal of a case pursuant to Rule 41(b) should employ a balancing test, considering the following factors:

> (1) the duration of the plaintiff's failure to comply with the court order, (2) whether plaintiff was on notice that failure to comply would result in dismissal, (3) whether the defendants are likely to be prejudiced by further delay in the proceedings, (4) a balancing of the court's interest in managing its docket with the plaintiffs interest in receiving a fair chance to be heard, and (5) whether the judge has adequately considered a sanction less drastic than dismissal.

*Lucas,* 84 F.3d at 535 (2d Cir.1996); *see also United States* ex rel. *Drake v. Norden Sys., Inc.,* 375 F.3d 248, 254 (2d Cir.2004). Generally, no one factor is dispositive. *Shannon v. Gen. Elec. Co.,* 186 F.3d 186, 194 (2d Cir.1999) (citing *Nita v. Conn. Dep't of Envtl. Prot.,* 16 F.3d 482, 485 (2d Cir.1994)).

## B. Analysis

Weighing all of the above factors, the Court dismisses this case with prejudice pursuant to Rule 41(b).

### 1. Duration

The first element of the balancing test, the duration of plaintiffs failures, requires that the court consider "(1) whether the failures to prosecute were those of the plaintiff; and (2) whether these failures were of significant duration." *Martens v. Thomann,* 273 F.3d 159, 180 (2d Cir.2001) (citing *Spencer v. Doe,* 139 F.3d 107, 113 (2d Cir.1998)); *see also United States* ex rel. *Drake,* 375 F.3d at 255). The court must also consider whether any of the delays are attributable to the defendant. *See Jackson v. City of New York,* 22 F.3d 71, 75 (2d Cir.1994).

Here, while the various failures to follow court orders can be attributed to both parties, plaintiff is primarily to blame for the fact that this case has not advanced in more than six months. *See Nolan I,* 2008 WL 650387, at \*5. This period of delay is particularly significant given that, during that time, the action did not merely lie dormant, but the parties ignored and disobeyed multiple court orders designed to move the case along. The six-month period at issue here thus is of sufficient duration to weigh in favor of dismissal. *See Lyell Theatre Corp.,* 682 F.2d at 42-43 (noting that Rule 41 dismissal may be warranted "after merely a matter of months").

### 2. Notice

The second element to be considered is whether the plaintiff was on notice that further delay would result in dismissal of the case. *See Lucas,* 84 F.3d at 535 (2d Cir.1996). The Second Circuit has held that where a court puts a plaintiff on notice that the court is considering dismissal, and a plaintiff fails to file a document explaining the failures and outlining why the action should not be dismissed, this element has been met. *See Shannon,* 186 F .3d at 194-95.

The notice element strongly weighs in favor of dismissal of this case. Plaintiff was given notice of the Court's intent to dismiss the action in *Nolan I,* which stated *three times*

that the action would be dismissed in the event of the plaintiffs failure to comply with its directives. *See Nolan I,* 2008 WL 650387, at *1-5. In addition, the OSC gave both parties an opportunity to submit papers and to appear in Court to contest dismissal. Plaintiff failed to submit papers in response to the OSC, or to appear on the return date, and failed to follow even one of the directives in *Nolan I.* Furthermore, the parties had previously been warned that the Court would consider sanctioning the parties for failure to comply with Court orders. (*See* Jan. 2, 2008 Order.) Finally, plaintiff himself appeared at the January 30, 2008 conference before the Court, and was informed of the Court's intention to issue the OSC and consider dismissing the case absent further action. (*See* Jan. 30, 2008 Tr. at 3-5.) Thus, because it is abundantly clear that the Court gave plaintiff notice of the impending dismissal of the case, the second element weighs in favor of dismissal.

### 3. Prejudice

**\*4** The third element requires that the Court consider the prejudice of further delay to the defendant. *See Lucas,* 84 F.3d at 535 (2d Cir.1996). Where the delay is unreasonable, prejudice may be presumed as a matter of law. *Shannon,* 186 F.3d at 195 (citing *Lyell Theatre,* 682 F.2d at 43). This is generally because "delay by one party increases the likelihood that evidence in support of the other party's position will be lost and that discovery and trial will be made more difficult." *Id.* However, "in cases where delay is more moderate or excusable, the need to show actual prejudice is proportionally greater." *Lyell Theatre,* 682 F.2d at 43. "Although a court cannot deny a plaintiff the right to be heard in the interest of avoiding docket congestion, where a plaintiff could have avoided dismissal 'there can be no claim by plaintiff that [its] due process rights have been denied.' " *Jacobs v. County of Westchester,* No. 99 Civ. 4976(WCC), 2008 WL 199469, at *6 (S.D.N.Y. Jan. 22, 2008) (quoting *Europacific Asset Mgmt. Corp. v. Tradescape Corp.,* 233 F.R.D. 344, 354 (S.D.N.Y.2005) (alteration in original)).

Defendants' counsel is to blame for at least some of the delay in this matter. Because of this, and because only six months have passed, the Court will not presume prejudice. While it is demonstrably unreasonable to fail to comply with court orders for six months, the unreasonable delay present in other cases in which courts presumed prejudice

is absent here. *See Shannon,* 186 F.3d at 195 (finding presumption of prejudice because events at issue in lawsuit had taken place over a decade earlier); *Peart v. City of New York,* 992 F.2d 458, 462 (2d Cir.1993) (citing potential for witness recollection to diminish or witness unavailability as the reason for a presumption of prejudice due to unreasonable delay); *Dodson,* 957 F.Supp. at 470 (S.D.N.Y.1997) (holding that dismissal was appropriate after a five-year delay because the court can presume that witnesses' "memories have faded" when eleven years have passed since the events giving rise to plaintiffs cause of action). Thus, the Court finds that the prejudice factor does not weigh in favor of dismissal.

### 4. Balancing the Court's and Plaintiff's Interests

With respect to the fourth element, the balancing of the court's interests and the plaintiff's right to a fair adjudication on the merits, the Second Circuit has instructed that "[t]here must be compelling evidence of an extreme effect on court congestion before a litigant's right to be heard is subrogated to the convenience of the court." *Lucas,* 84 F.3d at 535-36. As such, the plaintiff's failure to prosecute must be "vexatious and burdensome" on the Court's ability to manage its docket, as opposed to being merely "silent and unobtrusive." *LeSane,* 239 F.3d at 210.

Plaintiff's right to an opportunity to be heard is not taken lightly by this Court. However, this action has been pending for over a year, and there has been no significant progress of any kind for six months. During that time, this Court has issued six separate orders relating to the parties' various failures, and held three conferences relating to the parties' inability to advance the case. While the Court has less knowledge of what transpired prior to this action being reassigned to the undersigned on September 4, 2007, the parties' ongoing failure to comply with orders of this Court has taken up a grossly disproportionate amount of the Court's time since October, 2007. Plaintiff's duty to prosecute the case diligently "is designed to achieve 'fairness to other litigants, whether in the same case or merely in the same court as competitors for scarce judicial resources....' " *Dodson,* 957 F.Supp. at 470 (quoting *Chira v. Lockheed Aircraft Corp.,* 634 F.2d 664, 668 (2d Cir.1980)). As such, the Court finds that plaintiff's failures have been "vexatious and burdensome" and accordingly, the fourth element weighs in favor of dismissal.

5. Efficacy of Lesser Sanctions

**\*5** Finally, the fifth element looks to whether the Court has adequately considered remedies other than dismissal. "It is clear that a district judge should employ the remedy of dismissal 'only when he is sure of the impotence of lesser sanctions.' " *Dodson,* 86 F.3d at 39 (citing *Chira,* 634 F.2d at 665). "In deciding on the suitability of lesser sanctions, and whether the sanctions should be aimed primarily against the party or the attorney, it can be important for the district court to assess the relative roles of attorney and client in causing the delay...." *Id.* at 40. "[T]he more the delay was occasioned by the lawyer's disregard of his obligation toward his client, the more this factor argues in favor of a less drastic sanction imposed directly on the lawyer." *Id.* However, this Court must be guided by the Supreme Court's pronouncement that "[t]here is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Link,* 370 U.S. at 633-34.

Although it is without question that plaintiff's failures in this case are solely attributable to his counsel, Mr. Piccone, plaintiff himself was on notice of Mr. Piccone's shortcomings up to and including his failure to appear on January 30, 2008. Nevertheless, as of the April 8, 2008 telephone conference, Mr. Piccone was still the counsel of record in this matter. Plaintiff voluntarily chose Mr. Piccone to represent him in this action. Thus, while dismissal is an unfortunate result for plaintiff, it is not an unjust result. *See Link,* 370 U.S. at 633-34.

As to the consideration of lesser sanctions, this factor clearly weighs in favor of dismissal. As reflected in the record of this case, the Court has given plaintiff numerous opportunities to be heard in relation to his failure to follow court orders. Prior admonishments and warnings have been wholly ineffective. Indeed, the Court previously issued a civil contempt sanction against Mr. Piccone in the amount of $750.00 in order to induce his compliance with future orders. *See Nolan I,* 2008 WL 650387 at \*3. As of the date of this Order, that sanction has not been paid. Moreover, as noted above, counsel has not complied with

*any* of the directives contained in *Nolan I.* As such, and based on the record in this case, the Court is convinced that lesser sanctions will have no impact on plaintiff's, or his counsel's, conduct or compliance with this court's orders.

As four of the five elements favor dismissal under Rule 41(b), the Court finds that dismissal is appropriate, and this case is accordingly dismissed with prejudice pursuant to Rule 41(b). While the Court is sympathetic to the personal issues encountered by plaintiffs counsel over the past few months, as alluded to by Mr. Piccone during the April 8, 2008 telephone conference, that fact does not alleviate Mr. Piccone's duties to the Court and his client. A simple letter to the Court explaining his plight could have resulted in the extension of deadlines, a short stay of the action, or other relief, including obtaining new counsel for plaintiff. Mr. Piccone has made no showing that he was unable to contact the Court during the time that he was preoccupied with personal matters. The Court recognizes that dismissal of this case with prejudice may have the result of denying plaintiff any relief that he might have obtained on his claims. However, plaintiff is responsible for his choice of counsel, and did not choose at any point, even after being advised of Mr. Piccone's failures, to replace him as counsel. *See Lastra v. Weil, Gotshal & Manges LLP,* No. 03 Civ. 8756(RJH) (RLE), 2005 WL 551996, at \*4 (S.D.N.Y. Mar. 8, 2005) ("Claims by a litigant that he should be excused from his attorney's actions because of alleged fraudulent conduct and disobeyance of the litigant's orders may give rise to a claim for malpractice, but does not constitute an extraordinary circumstance or excusable neglect.")

### III. CONCLUSION

**\*6** For the foregoing reasons, this action is DISMISSED with prejudice pursuant to Rule 41(b). The Clerk of the Court is respectfully directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 1758644, 70 Fed.R.Serv.3d 397

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.